O27AABAZC                    Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

WILLIAM E. BAZZELLE, SR.,

                Plaintiff,

           v.                        23 CV 5146 (GHW)

NOVOCURE LIMITED ET AL.,

                Defendants.

------------------------------x
                                     New York, N.Y.
                                     February 7, 2024
                                     3:00 p.m.

Before:

                 HON. GREGORY H. WOODS,

                                     District Judge

                      APPEARANCES

ERIN BOARDMAN
     Attorney for Plaintiff Bazzelle

HILLE SHEPPARD
     Attorney for Defendant NovoCure

(Case called)

THE COURT:  Counsel, let's start with the substance of today's conference.  This is a premotion conference with respect to the proposed motion to dismiss, suggested by counsel for defendant.  I've looked at your respective letters.  I have a sense of results nature of argument that you expect to present court with respect to your motion still if either side would like to share more about the grounds for the anticipated motion or just let me know what the nature of your argument will be in response.  I am happy to give you the opportunity to do so now.  So, I'll start with counsel for defendants.

Counsel, would you like to tell me about the grounds of your proposed motion.

MS. SHEPPARD:  Thank you very much, your Honor.  Again, Hille Sheppard, for the defendants.

Defendants' motion to dismiss will focus heavily on the absence of any actionable misstatement in the complaint, as well as the complaint's failure to allege facts that give rise to a strong (inaudible) of scienter.  As you know, these are independent grounds for dismissal.

Let me start I providing a little context.  NovoCure is a global oncology company that develops a novel wearable device to treat cancer called "tumor treating fields".  The device has been approved to treat certain types of brain cancer and NovoCure is in the process of testing it in various other

cancers, including abdominal cancers and lung cancers.  This case pertains to one of NovoCure's clinical trials in lung cancer patients.  The trial which was called Lunar tested TT fields in patients in the second line which means that their first round of cancer treatment had failed.  The Lunar trial patients were divided into two control groups which were treated with either chemotherapy or amino-therapy plus the TT fields.  The Lunar trial concluded in late 2022 and NovoCure announced its top line results in early January 2023.  And those top line results were extremely promising and demonstrated with statistical significance that patients treated with TT fields lived longer than the patients in the control groups.  And for the group that was treated with immunotherapy, the TT fields extended life by nearly eight months.

When it announced its top line results, NovoCure also announced that it would provide full results at an upcoming medical conference and that is how clinical trial reporting works for a number of reasons, including because it allows the company time to conclude its review and analysis of the data.

When NovoCure announced the top line results its stock price shot up, but it started going down again very shortly thereafter.  Analysts raised questions about the commercial viability of the Lunar findings, one, because the standard of care in the United States had changed since the trial began,

shifting to prescribing immunotherapy in the first line of treatment.  And second, because the Lunar trial protocol did not require stratification for a biomarker called PD-L1 which helps predict a patient's receptiveness to certain immunotherapy.

In June 2023 NovoCure presented --

THE COURT:  What does "stratification" mean?

MS. SHEPPARD:  So, stratification is when you are dividing the people into which group they should be in.  You try and make sure that something is, you pay attention to that particular factor when you divide them.  So, for example, it could be something like age or sex.  You want to have the two groups be evenly divided by sex.  Here, you could divide them evenly by reference to this biomarker.  Here, they did not do that.  The trial people were divided evenly based on a random assignment.  But they did not know in advance what their PD-L1 biomarker status was.  For some of the people they didn't know at all.

THE COURT:  Thank you.

MS. SHEPPARD:  So, in June NovoCure presented the full trial results at a medical conference as it said it would do. Those disclosures were consistent with but more detailed than the top line results that had been announced in January and the stock price dropped after the medical conference which prompted this lawsuit.

So, plaintiff now claims that NovoCure's characterization of the Lunar trial in the period from January to June to 2023 were fraudulent.  The plaintiff does not challenge the accuracy of the top line results.  Essentially, plaintiff is saying that he wanted more information earlier.  And he also takes issue with the fact that NovoCure was enthusiastic about what it had achieved.

Plaintiff is asking it court to accept his judgments about science in place of NovoCure's judgments and he is attempting to challenge true statements about scientific results based on speculation about the commercial viability of TT fields for lung cancer after it's approved by the FDA and that's not fraud.

So, our brief will make the follow arguments:

First, we are going to argue that there is no actionable misstatement alleged in the complaint.  An abundance of case law from this circuit and others establishes that the types of statements that the plaintiff challenges do not state a claim for several reasons.

