**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIAM E. BAZZELLE, SR., individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br> vs.<br><br>NOVOCURE LIMITED, WILLIAM DOYLE, ASAF DANZIGER and ASHLEY CORDOVA,<br><br>      Defendants. | No. 1:23-cv-05146-GHW<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 4

    A.    The LUNAR Trial .................................................................................................. 4

    B.    NovoCure Reports Topline Trial Results Beginning January 5, 2023 ................... 5

    C.    NovoCure Reports Additional Data at the ASCO Conference on
        June 6, 2023 ......................................................................................................... 7

    D.    Plaintiff's Theory of Fraud .................................................................................... 8

    E.    The Challenged Statements ................................................................................... 10

ARGUMENT ..................................................................................................................... 12

I.    PLAINTIFF FAILS TO IDENTIFY A MATERIALLY FALSE OR MISLEADING
    STATEMENT ............................................................................................................ 13

    A.    Plaintiff's Claim Depends on the Erroneous Premise that Reporting Topline
        Results Triggers a Duty to Provide All Detailed Trial Data Immediately ............ 13

    B.    Plaintiff's Claim Is an Impermissible Attack on Trial Design ............................ 16

        1.    Plaintiff's claim that LUNAR did not match the evolving standard of
            care is an impermissible attack on trial design ........................................ 17

        2.    Plaintiff's claim that LUNAR did not stratify patients for PD-L1 status
            is an impermissible attack on trial design ............................................... 21

    C.    Plaintiff's Attacks Fail as to Each Challenged Opinion Statement Because
        Plaintiff Cannot Meet the Requirements of *Omnicare* and *Sanofi* ....................... 25

        1.    Plaintiff does not allege facts showing that any Defendant stated an
            opinion he or she did not honestly hold .................................................. 26

        2.    Plaintiff does not allege facts showing that any Defendant misleadingly
            omitted required information about the bases for his or her opinions ...... 30

        3.    Plaintiff does not allege facts showing that any Defendant embedded a
            false factual assertion in a statement of opinion ..................................... 32

    D.    Plaintiff's Attack Fails as to the Remaining Statements, Which Were
        Accurate and Non-Actionable Expressions of Corporate Optimism .................... 33

II.    PLAINTIFF HAS NOT ESTABLISHED A STRONG INFERENCE OF INTENTIONAL FRAUD ................................................................................................................. 35

    A.    The Bulk of Plaintiff's Scienter Allegations Are Conclusory Boilerplate ........... 35

    B.    Plaintiff Alleges No Facts Showing When Defendants Received the Data Purportedly Revealing LUNAR's Alleged "Flaws," Let Alone Facts Showing that Defendants Believed the Challenged Statements Were False or Misleading.......................................................................................................... 37

    C.    Plaintiff's Allegations About Two Individual Defendants' Nondiscretionary Stock Sales Do Not Support a Strong Inference of Intentional Deceit................. 38

    D.    Plaintiff's Remaining Allegations Fall Short of Establishing a Strong Inference of Intentional Fraud ................................................................................ 41

    E.    Plaintiff's Recklessness and Negligence Allegations Are Also Deficient............ 42

    F.    The Alleged Facts Weigh Strongly in Favor of a Benign Inference..................... 44

CONCLUSION.................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Decisions**

*Abely v. Aeterna Zentaris Inc.*,
    2013 WL 2399869 (S.D.N.Y. May 29, 2013) ................................................................... *passim*

*In re Advanced Battery Techs., Inc.*,
    781 F.3d 638 (2d Cir. 2015).................................................................................................43

*In re Amarin Corp. PLC Sec. Litig.*,
    2021 WL 1171669 (D.N.J. Mar. 29, 2021)....................................................14, 15, 28, 29

*Ark. Pub. Emps' Ret. Sys. v. Bristol-Myers Squibb Co.*,
    28 F.4th 343 (2d Cir. 2022) .................................................................5, 7, 13, 15, 39

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).........................................................................................5, 29

*Biondolillo v. Roche Holding AG*,
    2018 WL 4562464 (D.N.J. Sept. 24, 2018) ............................................................15

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. Apr. 1, 2004) ......................................................38

*Cachia v. BELLUS Health Inc.*,
    2022 WL 4367444 (S.D.N.Y. Sept. 21, 2022).......................................................19

*Chapman v. Mueller Water Prod., Inc.*,
    466 F. Supp. 3d 382 (S.D.N.Y. June 11, 2020) ....................................................42

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ...................................................................................31

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014)......................................................................................26

*City of Monroe Emps' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
    2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011).......................................................37

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
    967 F. Supp. 2d 771 (S.D.N.Y. Aug. 23, 2013).....................................................40

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. Jan. 15, 2020) .....................................................41

*Davison v. Ventrus Biosciences, Inc.*,
  2014 WL 1805242 (S.D.N.Y. May 5, 2014) ..............................................................16, 22

*Emps' Ret. Sys. of the City of Baton Rouge v. Macrogenics, Inc.*,
  2021 WL 4459218 (D. Md. Sept. 29, 2021) ......................................................................15

*Emps' Ret. Sys. of the City of Baton Rouge v. Macrogenics, Inc.*,
  61 F.4th 369 (4th Cir. 2023) ............................................................................................32

*Fries v. N. Oil & Gas, Inc.*,
  285 F. Supp. 3d 706 (S.D.N.Y. Jan. 11, 2018) ................................................................38

*Gale v. Smith & Nephew, Inc.*,
  989 F. Supp. 2d 243 .........................................................................................................29

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. Mar. 28, 2011) .........................................................39, 42

*In re GlaxoSmithkline PLC*,
  2006 WL 2871968 (S.D.N.Y. Oct. 6, 2006) ....................................................................39

*Glickman v. Alexander & Alexander Servs., Inc.*,
  1996 WL 88570 (S.D.N.Y. Feb. 29, 1996) ......................................................................36

*Greco v. Qudian, Inc.*,
  2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022) .................................................................33

*In re Iconix Brand Grp., Inc.*,
  2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ..............................................................37, 42

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020) ...............................................................................................44

*Johnson v. Siemens AG*,
  2011 WL 1304267 (E.D.N.Y. Mar. 31, 2011) ..................................................................41

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) .............................................................................................36

*In re Keryx Biopharm., Inc. Sec. Litig.*,
  2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) ...............................................14, 17, 18, 23, 38

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. Mar. 21, 2003) ...............................................................41

*Kleinman v. Elan Corp.*,
  706 F.3d 145 (2d Cir. 2013) ....................................................................................... *passim*

*Lehman v. Ohr Pharm. Inc.*,
  2019 WL 4572765 (S.D.N.Y. Sept. 20, 2019)......................................................................27, 31

*Lerner v. Nw. Biotherapeutics*,
  273 F. Supp. 3d 573 (D. Md. 2017) ...............................................................................................23

*Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*,
  838 F.3d 76 (1st Cir. 2016).............................................................................................................40

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)..........................................................................................................................13

*In re Neurotrope, Inc. Sec. Litig.*,
  315 F. Supp. 3d 721 (S.D.N.Y. June 4, 2018) ........................................................................22, 24

*In re Novan, Inc., Sec. Litig.*,
  2018 WL 6732990 (M.D.N.C. Nov. 30, 2018)................................................................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)................................................................................................................ *passim*

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  437 F. Supp. 3d 329 (S.D.N.Y. Feb. 4, 2020)................................................................................41

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  89 F.4th 408 (2d Cir. 2023) ......................................................................................................32, 33

*In re Plug Power, Inc. Sec. Litig.*,
  2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022)................................................................................39

*Rombach v. Chang*,
  355 F.3d. 164 (2d Cir. 2004).....................................................................................................12, 33

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009).............................................................................................................43

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. Jan. 28, 2015) ..........................................................................19, 34

*Shemian v. Rsch. in Motion, Ltd.*,
  2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ...............................................................................34

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)...........................................................................................................44

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)...........................................................................................................44

*In re Supercom Inc. Sec. Litig.*,
  2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) ........................................................................36

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. Apr. 16, 2008) ....................................................................41

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................................................12

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)...................................................................................26, 31, 32

*Villare v. Abiomed, Inc.*,
  2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)......................................................................39

*Zagami v. Cellceutix Corp.*,
  2016 WL 3199531 (S.D.N.Y. June 8, 2016) .........................................................................29

**Statutes**

15 U.S.C. § 78u-4(b)(1) .............................................................................................................12

15 U.S.C. § 78u-4(b)(2) .............................................................................................................12

15 U.S.C. § 78u-5(c)(1) .............................................................................................................35

15 U.S.C. § 78u-5(i)(1) ..............................................................................................................34

**Other Authority**

*Reference Manual on Scientific Evidence* (Federal Judicial Center, 3d ed. 2011) ........................24

**INTRODUCTION**

NovoCure Limited ("NovoCure") is a global oncology company. NovoCure makes Optune Gio® and Optune Lua® (collectively, "Optune"), a wearable medical device that harnesses Tumor Treating Fields (or "TTFields") to extend survival in some of the most aggressive forms of cancer. The FDA has approved Optune for treating certain brain (Gio) and lung (Lua) cancers. Using TTFields, NovoCure treats cancer patients through physics. Patients wear the Optune device, which emits electrical fields (*i.e.*, TTFields) that disrupt cancer cells' ability to divide.

This case arises from NovoCure's LUNAR clinical trial, which tested TTFields in patients suffering from non-small cell lung cancer ("NSCLC") whose disease had progressed after earlier platinum-based chemotherapy failed. On January 5, 2023, NovoCure reported that LUNAR was a success: The trial had met its primary endpoint. Patients who used the TTFields device together with approved oncology drugs lived significantly longer than patients treated with the approved drugs alone. With respect to one of the two approved drugs studied—immune checkpoint inhibitors, or ICIs—the survival benefit was profound. Patients who received TTFields therapy while treated with ICIs lived almost 8 months longer than patients treated with ICIs alone. This was the first advance in treating NSCLC in more than 7 years.

NovoCure's stock price shot up in January 2023 in response to these highly favorable topline results, and then decreased gradually over the next several months. In June 2023, when NovoCure presented complete clinical trial data at a medical conference, the stock fell steeply. Plaintiff, who claims to have lost money investing in NovoCure, attributes the latter stock drop to fraud. He asserts claims under the Securities Exchange Act of 1934 against NovoCure and three of its executives—Executive Chair William Doyle, CEO Asaf Danziger, and CFO Ashley Cordova (the "Individual Defendants").

1

Plaintiff does not dispute that LUNAR met its primary endpoint—what he calls the "main objective" of a clinical trial.  Rather, he claims that in reporting topline results, Defendants assumed and breached a duty to provide copious additional information, including information about two allegedly "serious flaws" in trial design.  First, he says that the standard of care shifted during the course of the trial, which purportedly made the favorable results irrelevant as a commercial matter.[1]  Second, he says that trial investigators did not uniformly collect data on a biomarker called PD-L1—although he does not allege that they were required to do so, or that NovoCure claimed they did so.  Although the trial was randomized as to PD-L1 status, Plaintiff speculates, with no basis, that patients with favorable PD-L1 status were overrepresented in the group using TTFields therapy together with ICIs, and underrepresented in the control group using ICIs alone.  Plaintiff further speculates that physicians will be concerned about this possibility, and that they will refrain from prescribing TTFields therapy because they cannot be sure that the device—as opposed to ICIs—was responsible for the 8-month survival benefit.  Finally, Plaintiff speculates that the "magnitude" of the survival benefit was "likely" caused by uneven distribution of PD-L1 status.

None of this supports a fraud claim, and Plaintiff comes nowhere close to satisfying the rigorous pleading standards imposed by the Private Securities Litigation Reform Act ("PSLRA").