First, there is no duty of complete disclosure when announcing top line results.  It is entirely appropriate and not fraudulent for the trial details to follow at a medical conference.

Second, under the Second Circuit's decision in Kleinman, courts stay away from claims that attack clinical

trials designs because those are within the purview of the FDA and Courts are ill-equipped to evaluate questions of oncology.

Third, case law is clear that statements about clinical trials, which these indisputably were, are evaluated as opinion statements. And to challenge an opinion, the plaintiff must allege that the opinion was not honestly held or that the defendant's misstated an embedded fact in those opinions.

So, based on his premotion letter, plaintiff is not arguing that the opinions were not honestly held. Rather, his theory is apparently that the detailed results of the Lunar trial are an embedded fact. Our brief will make clear that there was nothing misleading about Lunar's top line results. Plaintiff does not even challenge the accuracy of those results. So, it is not clear how plaintiff could ever establish a basis for opinion liability on that theory.

Finally, there are other challenge statements in the complaint such as that the defendants hope to treat many, many more patients, which is true. These statements were general statements of cooperate optimism and the type of classic puffery that Courts do not entertain.

So, our second ground for dismissal is that the complaint also fails because it does not raise a cogent and compelling inference of fraudulent intent. In fact, the scienter allegations are remarkably here, as we explained in

our letter.  Usually, plaintiffs alleging securities fraud try to bolster their scienter allegations or something internal from the company.  And there is nothing like that alleged here. Aside from generalized allegations that do not meet the PSLRA's heightened pleading standards, all plaintiff really points to are stock sales by two of three individual defendants.  But those stock sales were not discretionary and do not establish scienter as a matter of law.

The complaint has no allegation that any defendant did not believe any statement about the Lunar trial.  And plaintiff points to nothing that casts doubt on the fact that defendants' generally believed appropriately that Lunar's results were important and meaningful.  At base plaintiff is trying to craft a narrative around a stock drop and that simply does not allege fraud.

THE COURT:  Thank you.  Can I tell from the face of the complaint that the sales went on discretionary?

MS. SHEPPARD:  Well, so the first -- the CEO on the very first day of the class period sold stock, and that was due to a 10b5-1 trading plan that was triggered.  I believe that is apparent from the face of the complaint.

The second defendant that sold stock was the company's chief financial officer.  She sold stock in order to pay taxes upon the exercise of options.  And that will be apparent from the SEC filings that were reported the trade, which you could

consider as part of the complaint.

THE COURT:  Thank you.  I'll hear from you on that.  I know I can consider what they say.  I don't know if I can accept what they say is true, but thank you.

Anything else counsel for defendant?

MS. SHEPPARD:  Not at this time.

Thank you, your Honor.

THE COURT:  Thank you.

Counsel for plaintiff, let me hear from you.  I've seen and heard the nature of the arguments that defendants expect to present.  What's your thought about how you would just be responding?

MS. BOARDMAN:  Thank you, your Honor.

Again, this is Erin Boardman speaking on behalf of the plaintiff.

So, your Honor, I think what is important to keep in mind in this case is that when defendants announced at the start of our five-month class period and on January 5th, they announced that the Lunar trial had met its primary endpoint. They didn't get into the actual numbers that were in the trial, but they said it had met its primary endpoint.  Then they went further and went on to repeatedly over these five months characterize the results of the trial as clinically meaningful. And with respect to the group of the trial that cohort said had received immune checkpoint inhibitors, they called those

O27AABAZC                    Conference

results profound.  Then they also made other more detailed statements.  Some of them were in response to investors' concerns about the PD-L1 biomarkers and other issues.

They called the trial Arms Well balanced.  They made specific statements which I set out in Paragraph 84 of the complaint, which I think provides a good example of the statements calling the trial Arms Well balanced dismissing investor concerns about PD-L1 status as a red herring.  They said there was nothing funky about the trial and then they repeatedly made the statements calling the results clinically meaningful.  Investors very, very optimistic in light of the statements the defendants made about the results.

When they came out with the trial data five months later in June, investors saw that their concerns were well-founded.  And basically, what happened here is that the Lunar trial suffered from a whole host of problems and missing data, and the problems were compounded one on top of the other.