***NovoCure did not have a duty to report complete trial results in January 2023***.  As a legal matter, companies reporting topline results—that is, whether a clinical trial has met primary and specified secondary endpoints—do not thereby assume a duty to simultaneously disclose all purportedly adverse data. NovoCure's disclosure pattern is standard practice. Companies publicly report topline results very shortly after calculating them, in order to provide stakeholders with

---

[1] The "standard of care" is the "[c]urrent, prevailing medical treatment[] based on a patient's circumstances."  Am. Compl. at iii.

critical information as soon as practicable.  Companies subsequently report complete results at medical conferences and in medical journals, after fully analyzing trial data.  Numerous courts have rejected the contention that when companies announce topline results, they must also immediately disclose any data point allegedly cutting the other way.  *Infra* § I.A.

*Plaintiff's claims are based on a non-justiciable critique of trial design.*  The particular information Plaintiff claims NovoCure omitted from topline results consists of two purported "flaws" in LUNAR.  But under controlling law, a critique of trial design cannot support a securities fraud claim.  Plaintiff's "flaw" allegations also fail of their own accord.  LUNAR's trial design was publicly available, and the purportedly concealed "flaws" were publicly discussed.  Plaintiff offers no support for his speculation that the TTFields therapy's blockbuster 8-month survival benefit was "likely" caused by ICIs rather than TTFields, and disregards that LUNAR was a controlled trial and that PD-L1 expression was randomized across its cohorts.  *Infra* § I.B.

*Plaintiff fails to identify materially false or misleading statements.*  Beyond these two overarching legal deficiencies, Plaintiff fails to identify a false or misleading statement.  Most of the challenged statements are reports of trial results, including statements that the topline results were "clinically meaningful" and "profound," that there was "nothing funky" about the performance of the control group, and that LUNAR's arms were "well balanced."  Reports of trial results are evaluated as opinion statements, and Plaintiff's claim does not come within any of the three narrow paths the Supreme Court set out in *Omnicare* for challenging such statements.  *Infra* § I.C.  The remaining challenged statements relate to NovoCure's business prospects.  Plaintiff has not shown that these statements were false or misleading, and they are non-actionable puffery in any event.  *Infra* § I.D.

***Plaintiff fails to establish a cogent and compelling inference of intentional deceit.***
Plaintiff pleads no facts suggesting that Defendants believed anything other than that the reported topline results were highly promising—no allegations about confidential witnesses, company documents, or anything else bearing on Defendants' states of mind.  Plaintiff does not even allege *when* Defendants learned the granular details about trial data that allegedly exposed LUNAR's flaws.  Even more significantly, Plaintiff pleads no facts showing that Defendants considered these to be flaws at all.  Nothing in the complaint suggests that Defendants shared Plaintiff's erroneous belief that the 8-month survival benefit was "likely" caused by an imbalance in PD-L1 scores.

The bulk of Plaintiff's scienter allegations are boilerplate about "high-level positions" and generalized "access."  Courts routinely reject these allegations.  Plaintiff's few specific allegations relate primarily to stock sales by two of the three Individual Defendants.  But all of the sales were nondiscretionary, and hence not probative of scienter as a matter of law.  In the end, the strongest inference supported by the facts alleged is that Defendants were understandably enthusiastic about the blockbuster LUNAR results, and that in describing those results as "profound" and "clinically meaningful," they sincerely expressed their well-founded enthusiasm.  Plaintiff's competing contention—that Defendants hid purported flaws in the trial knowing that full results would be released in a matter of months—is not compelling.  *Infra* § II.

## BACKGROUND

### A.    The LUNAR Trial

The patients in the LUNAR trial were very sick.  Their lung cancer had progressed to Stage 4, meaning generally that it had spread to other organs, and that previous or "first-line" treatments had failed.  LUNAR tested TTFields as a second-line or subsequent treatment. ¶ 4.[2]  Other options

---

[2] "¶ _" citations in this brief refer to the paragraphs of the Amended Complaint, Dkt. 52.

4

in this space—treatments that extend survival after NSCLC has progressed—are very limited. Ex. 10 at slide 8.[3] LUNAR was an international trial. 30% of the patients came from North America, 30% from Eastern Europe, 30% from Western Europe, and the balance from East Asia. *Id.* at slide 14.

The LUNAR patients received TTFields therapy using Optune Lua in combination with one of two approved second-line treatments: either (1) one of three ICIs, or (2) docetaxel, a chemotherapy drug. ¶ 4. ICIs "treat[] various types of cancer by allowing the patient's immune system to fight the cancer directly." *Ark. Pub. Emps' Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 349 (2d Cir. 2022). In both the ICI and the docetaxel arms of the trial, the combination treatment—TTFields plus the already-approved drug—was tested against the approved drug alone, which was the control. ¶ 4. Plaintiff represents the structure of the trial with this graphic (*id.*):



Enrollment in LUNAR began in early 2017. In April 2021, the independent Data Monitoring Committee overseeing the trial recommended cutting enrollment nearly in half, citing ethical concerns with continuing to randomize patients to the control arm. ¶¶ 44–45.

### B.    NovoCure Reports Topline Trial Results Beginning January 5, 2023

Enrollment in LUNAR was completed in November 2021, and patient follow-up was completed in November 2022. ¶ 47. At that point, no trial data had been revealed to NovoCure.

---

[3] "Ex. _" citations refer to the exhibits to the Declaration of Francesca Brody in Support of Defendants' Motion to Dismiss. Of the 24 exhibits, Exs. 1–12 and 14–16 are documents cited in the Amended Complaint, and hence properly before the Court at the pleading stage. *E.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The remaining documents are properly before the Court for the reasons set forth in notes 8, 10, 12, and 14, below.

¶ 44 n.3. After the completion of patient follow-up, trial investigators generally need at least several weeks to enter and consolidate data. *See, e.g.*, *Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at *15 (S.D.N.Y. May 29, 2013) (describing a four-to-six-week process).

NovoCure reported topline results to investors on January 5, 2023, shortly after receiving raw data. The results were highly favorable. LUNAR had met its primary endpoint—that is, the trial's "main objective," ¶ 41—as well as one of two key secondary endpoints:

- The primary endpoint tested whether TTFields in combination with ICIs or docetaxel provided an advantage in overall survival compared to the control (ICIs or docetaxel alone). For the primary endpoint, the two arms of the trial were considered together. NovoCure reported that LUNAR "met its primary endpoint, demonstrating a statistically significant and clinically meaningful improvement in overall survival over standard therapies alone." ¶ 52. In other words, patients treated with TTFields lived longer.

- The first of the two key secondary endpoints tested whether TTFields in combination with ICIs provided an overall survival advantage over ICIs alone. NovoCure reported that LUNAR "showed a statistically significant and clinically meaningful improvement in overall survival when patients were treated with TTFields and [ICIs], as compared to those treated with [ICIs] alone." ¶ 53 (brackets in complaint).

- The second key secondary endpoint tested whether TTFields in combination with docetaxel provided an overall survival advantage over docetaxel alone. NovoCure reported that the overall survival benefit showed a "positive trend" in this arm but did not reach statistical significance. ¶ 54; *see also, e.g.*, Ex. 3 at 6.

NovoCure continued to report these topline results in press releases, SEC filings, earnings calls, and investor presentations between January 5 and May 4, 2023. ¶¶ 73–108. In both written and oral statements during this period, NovoCure characterized the results as "clinically meaningful" and "profound." ¶¶ 73, 76, 80, 88, 92, 94, 102, 104. NovoCure also used the terms "key achievement," "crucial finding," and "groundbreaking data" in oral presentations. ¶¶ 94–95, 102. On May 4, NovoCure noted that LUNAR had "provid[ed] the first advance in Stage 4 refractory non-small cell lung cancer in more than 7 years." ¶ 106. As discussed below, these

characterizations were amply justified.  The overall survival benefit on the ICI arm was close to 8 months, a result well in excess of market expectations.

As is typical, NovoCure told investors that it would present complete results at an upcoming medical conference.  Ex. 1 at 2.  NovoCure later specified that the conference was the annual meeting of the American Society of Clinical Oncology (ASCO), which takes place every June.  ¶ 101.

Between January and June 2023, NovoCure fielded investor and analyst questions about certain characteristics of LUNAR patients.  Plaintiff challenges several of NovoCure's responses.  During NovoCure's January 10, 2023 presentation at the annual J.P.Morgan Healthcare Conference, an analyst asked, "did you guys measure PD-[L]1 status at baseline?"  ¶ 84 (brackets in complaint).  The PD-L1 biomarker can in some cases predict a patient's response to certain ICIs.[4]  Doyle responded that PD-L1 status "has not shown any relevance in [the] second line," and that the trial's "arms were well balanced."  ¶ 84.  On February 23, 2023, an analyst asked more generally whether "the active and control arms in the study are balanced in terms of patient characteristics"; Doyle responded that "all the indications . . . show balance."  ¶ 99.  Finally, in response to two questions on May 4, 2023—"whether you have data on PD-L1 status for a large percentage of the patients" and "whether there was an imbalance"—Doyle said that NovoCure would address the issues at the ASCO conference the following month.  ¶ 108.

### C.    NovoCure Reports Additional Data at the ASCO Conference on June 6, 2023

On June 6, 2023, NovoCure issued a press release and made two presentations at the ASCO conference, one to a medical audience and one to investors.  ¶¶ 110, 113, 115.  In all three

---

[4] "Some cancer cells have PD-L1 proteins that bind with PD-1 proteins present on immune-system T-cells, preventing the immune system from combatting the tumor.  PD-1 checkpoint inhibitors block this interaction."  *Bristol-Myers*, 28 F.4th at 349.

communications, NovoCure provided information about LUNAR beyond the topline results. The details the Company released confirmed the previously reported topline results:

- As to the primary endpoint, the overall survival benefit for the combined ICI and docetaxel arms was 3.3 months. ¶ 110; Ex. 10 at slide 16. This was a statistically significant result, with a p-value of 0.035. Ex. 10 at slide 16.

- On the ICI arm, patients in the treatment cohort lived nearly 8 months longer than patients in the control cohort—a statistically significant result with a p-value of 0.03. ¶ 110; Ex. 10 at slide 17. This was indisputably a highly positive outcome, and exceeded the expectations of even analysts whose reports Plaintiff has cherry-picked. J.P.Morgan's analyst, for example, stated that the overall survival benefit on the ICI arm "edg[ed] out expectations," explaining "we had expected at least 5 mos and based on our investor conversations believe the buyside was expecting ~ 6 mos." Ex. 11 at 1 (emphasis deleted). Eight months was a blockbuster result.

- On the docetaxel arm, patients in the treatment cohort lived 2.4 months longer than patients in the control cohort. The p-value here was 0.28, which fell short of statistical significance. ¶ 110, Ex. 10 at slide 18.

NovoCure also addressed the matter of patients' PD-L1 scores at the ASCO conference. The Company presented PD-L1 data for 55% of the patients; this was the universe of patients for whom investigators had obtained scores. The data showed that low, medium, and high PD-L1 expression scores were balanced across the four cohorts. Ex. 10 at slide 15. Most significantly, scores were balanced between the treatment and control cohorts on the ICI arm. *Id.* Summarizing the distribution of scores, NovoCure stated at ASCO that "[a]vailable PD-L1 data showed no differences between arms." Ex. 12 at 9. Plaintiff does not dispute that characterization.

Notwithstanding these results, NovoCure's stock price fell steeply on June 6. Plaintiff attributes the decline to fraud, which he claims was revealed the same day. ¶¶ 110–17.

### D.    Plaintiff's Theory of Fraud

Plaintiff does not dispute that TTFields demonstrated a statistically significant benefit in overall survival for NSCLC patients, or that LUNAR met its primary endpoint and one of two key

secondary endpoints.  Plaintiff's theory is that, in reporting accurate (and favorable) topline trial results, NovoCure misled investors by omitting two details about LUNAR's patient population.