So, as we set out in our letter, the trial was a trial in the second line of cancer treatment.  So patients had previously received a type of chemotherapy called "platinum chemotherapy".  And this is a graphic on the trial design in Paragraph Four of the complaint that I think is useful because it's a bit convoluted in terms of clinical trial design.  So, the cohort of trial that received immune checkpoint inhibitors, which are a type of cancer drug either received them alone or

together with tumor treating fields.  Then the other cohort of the trial received a chemotherapy drug called (inaudible) either alone or together with tumor treating fields.  And it's important that the dosage Paxil cohort did not meet statistical significance.  It was only the ICI cohort that met statistical significance when those (inaudible) were broken out.

So, what investors didn't know when the company announced the top line results was, first of all, the fact that PD-L1 scores were missing for almost half of the patients.  It was 45 percent of the patients.  PD-L1 is essentially a biomarker is that indicates how effective immuno checkpoint inhibitors will be.  So, because as defense counsel mentioned, the trial did not stratify her PD-L1 status, that means that that characteristic which could have compounded and skewed the result, was not in terms of the trial design necessarily, evenly distributed between the four groups in the trial.  So, that can create a problem because if patients with high PD-L1 scores would respond effectively were mostly in one group and a few of them in other group, that would skew the trial results.  This was a relatively small trial.  There were only 200 plus patients in the trial, which makes it all the more likely that imbalances like this could effect the trial results.

So analysts and investors were concerned about that.  And what defendants failed to tell investors when they made these statements and when analysts asked about it, was they

failed to say that these scores were missing for 45 percent of the patients.  What that means is that NovoCure could never show the results were not skewed by these imbalances.  So, that's one problem with the trial.

And the second undisclosed issue that undermined defendant's positive statement was the fact that 98 percent of the patients in the ICI cohort were receiving immune checkpoint inhibitors for the first time during the trial.  So, this could easily have accounted for the superior survival rates in that cohort because the patients were benefiting from the ICIs in proportion to their PD-L1 scores, rather than benefiting from the addition of the chemo treating field.

Then those problems were compounded by the fact that the chemotherapy cohort of the trial did not show a statistically significant benefit in the tumor treating field.  And that was compounded by the fact that the Lunar trials failed to credibly show benefits in any currently relevant patient population, that the standard of care had changed during the time that the trial -- It actually changed before the trial began.  But it had certainly changed by the time the results were announced, to be used by ICI as the first line of therapy, instead of just the second line therapy.

So, since the trial was in the second line, the fact that some of these patients were receiving ICIs for the first time impacted the trial.  And only about 30 percent of the

patients in the trial ended up satisfying the current standard of care for both the first line and the second line where patients received ICIs in the first line.  And then if their cancer worsens, they receive chemotherapy in the second line. So, about 30 percent of the patients satisfied the standard care.  But then those were patients who got Paxil during the trial and those patients didn't show a statistically significant benefit.  So, that's another huge problem Then while the ICI cohorts did show a benefit only two percent of the patients in that group had received ICIs as the first line treatment, which is now the current standard of care.

So, we have a whole punch of problems here.  And what these problems boil down to is the fact that the result of the trials were basically unreliable uninterpretable and could never be interpreted because of all of this missing data, and they were clinically meaningless.

Meanwhile defendants are making public statements to investments that are also meaningful and profound, which we submit was materially false and misleading in light of all these problems.  So, we're not critiquing the trial design. We're critiquing the fact that defendants chose to make these public statements when announcing the top line results and when responding to analysts and investors' concerns.

So, NovoCure is free to design as convoluted a trial as it wanted.  It was free not to stratify for this important

O27AABAZC                    Conference

biomarker of PD-L1 scores.  But what defendants were not free to do without committing securities fraud was to then talk about the results in a manner that was extremely false and misleading.  And that's what we allege here.

Defendants mentioned opinion statement.  Opinions are liable under OmniCare.  And I don't even think that most of the statements here are opinions.  But to the extent that some of them are opinions, their actionable under at least two of the basis in OmniCare.  The first is that they contain a false statement of embedded fact, which is that the trial actually showed what it purported to show because the trial did not orally show anything about the addition of tumor treating field.

And then the second basis that I think we satisfy, under OmniCare is that the statements of opinion to the extent there are any, the facts that would render them misleading to an ordinary investor.  And those are all of the admissions that I just went through.  So, even if these statements are opinion, they satisfy OmniCare.