*First alleged omission: the treatment patients received in the first line.*  Patients were eligible for enrollment in LUNAR if they had received a platinum-based chemotherapy treatment in the first line and their disease had progressed during or after that treatment.  ¶ 40.  Patients may have also received an ICI in the first line, but this was not required for enrollment.  ¶ 4.  Plaintiff alleges that while LUNAR was ongoing, the standard of care in the first line shifted.  ¶ 48.  The FDA approved an ICI called pembrolizumab for first-line treatment of NSCLC in some patients in 2016.  *See* ¶ 50.  Physicians in the U.S. thereafter began prescribing the drug for that indication. In other words, the standard of care in the U.S. shifted to use of ICIs in the first line.

Plaintiff claims that this produced a "serious flaw[]" in LUNAR's trial design.  ¶ 6.  The purported flaw is that LUNAR's patient population is not "currently relevant" (at least in the U.S.). ¶ 11.  Plaintiff speculates that, as a result, physicians may not be inclined to prescribe TTFields therapy.  According to Plaintiff, NovoCure committed fraud by failing to disclose, between January and June 2023, the percentage of patients who had received an ICI in the first line. NovoCure reported that information at ASCO on June 6, 2023.  In LUNAR overall, 31% of the patients received an ICI in the first line, consisting of 58% of the patients on the docetaxel arm and 2% of patients on the ICI arm.  ¶ 111.  In other words, 58% of the LUNAR patients received ICIs in the first line followed by docetaxel in the second line, and 2% received ICIs in both the first and second line.

*Second alleged omission: patient scores on the PD-L1 biomarker.*  Plaintiff next alleges that for *any* patient treated with an ICI—in the first line or at any subsequent point—the PD-L1 biomarker predicts the patient's response to treatment.  According to Plaintiff, "[t]he effectiveness

of ICIs is heavily impacted by PD-L1 scores." ¶ 7. As a result, Plaintiff hypothesizes, "it was critical for the LUNAR trial's four subgroups to contain patient populations that were relatively balanced with respect to patients' PD-L1 scores." *Id.*

Plaintiff then alleges that NovoCure deceived investors by omitting information about PD-L1 scores when reporting topline results. Plaintiff does not directly allege that the PD-L1 scores were *imbalanced*. Nor could he. As noted, NovoCure reported PD-L1 scores for 55% of the patient population on June 6, 2023, and showed that low, medium, and high expression scores were balanced among the four subgroups. *Supra* at 8. Plaintiff does not dispute this.

Plaintiff's theory instead is that NovoCure committed fraud by not alerting investors, at the time it reported topline results, that PD-L1 data were unavailable for the remaining 45% of the patient population. As a result of this purported "flaw," Plaintiff speculates that NovoCure will "never be able to show that the trial results were *not* skewed by imbalances in patients' PD-L1 scores among the trial's four subgroups." ¶ 64 (emphasis in complaint). Consequently, Plaintiff says, "the LUNAR results were unreliable, uninterpretable, and essentially meaningless." ¶ 69. Plaintiff further speculates that in light of the "missing" data, the 8-month overall survival benefit on the ICI arm was "likely" caused by treatment with ICIs themselves, rather than by TTFields in combination with ICIs. ¶ 65.

### E.      The Challenged Statements

Plaintiff challenges 18 statements, which can be grouped as follows:

***Report and characterization of topline results.*** Plaintiff challenges NovoCure's statements that LUNAR's results are "profound," "meaningful," "statistically significant and clinically meaningful," and that LUNAR "met its primary endpoint, providing the first advance in Stage 4 refractory non-small cell lung cancer in more than 7 years." ¶¶ 73, 74, 76, 80, 88, 92, 94, 97, 102, 104, 106.

Within the same paragraphs, Plaintiff further challenges statements explicitly couched as opinions or other subjective expressions:  "We believe these data represent a crucial finding for patients diagnosed with Stage 4 non-small cell lung cancer" (¶ 94); "We believe the LUNAR data have the potential to transform the treatment paradigm for these patients, and more generally point to the future of solid tumor therapy" (*id.*); "I would like to echo [Doyle's] excitement about the positive top line readout of the LUNAR study" (¶ 95); "LUNAR is a key achievement for NovoCure" (*id.*); and "We are eager to share our groundbreaking data at the 2023 ASCO Annual Meeting" (¶ 102).

These challenges fail because Plaintiff (1) relies on a non-existent duty to disclose complete results, (2) impermissibly attacks trial design, and (3) attacks opinions but cannot satisfy any of *Omnicare*'s prongs.  Sections I.A–I.C below.

***Statements about trial design, oncology, and the performance of the control group.*** Plaintiff challenges NovoCure's responses to questions about trial design, including questions about the distribution of PD-L1 status among the four cohorts.  These statements include: "Patient enrollment was well balanced between the ICI and docetaxel cohorts of the experimental and control arms" (¶ 73); "PD-[L]1 status has not shown any relevance in second line" (¶ 84); "there was nothing unusual about the control group" (*id.*); LUNAR "incorporates the evolving standard of care for second-line treatment of NSCLC" (¶ 92); "all the indications . . . show balance" (¶ 99); and "we would expect to address all the issues with respect to balance and PD-L1 status at [ASCO]" (¶ 108).  Plaintiff's attack on these statements fails for the three reasons set forth above.

***Statements about TTFields' expected prospects.***  Plaintiff challenges NovoCure's statements about TTFields' expected prospects in light of LUNAR and other ongoing trials: "The successful LUNAR study marks the beginning of a transformational period where we anticipate

final data from multiple pivotal trials" (¶ 78); "We are . . . energized by the prospect of treating tens of thousands of patients who could benefit from [TTFields]" (*id.*); "We couldn't be more excited that the promise to bring Tumor Treating Fields into new indications is here" (¶ 82); and "The positive top-line readout from the pivotal LUNAR study marked the beginning of a transformational 24 months" (¶ 90). Plaintiff's attack fails because these are non-actionable expressions of corporate optimism (puffery), because Plaintiff has not alleged facts showing they are false, and because they are forward-looking statements protected by the PSLRA's safe harbor.[5]

## ARGUMENT

The complaint is governed by the PSLRA, under which Plaintiff must "specify each statement alleged to have been misleading," together with "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). This is a demanding standard. Section 10(b) plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d. 164, 174 (2d Cir. 2004).

The standard for pleading scienter is even more rigorous. Courts must dismiss securities fraud claims unless plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A plaintiff creates the necessary "strong inference" of intentional fraud "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). Plaintiff cannot satisfy either standard.

---

[5] For the Court's convenience, Defendants submit Appendix A, which sets forth each challenged statement, in context, and summarizes the reasons Plaintiff cannot state a claim.

In the text of the complaint, Plaintiff emphasizes some segments of the challenged statements but does not state that these are the parts he is challenging. In some instances, it seems clear that the emphasized portions are not what Plaintiff is challenging. *E.g.*, ¶ 84 (marking analyst question in bold/italics).

I.      **PLAINTIFF FAILS TO IDENTIFY A MATERIALLY FALSE OR MISLEADING STATEMENT**

   A.      **Plaintiff's Claim Depends on the Erroneous Premise that Reporting Topline Results Triggers a Duty to Provide All Detailed Trial Data Immediately**

At the most basic level, Plaintiff faults NovoCure for reporting only topline results between January and May 2023, claiming that the Company deceived investors by waiting to release detailed clinical trial data until the June 2023 ASCO conference.  Plaintiff repeatedly asserts that "[u]pon choosing to speak about the LUNAR trial's seemingly positive topline results, Defendants assumed a duty to speak completely and accurately, by disclosing [] material, adverse facts."  ¶¶ 75(d), 81(d), 89(d), 93(d), 96(d), 105(d), 107(d).

Plaintiff's attack is contrary to law.  Public companies do not, as Plaintiff claims, have "a duty to speak completely." *Id.*  "[I]t bears emphasis that [Section] 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (cleaned up).  In securities litigation arising from clinical trials, "Section 10(b) and Rule 10b-5 do not categorically prohibit statements that are incomplete or that report cumulative figures instead of detailed breakdowns of the underlying data or subcategories of data." *Abely*, 2013 WL 2399869, at *11 (citation omitted).

The fact pattern presented here is a recurrent one in failed securities litigation against companies developing innovative drugs and medical devices.  The Second Circuit has applied *Matrixx* in affirming dismissal in cases involving clinical trial reporting.  In *Bristol-Myers*, the plaintiff faulted the company for omitting information about patient eligibility criteria in the trial of a lung cancer drug; the appellate court held that the company had no duty to disclose that information.  28 F.4th at 352–53.  In *Kleinman*, the plaintiff faulted the company for omitting

13

detailed data in reporting topline results from the trial of an Alzheimer's Disease drug; there, too, the appellate court held that the company had no duty to disclose the information. *Kleinman v. Elan Corp.*, 706 F.3d 145, 152–53 (2d Cir. 2013).

Courts thus frequently reject the premise that by reporting topline or preliminary clinical trial results, companies must at the same time disclose those aspects of the trial that investors may believe put the results in a less positive light. "[D]issemination of top-line results does not trigger a duty to disclose the full results of a study." *In re Amarin Corp. PLC Sec. Litig.*, 2021 WL 1171669, at *15 (D.N.J. Mar. 29, 2021), *aff'd*, 2022 WL 2128560 (3d Cir. June 9, 2022); *see also id.* ("Plaintiff is incorrect that parties conducting clinical trials necessarily are required to release all the detailed data that may be of interest to investors") (cleaned up); *infra* at 15 (citing additional authorities). The court made this particularly clear in *Keryx*, where plaintiffs faulted a company for reporting preliminary results without simultaneously disclosing details that the plaintiffs believed undermined those results: "At their core, plaintiffs' allegations as to falsity amount to a desire to have known aspects of the methodology used in the Phase 2 trial earlier than such details were fully disclosed. . . . [T]hese allegations fail as a matter of law." *In re Keryx Biopharm., Inc. Sec. Litig.*, 2014 WL 585658, at *10 (S.D.N.Y. Feb. 14, 2014); *see also, e.g.*, *Abely*, 2013 WL 2399869, at *11.

NovoCure appropriately communicated topline results in January 2023, shortly after the trial finished, and told investors in its January 5 press release that it would release complete data at an upcoming medical conference. Ex. 1 at 2. NovoCure made similar statements in subsequent presentations, including conferences in which analysts asked about PD-L1 scores. On January 10, 2023, Doyle told an analyst that "the full data, including PD-[L]1 status will be presented later."

14

¶ 84 (brackets in complaint).  In April 2023, as noted, NovoCure told investors that it would make that presentation at ASCO's June meeting, ¶ 101, the premier oncology conference in the U.S.

Other companies conducting clinical trials follow the same disclosure pattern, and courts have repeatedly rejected claims that they violate the securities laws by doing so.  In each case, the court explicitly or implicitly rejected the proposition—on which Plaintiff relies here—that reporting topline trial results triggers a duty to disclose, or puts all purportedly adverse data "in play."  *E.g.*, *Kleinman*, 706 F.3d at 149 (company reported topline results of trial of Alzheimer's Disease drug and told investors it would present complete results at the International Conference on Alzheimer's Disease several months later; no duty to disclose details of post hoc analysis in the interim); *Amarin*, 2021 WL 1171699, at *15 (company announced topline results of heart medication trial and told investors it would provide more complete data at the annual meeting of the American Heart Association two months later; no duty to address potential issue related to placebo in the interim); *Emps' Ret. Sys. of the City of Baton Rouge v. Macrogenics, Inc.*, 2021 WL 4459218, at *10 (D. Md. Sept. 29, 2021) (company announced preliminary results of cancer drug trial in February and told investors it would provide more complete data at the ASCO conference in June; no duty to disclose differences between progression-free survival and overall survival rate in the interim), *aff'd*, 61 F.3d 369 (4th Cir. 2023); *Biondolillo v. Roche Holding AG*, 2018 WL 4562464, at *5–6 (D.N.J. Sept. 24, 2018) (company reported topline results of cancer drug trial in March and complete data at the ASCO conference in June; no duty to disclose subgroup analysis or p-value in the interim).[6]

---

[6] The cited decisions address a company's disclosure duties (or lack thereof) in reporting clinical trial *results*.  In a related area—describing clinical trial *design*—the Second Circuit has made equally clear that drug developers do not owe a duty of complete disclosure.  *Bristol-Myers*, 28 F.4th at 352–53.  Indeed, the data that the plaintiffs in *Bristol-Myers* claimed the company had wrongfully withheld, like the data at issue here, related to cancer patients' PD-L1 scores.  Bristol-Myers tested its ICI nivolumab as a first-line treatment for NSCLC.  (Nivolumab was also one of the three drugs used in the ICI arm of LUNAR.  Ex. 10 at slide 12.)  Bristol-Myers told investors that the trial population consisted of "strong" expressers of PD-L1, but declined to quantify what it meant by "strong" while the trial was

The absence of any duty to disclose disposes of Plaintiff's attack on the statements listed below.  For each, Plaintiff's claim depends on the contention that Defendants misled investors by omitting granular trial data:

- Statements that LUNAR "met its primary endpoint," together with descriptions of that endpoint.  ¶¶ 73, 76, 80, 88, 92, 94, 102, 106.