And the third basis for opinions liability under OmniCare is that the defendants didn't believe their statement. Defendants don't say in their letter which basis they think they satisfy, and I think that they would satisfy at least two out of three and possibly all three to the extent that any of these statements are opinions.  Defendants allude to the fact

that it was known that the trial didn't stratify for PD-L1 scores. And also it was known that the standard of care had changed.

Now, that's true that these issues were knowable, and that's exactly why during the class period between the time that the top line results were announced and the trial data was released, analysts and investors were very concerned about these issues. Analysts issued reports that are set out in the complaint flagging these issues. Analysts asked about these issues during conference calls, and that is exactly why defendants' statements on these topics were materially misleading.

So, investigators didn't know that PD-L1 scores were missing for about half the patients. That is not something they would have expected because it was standard for doctors to collect this information from patients.

Also, investors might have been able to ascertain that the standard of care had changed. But what they wouldn't know was that given that the Lunar trial didn't show a result in any currently relevant patient population. And those factors together made defendants' positive statements extremely materially false and misleading.

Now, with respect to scienter, defendants may question the fact that defendants were enthusiastic and optimistic about the trial. But the standard for scienter based on recklessness

within the Second Circuit as your Honor knows it can be based on either recklessness or a motive and opportunity. Here, we have facts going to both.

The standard for recklessness is whether defendants knew or should have known that they were misrepresenting material facts related to the corporation. Now, it doesn't matter how defendants felt about the Lunar results. It matters that when they made these statements about the results they knew or should have known that they were misrepresenting the nature of the trial results.

So, we alleged that in Paragraph 47 of the complaint which stated the trial itself concluded in November 2022. The top line data was released in January 2023. So, that's a very short period of time. And the defendants make much of the fact that we point out exactly when they came in possession of the Lunar data. But it was, obviously, sometime during that very short period of time.

It sort of goes without saying that the defendants had the data when they announced the trial results. They wouldn't have announced the top line results without having the data. And they even acknowledged this, defendant Doyle, who was the chairman, stated that they were an analyzing the data. They were preparing the data. So, they obviously knew the trial data during the class period when they were making these statements about the trial data.

So, this is not a case where we need confidential witnesses to tell us that because it's obvious from the nature of what they're talking about and the nature of how clinical trials work and the very short time period here where they finished the trial and then announced the top line results. So, they clearly knew what they were talking about.  And even they didn't, if they somehow didn't know that 45 percent of patients didn't have PD-L1 scores, that the trial didn't show a benefit in any relevant population, even if they didn't somehow know that, that would have been willful blindness and that's just another form of recklessness.

So, not only have we pleaded recklessness but our allegations of scienter here are bolstered by the insider trading.  During just this five-month period, two of the three defendants sold a total of $35 million worth of stock.  Those sales are significant in their own right but they're unusual and suspicious when they are compared to these individuals' prior sale.  For example, the CDL sold $23 million worth of stock, which was more than a third of his holdings.  And he made all of these sales on the day that the of top line results were announced.  He hasn't made any stock sales since at least as of the filing of our complaint.  And before those sales, he hadn't sold any stock since April of 2021.

Now, his sales were (inaudible), but as we know briefly in our letter (inaudible), that's an affirmative

defense.  And the reason that it's an affirmative defense is because we don't know when the plan was adopted.  And the Second Circuit holds that when insider trading plans are adopted during a class period or while the defendant knows the plans do not provide a defense to insider trading.

So, here, we simply don't know when the plan was adopted.  We don't know if NovoCure times its announcement of Lunar results to when those sales were allowed under the plan. We simply don't know the facts at the pleading stage.  So, if the pleading stage gave this considered 10b5-1 plan is an affirmative defense and it doesn't excuse the insider trading.

Then we also have sales by the CFO, in addition to other insiders.  And whether the CFO sales were for tax liability, some courts hold that it doesn't matter because it's still money is money and we cite a case which holds that in our letter.  So, we simply don't know one way or the other whether that excuses the insider trading.  And I would submit that is a taxable issue.  So, these insider sales only add to the interest of scienter here.

Collectively, the inference the defendants knew or should have known that they were misrepresenting material facts when they we made these unqualified positive statements, it is compelling and plausible and we respectfully submit that we pleaded scienter.

And I think that covers all of the main basis of the

letter.  I can answer any additional questions.

THE COURT:  Thank you, counsel.

What I'd like to do now is just to turn to setting a briefing schedule for the motions.  I'd like to just say one thing about the structured briefing.