- Statements that LUNAR showed a "statistically significant and clinically meaningful improvement in overall survival" on the ICI arm.  ¶¶ 73, 76, 88, 92, 102, 104.

- Statements that results were "profound."  ¶¶ 74, 80, 84, 106.

- Other statements characterizing trial results, including the terms "key achievement," "crucial finding," and "groundbreaking data."  ¶¶ 94–95, 102.

- Statements about TTFields' medical and commercial prospects and the role of the LUNAR trial in NovoCure's business.  ¶ 78 ("The successful LUNAR study marks the beginning of a transformational period"); ¶ 82 ("the promise to bring Tumor Treating Fields into new indications is here"); ¶ 90 ("LUNAR is the first of four pivotal studies we expect to read out in the next two years which could dramatically increase the number of patients eligible for Tumor Treating Fields").[7]

## B.    Plaintiff's Claim Is an Impermissible Attack on Trial Design

Plaintiff's attack on a largely overlapping set of statements fails for a second, independent reason.  The law in this Circuit is exceptionally clear that Section 10(b) plaintiffs cannot state a claim based on the theory that undisclosed flaws in a clinical trial render a company's positive statements about trial results false or misleading.  The leading decision is *Kleinman*, in which the Second Circuit held that the "critique of [a company's] overall study design" is not actionable. *Abely*, 2013 WL 2399869, at *9 (citing *Kleinman*, 706 F.3d at 154); *see also Davison v. Ventrus Biosciences, Inc.*, 2014 WL 1805242 at *7 (S.D.N.Y. May 5, 2014) (rejecting theory of fraud under

---

ongoing.  When Bristol-Myers ultimately revealed that the PD-L1 expression threshold for trial eligibility was 5%, the plaintiffs claimed that the company committed fraud by failing to disclose that figure earlier.  The Second Circuit affirmed dismissal, holding that "Bristol-Myers had no obligation to disclose the precise percentage of [PD-L1] expression which defined 'strong' expression in the [nivolumab] trial."  28 F.4th at 353.

[7] In his response to NovoCure's pre-motion letter, Plaintiff argued that Defendants' characterization of the topline results—as opposed to the reported results themselves—triggered a duty to disclose granular underlying data. Dkt. 57. As discussed in Section I.C below, the challenged characterizations, which were opinion statements, were demonstrably true and not misleading.  Making such statements cannot trigger a disclosure duty.

*Kleinman* where plaintiffs "criticize the study's methodology as unreliable"); *Keryx*, 2014 WL 585658, at \*10 ("The *Kleinman* court declined to mold [plaintiff's] criticisms [of trial methodology] into actionable securities fraud on the basis of false statements or omissions.").

In *Kleinman* itself, the plaintiff attacked both the methodology used to analyze trial results—a post-hoc "curvilinear" analysis—and the company's failure to tell investors it was using that methodology. 706 F.3d at 154. The Second Circuit explained that the plaintiff's "real complaint is that Defendants were able to tout positive results only because they deviated from the established protocol (which called for a linear analysis)," and that the plaintiff "simply has a problem with using post-hoc analysis as a methodology in pharmaceutical studies." *Id.* The Second Circuit declined to adjudicate that critique, holding that this was the job of the FDA, not the courts. *Id.* at 154–55.

Notwithstanding controlling law, Plaintiff alleges faults with trial design, claiming that "the LUNAR trial was marred by serious flaws." ¶ 6. The first purported flaw, as noted, concerns the treatments patients received in the first line; the second concerns PD-L1 scores. *Supra* at 9–10. In both cases, Plaintiff's claim is that LUNAR was improperly designed, that this undermined the reported topline results, and that the purported flaws were concealed from investors. ¶¶ 12–13. None of this constitutes a fraud claim.

### 1.    Plaintiff's claim that LUNAR did not match the evolving standard of care is an impermissible attack on trial design

With respect to the first purported flaw, Plaintiff challenges not the accuracy but the *relevance* of the topline results. Plaintiff alleges that, in light of the shift in the U.S. standard of care to ICIs in the first line, "the LUNAR trial failed to credibly show a survival benefit from TTFields therapy *in any currently-relevant NSCLC patient population*." ¶ 11 (emphasis added).

17

Plaintiff's claim is that NovoCure studied the wrong patient population.  That is a critique of trial design.  It cannot support a fraud claim under controlling Second Circuit law.

Plaintiff's critique has multiple defects beyond those identified in *Kleiman* and its progeny. First, Plaintiff does not and cannot allege that the purported mismatch between the trial population and the current U.S. NSCLC population constitutes a design flaw as a scientific or medical matter. Plaintiff's claim is that the trial was flawed as a *commercial* matter.  Notably, Plaintiff does not allege that FDA approval is in jeopardy.  He merely speculates that TTFields will "not be widely adopted by the medical community." ¶ 70.  He similarly contends that the "change in the standard-of-care meant that in order for the LUNAR trial to reflect current clinical practice—*such that doctors were likely to consider TTFields as a second-line therapy if LUNAR was a success*—the trial would need to enroll a patient population with a high rate of first-line ICI therapy."  ¶ 51 (emphasis added).  These allegations are wholly speculative, and could not support a fraud claim in any event.  But more fundamentally, courts do not police disputes about the best way to design a trial.  "It would indeed be unjust—and could lead to unfortunate consequences beyond a single lawsuit—if the securities laws become a tool to second guess how clinical trials are designed and managed." *Keryx*, 2014 WL 585658, at *1.  The danger would be even graver if plaintiffs were permitted to attack the design of a trial based on the contention that favorable results will not lead to optimal commercial uptake.

Second, Plaintiff does not contend that LUNAR's design was flawed at the outset of the trial.  Plaintiff claims that the trial *became* flawed when physicians in the U.S. began to prescribe the recently approved ICI pembrolizumab as a first-line treatment for certain NSCLC patients. ¶ 50.  Plaintiff's claim thus appears to be that NovoCure should have abandoned LUNAR when the standard of care began to shift in the U.S., or should have sought to radically modify the trial

18

design in order to exclude most or all patients who had received only chemotherapy—and not an ICI—in the first line. ¶ 51 ("the trial would need to enroll a patient population with a high rate of first-line ICI therapy"). Plaintiff alleges no facts suggesting that such a modification would have been feasible as a regulatory matter, let alone required as a matter of compliance with federal securities laws. Nor does Plaintiff allege whether or when the standard of care shifted for the 70% of LUNAR patients outside the U.S. *Supra* at 5. Most significantly, "second guessing a clinical trial's . . . enrollment criteria is not permitted under securities law." *Cachia v. BELLUS Health Inc.,* 2022 WL 4367444, at *5 (S.D.N.Y. Sept. 21, 2022).

Third, Plaintiff cannot plead a misleading omission related to the purported flaw in trial design because the relevant information about the alleged mismatch in patient populations was publicly available. Information related to the shift in the U.S. standard of care for first-line NSCLC was not specific to NovoCure. That information was as accessible to participants in the securities markets as it was to NovoCure itself. Developers of medical treatments have no obligation to advise the market of publicly available information related to the context in which their clinical trials are performed. *E.g.*, *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 540–43 (S.D.N.Y. Jan. 28, 2015) (court assumes investors are aware of the FDA's published guidance on optimal trial design), *aff'd*, 816 F.3d 199 (2d Cir. 2016).

By the same token, investors knew which first-line treatment the LUNAR patients were likely to have received. Key information about LUNAR was provided on clinicaltrials.gov, the government website compiling clinical trial information. The website showed that prior treatment with platinum-based chemotherapy was a LUNAR eligibility requirement—but that prior treatment with a checkpoint inhibitor was not. Ex. 13 at 6–7.[8]

---

[8] Information from the government's clinical trial database is properly before the Court. *See Sanofi*, 87 F. Supp. 3d at 540.

19

From this publicly available information, market participants readily grasped the difference between the population of patients who received first-line treatment before enrolling in LUNAR, and the U.S. patient population today. Plaintiff's selected analyst reports make the point explicitly. J.P.Morgan stated on March 17, 2023—months before the June 6, 2023 purported corrective disclosure—that NovoCure had "suggested that less than half the patients in the trial received [an ICI] in the first line setting" and "this could be well below 50%." Ex. 14 at 3; ¶ 61. The analyst accordingly referred to "a relatively limited commercial opportunity for [TTFields] in NSCLC due to the trial design." Ex. 14 at 3. In late May 2023—again, before the purported corrective disclosure—the same analyst stated, "We believe the population enrolled in LUNAR *will not reflect current SoC [standard of care]*, and therefore the results would be unlikely to support robust uptake in 2L [second line] NSCLC." Ex. 15 at 1 (emphasis added); *see also* ¶ 62 (quoting from the same analyst report). The purportedly concealed mismatch between the trial population and the current U.S. population was, in reality, discussed in the marketplace.

Plaintiff's selected analyst reports from *after* ASCO confirm this. J.P.Morgan's post-ASCO report was headlined "ASCO Takeaway: LUNAR Story Unfolding as Expected." ¶ 119; Ex. 11 at 1. The analyst made clear that precisely the "flaw" Plaintiff accuses NovoCure of concealing was known to the market before the conference:

> *Consistent with our expectation heading into the reveal []*, only 31% of patients in the trial had already received a checkpoint inhibitor (CPI), which we see representing a distinct mis-match versus today's second-line NSCLC population . . . . *As expected*, a minority of LUNAR patients previously received CPI.

Ex. 11 at 1 (emphasis added).

Plaintiff's claim that NovoCure concealed the purported mismatch in patient populations thus fails on multiple levels. As Plaintiff concedes, the claim is based on an alleged "flaw" in trial design, and such claims are not cognizable in the Second Circuit. The contention that the mismatch

20

in populations was a flaw in the first place is additionally based on speculation about commercial uptake—not on any issue concerning LUNAR's scientific soundness.  Finally, the purported flaw was never concealed.  Market participants knew about the changing standard of care, knew about LUNAR's eligibility criteria, and knew that the trial and current U.S. patient populations had diverged during the course of the trial.  Plaintiff has not stated a fraud claim.