First, it's evident that the 25-page limit will not work from my perspective for a motion of this type, among other things.  I think that's the case because I believe that the briefing should respond to each of the allegedly false or misleading statements and I don't want to set a page limit that might encourage the parties to only brief these issues in a sort of categorical way without providing me with your views about the significant statements in the context of which it is made.

So, the first thing that I want to just say on this topic is that the page limit is too short and I'm going to invite the parties to let me know what you think is an appropriate age limit.  You can tell me that now or if you confer and just submit a letter at a later date and to let me know how long you think that the briefing should be.

The second part of this comment relates to the point that I mentioned earlier, namely, that I think I will benefit from seeing the parties in particular, the defendants' analysis of each of the statements in the context in which it was made. There may be an efficient way to do that.  You don't need to

include a lot of text in the brief itself.  I think that I should be looking at each of the statements in context, and as a result, I am going to solicit the parties about how best to present briefing to me that will articulate your respective views about the submissions of each of the statements that are asserted to me -- are misleading -- that I can evaluate them in turn.

So, with that, let me hear from each of the parties. I'll start with counsel for defendant.

MS. SHEPPARD:  Yes.  Thank you, your Honor.

We did confer with the plaintiffs about a request in advance for 45 pages on the opening brief, which I think will be long enough given your Honor's admonitions about each statement.  We have a 60-page complaint with more than a dozen distinct statements.  I think 45, and maybe I should be asking for 50.  They had responded and said no more than 35, which is definitely not enough space.  And then I would also suggest at least 25 for the reply.

THE COURT:  Thank you.

Counsel for plaintiff?

MS. BOARDMAN:  As defense alluded to, we had suggested 35, but I am sensitive to the fact that your Honor wants to make sure that the statements are fully briefed.  So, we don't take a position on defendant's request for 45 pages.

THE COURT:  I'm happy to grant that request.  And the

default page limit will be 45 pages for each of the motions and the opposition and 25 pages for the rely, and then if that's insufficient, please, feel free to write me.

I've also seen in this context counsel giving me something like a chart annex-ed that contains each of the statements as it appears in context with some kind of annotation that describes your view on it in a categorical or individualized analysis, which could be helpful to the Court. I don't view that as counting against the page limit.

Good.  So, counsel for defendants, when would you propose to file your motion?

MS. SHEPPARD:  We propose February 28, your Honor, which is in three weeks.

THE COURT:  Thank you.

Counsel for plaintiff, how long would you want in order to respond to that motion, assuming it's filed on the 28th?

MS. BOARDMAN:  We had actually conferred in advance with defense counsel on the schedule and under the schedule that they proposed, that date was April 29th, which was 60 days.  So, we're fine with that date.

THE COURT:  Thank you.  Why so long?

MS. BOARDMAN:  Well, it's standard in a securities case to allow 60 days for an amended case, 60 days for an opp. Here, we filed our amended complaint in November and then

O27AABAZC                       Conference

defendants wanted 60 days from the filing of the complaint for their letter.  So, they have had 60 days not only to draft their letter but to get going on their motion to dismiss.  So, it's probably reasonable to imagine that the motion, that they have been working on it during the period of time since November 13th when our complaint was filed.

THE COURT:  Thank you.

MS. BOARDMAN:  I think that's baked into the schedule that they proposed.

THE COURT:  Thank you.  Do you need two months to respond to a 45-page motion?

MS. BOARDMAN:  I mean, I think it's standard and reasonable.  They have had our complaint for more than 60 days and by the time their motion is filed on February 28th, they would have had it for 60 days plus, probably about a month.  If your Honor feels that 60 days is too much time, we're happy to consider a different date, but that's the date that defendants propose.

THE COURT:  Fine.  I am going to set the following schedule:  I have the motion due on the 4th of March.  I'll have the opposition due eight weeks following the date of service of the motion.  Any replies will be due no later than four weeks from the date of service of the opposition.  If you file your replies sooner, I'll potentially have the opportunity to look at it.  These are floating deadlines, but you can file

O27AABAZC                    Conference

things sooner if you wanted to, and we'll just accordion the schedule because it's based on the date of filing of each of the motions in the opposition.

So I think that's it.  Anything else that we should talk about here counsel for plaintiff?

MS. BOARDMAN:  Nothing further, your Honor.

THE COURT:  Thank you.

Counsel for defendant?

MS. SHEPPARD:  Nothing further, your Honor.

Thank you for your time.

THE COURT:  Very good.  Thank you, all.

(Adjourned)