### 2.    Plaintiff's claim that LUNAR did not stratify patients for PD-L1 status is an impermissible attack on trial design

The second purported flaw Plaintiff identifies relates not to the relevance of LUNAR's topline results but instead—in Plaintiff's view—to their reliability.  Plaintiff contends that NovoCure was required to balance (or "stratify") PD-L1 scores across the four trial subgroups "in order to ensure that the results of the trial actually reflected the addition of TTFields therapy, and were not skewed by patients responding differently to ICIs based on their PD-L1 scores."  ¶¶ 51, 59 n.4.  Plaintiff does not directly claim that the four groups were *not* balanced as to PD-L1 status.  As discussed, the data NovoCure presented at ASCO showed a balance of PD-L1 expression across the four groups.  *Supra* at 8.  Plaintiff instead claims that data were "missing" for 45% of the patients, and on that basis speculates that the "magnitude of the [overall survival] benefit" on the ICI arm "reflect[ed] patients' PD-L1 scores, instead of being attributable to the addition of TTFields therapy."  ¶ 10.[9]

This is again an impermissible attack on trial design, and an entirely speculative one at that.  Plaintiff's claim is that NovoCure's trial design did not ensure that an overall survival benefit could reliably be attributed to TTFields rather than to the ICI administered alongside it.  Plaintiff goes

---

[9] Some market participants engaged in similar speculation between January and June 2023, showing that this purported flaw was not hidden from the public either.  Plaintiff quotes a J.P.Morgan analyst who referred in March 2023 to "the potential for imbalance/incomplete data on patient baseline PD-L1 levels," which "could invite skepticism around the results in the ICI subgroup."  ¶ 61 (cleaned up); Ex. 14 at 2; *see also* Ex. 16 at 43 ("Given what we know (*pts not stratified on PD1 status*), we cannot rule out a potential imbalance of treatment vs. control arms which could have skewed results.").

21

so far as to say that the "magnitude" of the overall survival benefit *was* caused by ICIs rather than TTFields.  *Id.*  In other words, Plaintiff claims that the overall survival benefit was a false positive—and that the trial was flawed insofar as it failed to prevent that result.

The *Abely* court rejected a similar theory of fraud.  There, "[a]ccording to plaintiff, the study was organized in a way that heightened the likelihood of yielding a false positive."  2013 WL 2399869, at *8–9.  Not surprisingly, the court concluded, under *Kleinman*, that this "amount[ed] to a non-actionable critique of defendants' study design." *Id.* at *8.

Other cases from this District and beyond are similar.  The plaintiffs in *Neurotrope* claimed that the developer of an Alzheimer's Disease drug was able to report statistically significant results only because it was using—but did not disclose it was using—a p-value of $< 0.1$, which is less rigorous than the industry-standard $< 0.05$. *In re Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 727–28 (S.D.N.Y. June 4, 2018).  The court dismissed the claim under *Kleinman*, holding that it was an impermissible critique of trial methodology.  *Id.* at 731–32.  In *Ventrus*, the plaintiffs claimed that the company's favorable Phase 2 trial results "were completely inconclusive due to the small number of participants in the study."  2014 WL 1805242, at *4.  This too was a criticism of trial methodology, and hence impermissible under *Kleinman*. *Id.* at *7–8.  In *Novan*, as in this case, the plaintiffs criticized the company for failing to stratify as to a given patient characteristic—there, severity of the condition being treated.  *In re Novan, Inc., Sec. Litig.*, 2018 WL 6732990, at *12 (M.D.N.C. Nov. 30, 2018).  In that case, the trial failed to meet its primary endpoint, and the plaintiffs' criticism was that the failure to stratify increased the risk of a false *negative*.  The court agreed that this was, "in hindsight, a reasonable criticism."  *Id.*  But it did not give rise to a fraud claim:  "Plaintiffs may not utilize securities litigation to second guess the decisions by scientists and company officials in how they approached the clinical trials." *Id.*

22

More generally, courts reject fraud claims based on allegedly faulty trial design or methodology because "'[t]he securities laws do not impose a requirement that companies report only information from optimal studies, even if scientists could agree on what is optimal.'" *Lerner v. Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 588 (D. Md. 2017) (citation omitted). By the same token, drug and device developers are "not required to adopt" the negative views of trial data later advanced by securities plaintiffs. *Kleinman*, 706 F.3d at 154. "[W]here a company accurately reports the results of a scientific study, it is under no obligation to second-guess the methodology of that study." *Nw. Biotherapeutics*, 273 F. Supp. 3d at 587–88 (citation omitted); *see also*, *e.g.*, *Keryx* 2014 WL 585658, at *1 (predicting "unfortunate consequences" if "the securities laws become a tool to second guess how clinical trials are designed and managed"). NovoCure had no obligation to embrace Plaintiff's litigation contention that the "missing" 45% of PD-L1 scores "drastically undermined" the favorable topline trial results. *E.g.*, ¶¶ 9, 64, 75(a).

Beyond this, Plaintiff engages in impermissible speculation and disregards basic features of clinical trial practice in general and the features of LUNAR in particular. In claiming that the overall survival advantage on the ICI arm was "likely due to these patients benefitting from receiving ICIs for the first time," ¶ 65, Plaintiff ignores that LUNAR was both controlled (*i.e.*, it employed experimental and control arms) and randomized (*i.e.*, patients were assigned randomly to the arms). The reason LUNAR tested ICIs alone as well as ICIs in combination with TTFields was to ensure that the overall survival benefit did *not* reflect the ICIs. By definition, the benefit reflected the *difference* between ICIs alone and ICIs in conjunction with TTFields. The 7.7-month survival benefit was the difference between a median survival rate of 18.5 months on the TTFields arm and a median survival rate of 10.8 months on the ICI-only arm. Ex. 10 at slide 17. The control shows that the survival advantage was *not* the "likely" consequence of receiving ICIs.

23

As to the possibility of an imbalance in PD-L1 status between the ICI-only and the ICI-plus-TTFields combination, that is addressed through randomization. Plaintiff does not dispute that the assignment of patients to the control or treatment cohort was random as to PD-L1 scores. "With a randomized controlled experiment, subjects are assigned to treatment or control at random in the strict sense—by tossing coins, throwing dice, looking at tables of random numbers, or more commonly these days, by using a random number generator on a computer." *Reference Manual on Scientific Evidence* ("What is Random?") at 230 (Federal Judicial Center, 3d ed. 2011). Randomization is designed to minimize bias or other factors that result in lopsided distributions. *See id.* Plaintiff provides no basis to infer that randomization did not work properly here, much less a reason to conclude that Defendants believed there was any kind of malfunction in the randomization process.

After missing the point of a controlled and randomized trial, Plaintiff proceeds to ignore statistics. His complaint is that the overall survival benefit is a false positive, but LUNAR's design accounted for that risk. The design included an "alpha" value of 0.05, a fact Plaintiff does not dispute. Ex. 10 at slide 13. This means that the trial would not be considered a success unless the likelihood of a false positive was 5% or less. *Reference Manual on Scientific Evidence* at 251 n.100. Plaintiff similarly does not dispute that the p-value on the ICI arm was 0.03. Ex. 10 at slide 17. This means that the likelihood of the reported results occurring if the null hypothesis was true is 3%; the null hypothesis in this case is that the 7.7-month overall survival benefit was *not* caused by TTFields. *Id.* at 626 (definition of p-value); 625 (definition of null hypothesis); *see also Neurotrope*, 315 F. Supp. 3d at 727 n.1 (discussing p-value and null hypothesis).

Other undisputed facts highlight the absurdity of Plaintiff's contention that the 7.7-month overall survival benefit was "likely" the result of an overrepresentation of high PD-L1 scores in

24

the TTFields/ICI cohort.  Although Plaintiff fixates on the 45% of patients with "missing" PD-L1 data, he does not dispute that NovoCure had and reported data for the other 55%, and that these data showed that PD-L1 status was well balanced among the four cohorts.  Ex. 10 at slide 15; *supra* at 8.  With those data known, the chance that the overall survival benefit was driven by an imbalance in PD-L1 scores was further diminished, as was the chance that the randomization mechanism had somehow malfunctioned.

Plaintiff's dependence on a critique of trial design is fatal to each of the challenged statements about trial results and commercial potential listed on page 16.  The fact that Plaintiff's claim is rooted in an attack on trial design also disposes of the single challenged statement from NovoCure's Form 10-K:  "We believe our protocol [for the LUNAR] trial incorporates the evolving standard of care for second-line treatment of NSCLC."  ¶ 92 (brackets in complaint; emphasis omitted).  Plaintiff contends that this statement was false or misleading based on LUNAR's purportedly defective design, alleging that "[t]he LUNAR trial did not 'incorporate[] the evolving standard of care for second-line treatment of NSCLC' because only 30% of the patients in the trial fit the current first-line and second-line standards of care for NSCLC patients." ¶ 92(c).  It is difficult to think of a plainer—or more plainly prohibited—attack on trial design.

### C.    Plaintiff's Attacks Fail as to Each Challenged Opinion Statement Because Plaintiff Cannot Meet the Requirements of *Omnicare* and *Sanofi*

Most of the statements Plaintiff challenges relate to trial results.  *Supra* at 10–11 (listing statements).  This includes statements that LUNAR met its primary endpoint, statements that the results were "clinically meaningful" and "profound," further characterizations such as "key achievement," "crucial finding," and "groundbreaking data," and responses to questions about PD-L1 status.  *E.g.*, ¶¶ 94–95, 102.  All of these are opinion statements governed by *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), which sets

forth three narrow channels through which an opinion statement can support a claim under the federal securities laws.

At the pre-motion conference, Plaintiff disputed that the challenged statements are opinions in the first place.  Plaintiff is wrong.  "Interpretations of clinical trial data are considered opinions." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014).  The Second Circuit recognized the same point in *Tongue v. Sanofi*, 816 F.3d 199, 213–14 (2d Cir. 2016), where it applied *Omnicare* in evaluating challenges to interpretations and characterizations of clinical trial results.

*Omnicare*'s three channels flow from the two options securities plaintiffs have in attacking statements.  When plaintiffs allege that an opinion statement is *false*, they must show that "the speaker did not hold the belief she professed"—that the belief was not "honestly held."  *Omnicare*, 575 U.S. at 186.  When plaintiffs allege that an opinion statement is *misleading by omission*, they must "identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading."  *Id.* at 194.  The *Omnicare* Court emphasized that stating a claim under an omission theory is "no small task for an investor."  *Id.* Under the false statement prong, plaintiffs may alternatively state a claim if they can show that "the supporting fact[s] [a speaker] supplied were untrue."  *Id.* at 186.  Plaintiff here cannot satisfy any of *Omnicare*'s prongs.

### 1.  Plaintiff does not allege facts showing that any Defendant stated an opinion he or she did not honestly hold

Plaintiff fails to allege that any Defendant stated an opinion he or she did not honestly hold.

***Opinions about topline trial results.***  Plaintiff alleges no facts showing that the Defendants did not honestly hold their stated opinions that LUNAR's topline results reflected a crucial and

26

groundbreaking development for NSCLC patients. Indeed, Plaintiff alleges no facts about the three Individual Defendants' subjective beliefs at all—no allegations about confidential witnesses, internal documents, or anything else bearing on Defendants' states of mind. *See infra* at 37–38 (noting a similar shortfall in Plaintiff's scienter allegations).

Plaintiff's attack on the two terms NovoCure used consistently in its written statements— "clinically meaningful" and "profound," ¶ 5—suffers from an additional infirmity. Plaintiff does not explain how those terms were (purportedly) false in the first place. Meanwhile, Plaintiff's selected materials establish the *truth* of NovoCure's statement that LUNAR's results were "clinically meaningful." Plaintiff cites an analyst report quoting "key opinion leaders" for the proposition that "3 months plus is clinically meaningful" for an oncology treatment. Ex. 16 at 39; *see* ¶ 60 (quoting from the same report). The overall survival benefit on the ICI arm, of course, was 7.7 months; the overall survival benefit on the two arms combined was 3.3 months. *Supra* at 8. Courts in this District look askance at securities plaintiffs who "make . . . hay about the use of the term 'clinically meaningful,'" even when those plaintiffs can identify sources that assign the term a meaning *different* from the issuer's. *Lehman v. Ohr Pharm. Inc.*, 2019 WL 4572765, at *4 (S.D.N.Y. Sept. 20, 2019), *aff'd*, 2021 WL 5986761 (2d Cir. 2021). Here, Plaintiff's own sources *agree* with NovoCure's use of the term, establishing that the overall survival benefit was in fact "clinically meaningful."

Plaintiff does no better with "profound." He identifies no source and advances no logic suggesting that living an additional 8 months with no additional toxicities is anything short of profound for a patient with advanced lung cancer. And he pleads no facts showing that *Defendants* did not believe this was a profound benefit.

27

Plaintiff challenges a final statement about topline results, related to the performance of the control groups. In response to a question at the January 10, 2023 conference, Doyle said:

> [T]here was nothing unusual about the control group. So when you report top line data, it's very encouraging to hear that the trial was successful in the top line. But then you have to ask what about the controls. Was there anything funky about the controls. . . . [T]he controls behaved as expected, in line with prior studies. So there was nothing funky here.

¶ 84 (emphases in complaint omitted). The phenomenon Doyle described is well understood in the context of clinical trials and by courts assessing challenges to them. In many cases, plaintiffs attack favorable-appearing topline results by contending that the advantage of the treatment group over the control group was driven by underperformance on the control arm rather than the efficacy of the treatment. *E.g.*, *Kleinman*, 706 F.3d at 150 (plaintiffs alleged that "the control group was losing cognitive function at a greater rate than normal, thus exaggerating any effectiveness in the group taking [the study drug]"); *Amarin*, 2021 WL 1171669, at *2 (plaintiffs speculated that trial succeeded because placebo given to control group worsened patients' conditions). Doyle told investors that this was not the case with LUNAR. The two control cohorts—ICIs alone and docetaxel alone—"behaved as expected . . . nothing funky here." ¶ 84. Plaintiff alleges nothing to the contrary, let alone particularized facts showing that Doyle did not honestly hold the opinion that the control groups performed as expected.

***Opinions about PD-L1 status.*** After Doyle presented topline results at the January 10, 2023 conference, an unidentified analyst asked whether PD-L1 scores had been collected in LUNAR. *Id.* In response, Doyle referred to the performance of the control group (just discussed), and offered additional opinions, which Plaintiff attacks. *Id.* But Plaintiff has not come close to pleading facts showing that Doyle disbelieved the opinions he offered.

Doyle's first opinion statement was "PD-[L]1 status has not shown any relevance in second line," where it is a "red herring." *Id.* (brackets in complaint). Plaintiff contends that this was false

28

because "the effectiveness of ICIs generally increases with higher PD-L1 scores, regardless of whether a patient is given ICIs are [sic] a first-line or second-line treatment." ¶ 87. But Plaintiff cites absolutely nothing in support. He simply asks the Court to believe that his knowledge of oncology is superior to NovoCure's. Even outside of *Omnicare*'s rules for challenging opinion statements, Plaintiff would fall short: "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99. And even if Plaintiff could cite a source for his assertion about the relevance of PD-L1 status in the second line, that would establish, at most, that Plaintiff has a basis for disagreeing with Doyle about oncology—but "[s]ecurities law is simply not a vehicle through which courts will police disagreements in the cancer research community or the parameters of clinical trials." *Zagami v. Cellceutix Corp.*, 2016 WL 3199531, at *13 (S.D.N.Y. June 8, 2016). Most fatally, Plaintiff cites no facts showing that *Doyle* did not believe the opinion he articulated—the subjective element required by *Omnicare*'s first prong.

Plaintiff again reveals the shortfall between the facts he alleges and *Omnicare*'s requirements in claiming Doyle lacked a "reasonable basis" for his statement about relevance in the second line. ¶ 87. The lack of a reasonable basis might conceivably show negligence—reasonableness is a negligence standard—but that is far removed from a subjective disbelief in one's own statements. In any event, Doyle *did* have a reasonable basis. Of the three ICIs used in LUNAR, the FDA has approved two for the second-line treatment of NSCLC *regardless of PD-L1 scores*, and has approved the third for any patient with a PD-L1 score above 1%. Ex. 10 at slide 12 (listing the three ICIs used in LUNAR); Ex. 17 at 1; Ex. 18 at 1; Ex. 19 at 1 (FDA labels).[10] Plaintiff cannot satisfy even the artificially low "reasonableness" standard at which he aims.

---

[10] Publicly available FDA materials are properly before the Court for purposes of establishing an action the agency has taken. *See, e.g.*, *Gale v. Smith & Nephew, Inc.*, 989 F. Supp. 2d 243, 246 n.2, 250 n.6 (S.D.N.Y. Feb. 13, 2013) (on motion to dismiss, taking judicial notice of FDA approval and scope of FDA recall).

Doyle's remaining challenged statement on January 10, also in response to the question about PD-L1 scores, was "these arms were well balanced."  ¶ 84.  Plaintiff alleges no contrary facts here either, nor any basis to conclude that Doyle did not believe his statement.  The available data on PD-L1 status showed a balance among the four arms.  *Supra* at 8.  Plaintiff's theory is that PD-L1 scores were available for only 55% of the LUNAR patients, and that an imbalance could have existed in the remaining 45%.  But Plaintiff pleads no facts showing that such an imbalance existed, and certainly no facts suggesting that Doyle did not subjectively believe his opinion that the arms were well balanced.  Nor does it make sense to contend, as Plaintiff does, that randomization *failed* to produce a balanced distribution of the 45% of patients with "missing" PD-L1 scores, when randomization demonstrably *did* produce a balanced distribution of the 55% of patients whose PD-L1 scores were known.  *Supra* at 25.

For the same reasons, Plaintiff cannot state a claim based on two subsequent statements referring to balance:  (1) Doyle's February 23 statement that "all the indications, as we announced in the press release[,] show balance," ¶ 99, and (2) Doyle's May 4 statement that "we would expect to address all the issues with respect to balance and PD-L1 status at [ASCO]," ¶ 108.  Plaintiff pleads no facts showing that either statement was untrue or that Doyle did not subjectively believe it was true.  Again, PD-L1 scores for 55% of the LUNAR patients were undisputedly balanced across the arms, and Plaintiff pleads no facts suggesting that the same was not true of the remaining 45% of patients—who, like the 55%, were randomized to the treatment or control cohorts.

### 2.     Plaintiff does not allege facts showing that any Defendant misleadingly omitted required information about the bases for his or her opinions

Under *Omnicare*'s second prong, Plaintiff must "identify particular (and material)" facts about the basis of a speaker's opinion "whose omission makes the opinion statement at issue misleading." 575 U.S. at 194.  The Supreme Court provided an example.  If a company makes a

30

legal compliance opinion statement—"we believe our conduct is lawful"—a reasonable investor will expect that the company has consulted with a lawyer. *Id.* at 188–89. If the company did not do so, and omits that it did not do so, a plaintiff who is able to allege this as a factual matter may be able to plead a misleading omission. *Id.*

Plaintiff has not satisfied this prong. Plaintiff identifies no facts about the bases of Defendants' opinions at all. Plaintiff points only to aspects of the data presented at ASCO that in *Plaintiff's* opinion undermine the topline results. That says nothing about the bases of *Defendants'* opinions. *See, e.g.*, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys v. Align Tech., Inc.*, 856 F.3d 605, 618–19 (9th Cir. 2017) ("Plaintiff's pleading of its own calculations . . . does not provide a sufficient substitute for Plaintiff's failure to plead the actual assumptions used by Defendants"; plaintiff accordingly fails to state a claim under any of *Omnicare*'s prongs.).

In any event, by faulting NovoCure for omitting the data points that Plaintiff believes undermine the topline results, Plaintiff has done exactly what the *Omnicare* Court held is *not* sufficient to state a claim. He has identified facts "cutting the other way"—but the makers of opinion statements are not obliged to disclose such facts. 575 U.S. at 189–90. The Second Circuit recognized this in the context of clinical trials in *Sanofi*, where the plaintiff's case "essentially boil[ed] down to an allegation that the statements [about trial results] were misleading for failure to include a fact that would have potentially undermined Defendants' optimistic projections." 816 F.3d at 212. As the appellate court recognized, *Omnicare* "imposes no such disclosure requirements." *Id.*; *see also*, *e.g.*, *Ohr*, 2014 WL 4572765, at *3 (rejecting plaintiff's attack on company's interpretation of interim and final trial results under *Omnicare* and *Sanofi*).

Any attempt to state a claim under *Omnicare*'s second prong would also run afoul of *Kleinman*. In addition to barring attacks on clinical trial design specifically, *supra* at 16–17, the

31

*Kleinman* court more generally rejected claims that amount to "little more than a dispute about the proper interpretation of data." *Sanofi*, 816 F.3d at 214 (discussing *Kleinman*, 706 F.3d at 154). The Second Circuit has very recently underscored this: "We have rejected the proposition that a mere dispute about the interpretation of data can form a basis for liability under section 10(b) and Rule 10b-5." *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F. 4th 408, at *7 (2d Cir. 2023) (cleaned up). Other appellate courts have done the same. *E.g.*, *Emps' Ret. Sys. of the City of Baton Rouge v. Macrogenics, Inc.*, 61 F.4th 369, 387 (4th Cir. 2023) ("Plaintiffs' negative interpretation of the Kaplan-Meier curves graph [presenting overall survival data in a cancer drug trial] is merely a difference of opinion, which is insufficient to establish a securities law violation."). Plaintiff's claim in this case is based on his disagreement with NovoCure's interpretation of the LUNAR data. *Sanofi*, *Kleinman*, and *Philip Morris* foreclose Plaintiff's effort to convert that disagreement into a securities fraud claim.

### 3.    Plaintiff does not allege facts showing that any Defendant embedded a false factual assertion in a statement of opinion

Under *Omnicare*'s third prong, a plaintiff must identify a false statement of embedded fact. The Supreme Court provided an example here, too. An executive states, "I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access." 575 U.S. at 185. A plaintiff who shows that the company does not use a patented technology may be able to state a claim because the embedded factual statement is untrue. *Id.*

Plaintiff's claim does not satisfy this prong. To the extent Plaintiff contends that any challenged statement is a factual assertion rather than the articulation of an opinion, Plaintiff does not plead falsity. As discussed, Plaintiff alleges no facts showing that the control groups did *not* perform as expected, or that PD-L1 scores in LUNAR were *not* balanced. Meanwhile, the FDA's

32

approval of ICIs in the second line regardless of PD-L1 status provides ample support for Doyle's

statement about the irrelevance of PD-L1 scores in that setting.  *Supra* at 29.  That is fatal.[11]

### D.  Plaintiff's Attack Fails as to the Remaining Statements, Which Were Accurate and Non-Actionable Expressions of Corporate Optimism

The remaining challenged statements are expressions of optimism about TTFields'

prospects.  When NovoCure made these statements, it expected to receive and report results for

three major trials in addition to LUNAR—trials testing TTFields' efficacy in treating ovarian

cancer, pancreatic cancer, and brain metastases.  Ex. 6 at 6.  Plaintiff challenges the following:

- Doyle's January 9 statements that LUNAR marks "the beginning of a transformational period where we anticipate final data from multiple clinical trials," that NovoCure was "eager to reach . . . clinical milestones," and that the Company was "energized by the prospect of treating tens of thousands of patients who could benefit from" TTFields. ¶ 78.

- Doyle's January 10 statements that NovoCure was "standing on the threshold of the opportunity to treat many, many, many more patients by extending the reach of our platform," and "couldn't be more excited that the promise to bring [TTFields] into new indications is here." ¶ 82.

- Danziger's February 23 statement that "The positive top-line readout from the pivotal trial marked the beginning of a transformational 24 months for Novocure.  LUNAR is the first of four pivotal studies we expect to read out in the next two years which could dramatically increase the number of patients eligible for" TTFields. ¶ 90.

Plaintiff cannot state a fraud claim based on these statements.  The statements were

accurate:  Plaintiff does not dispute that NovoCure expected to report the results of other major

trials in the near term.  And NovoCure's expressions of optimism and excitement at the

opportunities this provided are not actionable.  "[E]xpressions of puffery and corporate optimism

do not give rise to securities violations."  *Rombach*, 355 F.3d at 174; *see also, e.g.*, *Philip Morris*,

89 F.4th at 417 (collecting authorities); *Greco v. Qudian, Inc.*, 2022 WL 4226022, at *19

---

[11] In his pre-motion letter, Plaintiff states that the pertinent embedded fact is, broadly, "that LUNAR credibly showed what it purported to show—a benefit from TTFields." Dkt. 57 at 3.  But the statements about LUNAR's results and TTFields' medical benefits are neither false nor misleading for all of the reasons discussed above.

(S.D.N.Y. Sept. 13, 2022) (statement that company had an "exciting and reasonable growth outlook" is non-actionable puffery); *Shemian v. Rsch. in Motion, Ltd.*, 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013) (statement that company is "laying in the pieces here to sustain really exciting growth" is non-actionable puffery).

NovoCure's statements about TTFields' prospects, like the challenged statements about LUNAR, are also statements of opinion. Defendants repeatedly couched their statements in terms of their own expectations, emotions, and states of mind. ¶ 78 (referring to "the beginning of a transformational period where we anticipate final data from multiple pivotal trials," and noting "[w]e are eager . . . and energized."); ¶ 82 ("We couldn't be more excited."); ¶ 90 ("LUNAR is the first of four pivotal studies we expect to read out in the next two years which could dramatically increase the number of patients eligible for Tumor Treating Fields."). Plaintiff's attack on these opinions fails under *Omnicare* for the reasons discussed above. Among other things, Plaintiff never suggests that Defendants did not genuinely hold the opinions they expressed.

Plaintiff's attack additionally fails because the challenged statements, which relate to NovoCure's prospects, are forward looking and hence protected by the PSLRA's safe harbor. 15 U.S.C. § 78u-5(i)(1)(B) (statements of "plans or objectives relating to the products or services of the issuer" are forward looking). Indeed, the statements are forward looking on two levels. The safe harbor applies to statements that are forward looking *when made*; by the time litigation commences, the predicted results have generally materialized (or failed to materialize), often in the form of an alleged corrective disclosure. *E.g.*, *Sanofi*, 87 F. Supp. 3d at 535 (forward-looking statements about FDA approval). In this case, Plaintiff takes speculation to a new level. Plaintiff predicts events that even now have not occurred, contending that TTFields will "not be widely adopted by the medical community" unless NovoCure performs additional lung-cancer trials, after

34

LUNAR. ¶ 79. Plaintiff's prediction plainly cannot be proven or disproven until months or years in the future. NovoCure's statements are protected by the safe harbor because Plaintiff fails to allege they were made with actual knowledge that they were false or misleading. 15 U.S.C. § 78u-5(c)(1)(B); *see also* App'x A at 2 (statement identified as forward-looking accompanied by cautionary language). Plaintiff's challenge additionally fails because the purported reasons for falsity he offers are simply speculation about unknown future events. Notably, moreover, Plaintiff is speculating only about *commercial* success. His purported reasons for falsity accordingly do not even match the challenged statements, which relate to scientific matters. Plaintiff does not predict that TTFields will fail to gain FDA approval as a treatment for NSCLC, nor claim that LUNAR's results are insufficient to support approval.

## II.      PLAINTIFF HAS NOT ESTABLISHED A STRONG INFERENCE OF INTENTIONAL FRAUD

Plaintiff also fails to establish the strong, cogent, and compelling inference of intentional fraud required by the PSLRA and *Tellabs*. *Supra* at 12. Plaintiff's scienter allegations consist largely of boilerplate applicable to any company and its executives, while the few Company-specific and Defendant-specific facts he pleads fall short of supporting a strong inference that Defendants intended to deceive investors by reporting undisputedly accurate topline results.

### A.      The Bulk of Plaintiff's Scienter Allegations Are Conclusory Boilerplate

Most of Plaintiff's scienter allegations are entirely conclusory. Substituting repetition for the required supporting facts, Plaintiff alleges that Defendants "knew and/or recklessly disregarded the false and misleading nature" of the challenged statements, had "knowledge" of "[t]he fraudulent scheme described herein," and "had actual knowledge of the misrepresentations and omissions of material facts set forth herein." ¶¶ 129, 131. These are conclusions, not particularized factual allegations, and they do not support a strong inference of intentional fraud.

*E.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (rejecting "speculative and conclusory" allegations of scienter).

In connection with these defective conclusions, Plaintiff offers allegations that could be made against any company and executive in the biotech industry. He claims that the Individual Defendants "recei[ved] . . . information reflecting the true facts regarding NovoCure," ¶ 128, that "by virtue of their high-level positions within the Company, [Defendants] were privy to confidential proprietary information," ¶ 130, and that, "[g]iven their medical backgrounds and experience with clinical trials, Defendants understood the significance of the LUNAR trial's serious flaws," ¶ 133. Courts have long recognized that the contention that executives occupy high-level positions and thus enjoy access to information is so ubiquitous as to be meaningless. *E.g.*, *Glickman v. Alexander & Alexander Servs., Inc.*, 1996 WL 88570, at *14 (S.D.N.Y. Feb. 29, 1996) (individual defendant's "'access,' even his 'unfettered access' to [the company's] records is an inadequate basis for scienter, one which would expose virtually any CEO, by virtue of his or her position alone, to liability") (cleaned up); *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *30 (S.D.N.Y. Oct. 10, 2018) ("Courts in this Circuit have long held . . . that accusations founded on nothing more than a defendant's corporate position are entitled to no weight") (cleaned up; citing authorities).

The inadequacy of boilerplate access allegations is particularly pronounced in the clinical trial setting. "Broad references to raw data, which lack even an allegation that these data had been collected into reports," are "inadequate to allege knowledge that contradicts public statements." *Abely*, 2013 WL 2399869, at *19 (cleaned up). Plaintiff's access allegations are meaningless under these authorities.

36

**B.    Plaintiff Alleges No Facts Showing When Defendants Received the Data Purportedly Revealing LUNAR's Alleged "Flaws," Let Alone Facts Showing that Defendants Believed the Challenged Statements Were False or Misleading**

The scienter allegations are also deficient in that Plaintiff fails to allege facts showing when the three Individual Defendants came into possession of the detailed clinical trial data that purportedly undermined the reported topline results. Plaintiff fails, for example, to allege any fact suggesting that when NovoCure began reporting topline results in press releases and at an investor conference in early January 2023, anybody at NovoCure—let alone the Individual Defendants—had calculated the number of LUNAR patients who received ICIs in the first line, or the percentage of patients for whom PD-L1 scores were available. Plaintiff suggested in his pre-motion letter that the Individual Defendants had digested *all* trial data by January 5, Dkt. 57, but cites no facts to support that.

Specifying when the Individual Defendants became aware of particular data, of course, would not in itself create a strong inference of scienter. Plaintiff would also need to plead facts showing that the Individual Defendants believed that the data—which Plaintiff believes reflect flaws in LUNAR's design—rendered the undisputedly accurate report of topline results misleading. Plaintiff alleges nothing remotely supporting any such contention.

In this respect, the scienter allegations are notable for what they lack. Plaintiff cites no confidential witness and no internal report that might shed light on Defendants' states of mind. While it may be possible in some cases to create the required cogent and compelling inference of intentional deceit without such allegations, courts in this District have repeatedly underscored the scienter shortfall in complaints that lack them. *E.g.*, *In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *18 (S.D.N.Y. Oct. 25, 2017) (dismissing where plaintiff "cites no internal reports, documents, or communications that shed light on Defendant's knowledge of or conduct"); *City of Monroe Emps' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 2011 WL 4357368, at *1 (S.D.N.Y.

37

Sept. 19, 2011) (dismissing where, "unlike [in] many securities class actions, plaintiffs do not rely on a single confidential witness or internal document in order to support their allegations").

### C.    Plaintiff's Allegations About Two Individual Defendants' Nondiscretionary Stock Sales Do Not Support a Strong Inference of Intentional Deceit

Plaintiff's few attempts at specific scienter allegations relate principally to stock sales made on behalf of CFO Cordova and CEO Danziger.  ¶¶ 136–42.  Plaintiff fails to establish the required strong inference for either Defendant.

*Cordova.*  All of Cordova's sales were made automatically to cover tax liability that arose when stock rights vested.  Exs. 20–22.  These nondiscretionary sales are irrelevant to the scienter analysis as a matter of law.  *Keryx*, 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. Apr. 1, 2004).[12]  Plaintiff does not allege that Cordova's sales were unusual in timing or amount.  *Infra* at 39.

Notably, moreover, Plaintiff makes no effort to tie Cordova, NovoCure's CFO, to the alleged fraud.  Plaintiff merely observes that she signed SEC filings setting forth the undisputedly accurate topline results.  *E.g.*, ¶¶ 73, 76, 92.  Cordova did not make any challenged oral statements, and Plaintiff alleges no facts suggesting that she was conversant with the detailed data breakdowns allegedly reflecting flaws in trial design—much less that she intended to deceive investors by reporting topline results before NovoCure provided detailed data in June 2023.

*Danziger.*  Plaintiff concedes that CEO Danziger's sales were also nondiscretionary,

---

[12] Exhibits 20-22 are Forms 4 that NovoCure filed with the SEC on Cordova's behalf.  Courts routinely consider Forms 4 in evaluating scienter allegations based on stock sales.  In particular, courts accept for the truth of the matter asserted representations in a Form 4 that stock was sold to pay tax liability associated with equity vesting.  *Keryx*, 2014 WL 585658, at *13 ("[T]he relevant Form 4s . . . indicate that the sales were executed to cover the tax withholding obligations due upon the vesting of shares of restricted stock. Such sales for tax reasons are not indicative of fraud"; dismissing on scienter grounds) (citations omitted); *Bristol-Myers Squibb*, 312 F. Supp. 2d at 561 & n.6 (citing Forms 4 and noting that "sales to meet tax obligations [are] not indicative of fraud"; dismissing on scienter grounds); *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 720 n.5 (S.D.N.Y. Jan. 11, 2018) ("SEC filings show that [defendants] sold stock for tax purposes," which is "*not* indicative of fraud.").

alleging on the face of the complaint that the sales were made "pursuant to [a] Rule 10b5-1 trading plan[]." ¶ 141. "It is well established that trades under 10b5-1 plans do not raise a strong inference of scienter." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. Mar. 28, 2011) (cleaned up). Plaintiff surmises that "it is plausible" that Danziger entered into his plan between the time NovoCure received the raw data from LUNAR in late 2022 and January 5, 2023, when the Company made the first challenged statement. ¶ 141. But Plaintiff offers no supporting facts— nothing suggesting that Danziger entered into his plan at the very end of 2022 rather than at any other time. Plaintiff bears the burden of marshalling particular facts supporting a strong inference of intentional fraud. Labeling his conclusory statement as "plausible" falls short, and courts in this District have rejected precisely the inference Plaintiff invites here—that a defendant may have executed a trading plan at a time convenient for a plaintiff's theory of fraud. *In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *15 (S.D.N.Y. Sept. 29, 2022) ("courts have rejected" speculative allegations that "it is 'highly plausible' that the individual defendants adopted or amended their [Rule 10b5-1] plans during the Class Period"); *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *21 (S.D.N.Y. Sept. 21, 2021) (same, noting that plaintiff "bears the burden of pleading allegations to establish that the stock sales are unusual or suspicious").[13]

Plaintiff's stock sale allegations are defective for additional reasons. Even if Danziger's sales were not made automatically under his trading plan, Plaintiff would need to show that the sales were unusual in timing and amount. *E.g.*, *In re GlaxoSmithkline PLC*, 2006 WL 2871968, at *12 (S.D.N.Y. Oct. 6, 2006) (citing authority). Plaintiff claims he has shown this because

---

[13] Even if Plaintiff could allege when Danziger adopted his trading plan, that alone would not support an inference of scienter. Plaintiff would also need to allege facts showing that when Danziger entered into the plan, he believed that purported trial design flaws undermined topline results, and further believed that the omission of information about those flaws would deceive investors. *See, e.g.*, *Bristol-Myers Squibb*, 28 F.4th at 355–56 & n.4 (rejecting stock sale allegations where plaintiff failed to allege "that the purpose of [defendant's trading] plan was to take advantage of an inflated stock price"). Needless to say, Plaintiff pleads no such facts.

Danziger made no comparable sales in the five months before January 2023. ¶ 141. But as one of Plaintiff's selected analyst reports notes, Danziger made a comparable sale under very similar circumstances in April 2021. After NovoCure announced that the Data Monitoring Committee recommended ending LUNAR early—favorable news that pushed the stock price up—a stock sale of roughly $19 million was triggered under Danziger's trading plan, comparable to the roughly $23 million sale triggered under his plan on January 5, 2023. Ex. 16 at 37; *see also id.* at 6 (showing surge in stock price following announcement of DMC's recommendation).

The 2021 sale shows that the 2023 sale was not unusual or suspicious, and neither sale bears indicia of scienter. Sales made on the report of good news are not suspect—in contrast with sales made shortly before the announcement of bad news, when unscrupulous insiders may "rush[] to cash out." *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. Aug. 23, 2013); *see also Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*, 838 F.3d 76, 84–85 (1st Cir. 2016) (sales after stock "jumped a large amount" not suspicious). It is also notable that Danziger's sale occurred on the very first day of the purported class period. Plaintiff alleges no facts showing that at this early point, Danziger or anyone else at NovoCure had calculated the figures that Plaintiff says reflect flaws in trial design. *Supra* at 37. Indeed, as with Cordova, Plaintiff makes little effort to tie Danziger to the alleged fraud. Danziger made only two challenged statements, and both are squarely within the realm of non-actionable puffery. ¶ 90 ("the beginning of a transformational 24 months for Novocure"); ¶ 95 ("I would like to echo Bill's excitement about the positive top line readout . . . LUNAR is a key achievement for NovoCure.").

Finally, Plaintiff alleges no stock sales by Doyle, who made the great majority of the challenged statements. Plaintiff cannot substantiate his allegation that Defendants had a motive to commit fraud when the principal speaker held a vast amount of NovoCure stock without a single

40

alleged sale during the class period.  Ex. 23; Ex. 24 at 69 (internal pagination) (551,176 shares held as of August 2, 2022 and April 4, 2023).[14]  Doyle's holdings  undermine any inference of scienter.  *E.g.*, *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383–84 (E.D.N.Y. Mar. 21, 2003) ("As chairman and CEO of the Company, and as the individual who actually made most of the alleged misstatements during the class period, defendant Catell, if anyone, was surely well-positioned to reap profits from insider knowledge.  His failure to do so . . . is thus significant."); *Johnson v. Siemens AG*, 2011 WL 1304267, at \*14 (E.D.N.Y. Mar. 31, 2011) (similar; dismissing complaint on scienter grounds);  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 278–79 (S.D.N.Y. Apr. 16, 2008) (dismissing complaint where inference of scienter raised by CFO's stock sales was undermined lack of sales by CEO or "defendants most intimately involved").[15]

> **D.      Plaintiff's Remaining Allegations Fall Short of Establishing a Strong Inference of Intentional Fraud**

Plaintiff makes only two other Company-specific scienter allegations.  First, Plaintiff alleges that the "sudden termination" of NovoCure's chief medical officer on January 17, 2023 creates an inference of "significant problems with the LUNAR data" and hence an inference of fraud.  ¶ 135.  Plaintiff makes no attempt to explain why this is so.  He does not allege that the CMO designed or oversaw LUNAR.  Nor does he allege that the CMO was responsible for (or even aware of) its purported flaws, had any role in the alleged fraud, or disagreed with the Individual Defendants about LUNAR's results.  Courts reject unvarnished allegations that a

---

[14] The Court can consider Doyle's stock holdings under the authorities in note 12 (page 38, above).

[15] Plaintiff also alleges stock sales by five employees who are not defendants.  ¶ 136.  Sales by non-defendants cannot redeem deficient scienter allegations.  *E.g.*, *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 360 (S.D.N.Y. Feb. 4, 2020) ("Plaintiffs' only other allegations regarding trading of stock involve non-Defendants. Plaintiffs therefore fail to establish scienter. . . ."), *aff'd*, 89 F. 4th 408 (2d Cir. 2023); *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 545 n.20 (S.D.N.Y. Jan. 15, 2020) (non-defendants' trades irrelevant to defendants' scienter).  In addition, Plaintiff pleads no facts showing that any of the five employees believed the challenged statements were false or misleading.  Plaintiff says nothing at all about these employees—save that they sold stock.

termination or resignation shows fraud; such events are probative only when "unusual and suspicious" and "tied to the fraud alleged." *Glaser*, 772 F. Supp. 2d at 598 (cleaned up; collecting authorities); *see also*, *e.g.*, *Iconix*, 2017 WL 4898228, at *19 ("there are any number of reasons that an executive might resign, most of which are not related to fraud") (cleaned up).

Plaintiff's remaining contention is that NovoCure announced on June 6 that it would undertake additional trials in NSCLC. ¶ 134. Plaintiff surmises that planning for these trials must have been underway during the Class Period, and hence that NovoCure knew TTFields will "not be widely adopted by the medical community" absent additional trials. *Id.* This conjecture is baseless. NovoCure had already planned additional trials in NSCLC *while LUNAR was ongoing*, *i.e.*, before the Company knew what the trial results were. Ex. 5 at 9 (referring to pilot study testing TTFields in combination with an ICI in the first line; trial sites began screening patients in 2021). That wholly undermines Plaintiff's claim that NovoCure's plans for more trials show an awareness of purported flaws in LUNAR. NovoCure did what all drug and device developers do. Rather than stopping at a single trial, it planned additional studies to capture other indications and strengthen the case for adopting its product.

### E.    Plaintiff's Recklessness and Negligence Allegations Are Also Deficient

Plaintiff pleads in the alternative that Defendants "at the very least were reckless in not knowing" that the challenged statements were purportedly false or misleading. *E.g.*, ¶ 127. That cannot save Plaintiff's deficient scienter allegations. As an initial matter, recklessness has little if any application here, where Plaintiff challenges almost exclusively statements of opinion. Under *Omnicare*'s first prong, Plaintiff must establish intentional dishonesty, not just recklessness. *Supra* at 26. Because *Omnicare*'s first prong incorporates a scienter-like requirement, "the falsity and scienter requirements are essentially identical." *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 398–99 (S.D.N.Y. June 11, 2020) (cleaned up). Recklessness accordingly cannot

42

supplant the subjective falsity requirement of *Omnicare*'s first prong.  And as noted above, Plaintiff cannot satisfy the second or third prong.  *Supra* at 31–33.

To the extent the recklessness standard applies, Plaintiff could not meet it.  The Second Circuit requires "conscious recklessness"—"*a state of mind approximating actual intent*" to commit fraud.  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (cleaned up; emphasis in decision).  Recklessness is "not merely a heightened form of negligence." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (cleaned up).

Plaintiff's allegations fall short of the recklessness standard in any event.  Plaintiff claims that by reporting topline results, Defendants assumed "a duty to familiarize themselves with the trial data," and then "recklessly disregarded" purported flaws.  ¶¶ 132–33.  In asserting that Defendants breached this purported "duty," Plaintiff alleges at most "a heightened form of negligence."  Most significantly, Plaintiff depends on the premise that anyone familiar with the data would conclude that it undermined the topline results.  But that is *Plaintiff*'s litigation position. It says nothing about *Defendants*' states of mind, and certainly does not lead to an inference that Defendants deliberately ignored or shielded themselves from information that undermined their factually accurate statements.

Plaintiff finally suggests that an even lower scienter standard applies—that he need show only that Defendants made the challenged statements "without a reasonable basis."  ¶ 131.  Again, reasonableness is a negligence standard; making a statement "without a reasonable basis" does not equate to intentional deception and does not establish scienter.  In any event, the undisputed accuracy of the topline results plainly *did* provide Defendants with a reasonable basis for reporting

43

them.  Meanwhile, FDA materials in the public domain provided a basis for challenged statements about the relevance of PD-L1 expression in the second line.  *Supra* at 29.[16]

### F.       The Alleged Facts Weigh Strongly in Favor of a Benign Inference

*Tellabs* instructs courts to weigh any inference of intentional or reckless deceit urged by a plaintiff against competing benign inferences.  *E.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 775–76 (2d Cir. 2010).  Courts consider scienter allegations holistically at this stage.  *Id.*

Here, the benign inference is exceptionally strong.  NovoCure followed—and told investors it would follow—a well-established disclosure protocol, announcing topline results at an early point and then providing detailed clinical trial data several months later at a prestigious medical conference.  Given the planned release of detailed information, the exposure of any alleged fraud was inevitable, and was only months away.  That in itself weighs against an inference of fraud.  "It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).

A benign inference also arises from the nature of the challenged statements.  LUNAR's topline results reflected the first advance in the treatment of a terrible disease—Stage 4 lung cancer resistant to other treatments—in more than 7 years.  *Supra* at 6.  The accuracy of the reported results is not disputed.  The positive news supports a strong inference that Defendants were genuinely excited about the trial results.  Defendants believed in good faith that the results were "profound" and "groundbreaking."

Plaintiff's theory of fraud does not support a contrary inference, let alone a strong one.

---

[16] Plaintiff introduces the "reasonable basis" standard in connection with his allegations of "corporate scienter."  ¶ 131.  Those allegations are defective for reasons beyond Plaintiff's use of the wrong standard.  To establish scienter at the entity level, Section 10(b) plaintiffs must "plead[] facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (cleaned up).  That "someone" need not be one of the individual defendants, but there must be "connective tissue" between that person and the challenged statement before imputation can occur.  *Id.* at 99.  Plaintiff does not identify any such "someone" here.

44

Plaintiff asks the Court to infer that Defendants believed that LUNAR's purported design flaws would hamper commercial uptake, and that they deliberately or recklessly deceived investors by choosing not to refer to patient characteristics reflecting those flaws when reporting topline results. Plaintiff offers no fact supporting those inferences. Notably, Plaintiff makes no allegations about confidential witnesses or documents that might show that interpretation of LUNAR's results was even debated within NovoCure, let alone that Defendants did not believe their interpretation. The fact that the purported flaws on which Plaintiff fixates were understood by market participants before the June 2023 disclosures, *supra* at 19–20, further undermines Plaintiff's inference.

LUNAR's results represented a breakthrough in the treatment of NSCLC. NovoCure's stock nevertheless fell on June 6, perhaps because the market had reservations in predicting the prescribing decisions of healthcare providers following FDA approval. But that says nothing about Defendants' beliefs. The facts alleged strongly support the inference that Defendants believed their statements were accurate and not misleading, just as they believed in the profound promise of a clinical trial that undisputedly met its primary endpoint and kept patients alive longer.

## CONCLUSION

The Court should dismiss the complaint. Because Plaintiff has elected to stand on his complaint rather than amend it in response to NovoCure's pre-motion letter, the Court should dismiss this action with prejudice. Ind. Rules of Practice in Civil Cases 3.D.

Dated: March 4, 2024

**SIDLEY AUSTIN LLP**

/s/ *Francesca E. Brody*
Francesca E. Brody
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
fbrody@sidley.com

45

Hille R. Sheppard (admitted *pro hac vice*)
One South Dearborn
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036
hsheppard@sidley.com

Robin Wechkin (admitted *pro hac vice*)
8426 316th Place Southeast
Issaquah, Washington
Telephone:  (415) 439-1799
Facsimile:  (415) 772-7400
rwechkin@sidley.com

*Attorneys for Defendants NovoCure Limited,
William Doyle, Asaf Danziger, and Ashley
Cordova*

46