# Exhibit 8

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

**(Mark One)**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2023**
**or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission File Number 001-37565**

# NovoCure Limited
(Exact Name of Registrant as Specified in Its Charter)

| **Jersey** | **98-1057807** |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**No. 4 The Forum**
**Grenville Street**
**St. Helier, Jersey JE2 4UF**
(Address of principal executive offices, including zip code)

**+44 (0) 15 3475 6700**
(Registrant's Telephone Number, Including Area Code)

**Not Applicable**
(Former Name, Former Address and Former Fiscal Year, If Changed Since Last Report)

Securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary Shares, no par value | NVCR | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐.

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒.

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Outstanding as of April 28, 2023 |
|---|---|
| Ordinary shares, no par value | 106,209,251 Shares |

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

In addition to historical facts or statements of current condition, this report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements contained in this report are based on our current plans, expectations, hopes, beliefs, intentions or strategies concerning future developments and their impact on us. Forward-looking statements contained in this report constitute our expectations or forecasts of future events as of the date this report was filed with the Securities and Exchange Commission (the "SEC") and are not statements of historical fact. You can identify these statements by the fact that they do not relate strictly to historical or current facts. Such statements may include words such as "anticipate," "will," "estimate," "expect," "project," "intend," "should," "plan," "believe," "hope" and other words and terms of similar meaning in connection with any discussion of, among other things, future operating or financial performance, strategic initiatives and business strategies, regulatory or competitive environments, our intellectual property and research and development related to our Tumor Treating Fields devices marketed under various brand names, including Optune and Optune Lua, and software and systems to support and optimize the delivery of Tumor Treating Fields (collectively, our "Products"). In particular, these forward-looking statements include, among others, statements about:

- our research and development, clinical study and commercialization activities and projected expenditures;

- the further commercialization of our Products for current and future indications;

- our business strategies and the expansion of our sales and marketing efforts;

- the market acceptance of our Products for current and future indications by patients, physicians, third-party payers and others in the healthcare and scientific community;

- our plans to pursue the use of our Products for the treatment of solid tumor cancers other than glioblastoma multiforme ("GBM") and malignant pleural mesothelioma ("MPM");

- our estimates regarding revenues, expenses, capital requirements and needs for additional financing;

- our ability to obtain regulatory approvals for the use of our Products in indications other than GBM and MPM;

- our ability to acquire from third-party suppliers the supplies needed to manufacture our Products;

- our ability to manufacture adequate supply of our Products;

- our ability to secure and maintain adequate coverage from third-party payers to reimburse us for our Products for current and future indications;

- our ability to receive payment from third-party payers for use of our Products for current and future indications;

- our ability to maintain and develop our intellectual property position;

- our ability to manage the risks associated with business disruptions caused by natural disasters, extreme weather events, pandemics such as the COVID-19 pandemic, including the emergence of variant strains, or international conflict and other disruptions outside of our control;

- our cash needs; and

- our prospects, financial condition and results of operations.

These forward-looking statements involve a number of risks and uncertainties (some of which are beyond our control) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. Factors which may cause such differences to occur include those risks and uncertainties set forth under Part I, Item 1A., "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022 filed on February 23, 2023, as well as other risks and uncertainties set forth from time to time in the reports we file with the SEC. In our prior filings, references to NovoTTF-100L now refer to Optune Lua. We do not intend to update publicly any forward-looking statement, whether as a result of new information, future events or otherwise, except as required by law.

TRADEMARKS

This Quarterly Report on Form 10-Q includes trademarks of NovoCure Limited and other persons. All trademarks or trade names referred to herein are the property of their respective owners.

ii

Table of Contents

**NovoCure Limited**
**Quarterly Report on Form 10-Q**
**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| Cautionary Note Regarding Forward Looking Statements | | i |
| Trademarks | | ii |

**PART I-FINANCIAL INFORMATION**

| Item 1. | Financial Statements | 2 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 15 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 23 |
| Item 4. | Controls and Procedures | 23 |

**PART II-OTHER INFORMATION**

| Item 1. | Legal Proceedings | 25 |
| Item 1A. | Risk Factors | 25 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 25 |
| Item 3. | Defaults Upon Senior Securities | 25 |
| Item 4. | Mine Safety Disclosures | 25 |
| Item 5. | Other Information | 25 |
| Item 6. | Exhibits | 26 |
| | Signatures | 27 |

Table of Contents

**PART I-FINANCIAL INFORMATION**

**Item 1. Financial Statements**
**NOVOCURE LIMITED AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

**U.S. dollars in thousands (except share data)**

|  | March 31, 2023 | | December 31, 2022 | |
|---|---|---|---|---|
|  | Unaudited | | Audited | |
| ASSETS | | | | |
| CURRENT ASSETS: | | | | |
| Cash and cash equivalents | $ | 185,963 | $ | 115,326 |
| Short-term investments | | 772,072 | | 854,099 |
| Restricted cash | | 676 | | 508 |
| Trade receivables, net | | 74,830 | | 86,261 |
| Receivables and prepaid expenses | | 23,730 | | 25,959 |
| Inventories | | 31,723 | | 29,376 |
| Total current assets | | 1,088,994 | | 1,111,529 |
| LONG-TERM ASSETS: | | | | |
| Property and equipment, net | | 36,454 | | 32,678 |
| Field equipment, net | | 12,216 | | 12,684 |
| Right-of-use assets | | 25,529 | | 23,596 |
| Other long-term assets | | 11,147 | | 11,161 |
| Total long-term assets | | 85,346 | | 80,119 |
| TOTAL ASSETS | $ | 1,174,340 | $ | 1,191,648 |

The accompanying notes are an integral part of these unaudited consolidated financial statements.

2

Table of Contents

**NOVOCURE LIMITED AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

**U.S. dollars in thousands (except share data)**

| | March 31, 2023 | December 31, 2022 |
|---|---|---|
| | Unaudited | Audited |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | |
| CURRENT LIABILITIES: | | |
| Trade payables | $ 81,469 | $ 85,197 |
| Other payables, lease liabilities and accrued expenses | 67,306 | 73,580 |
| Total current liabilities | 148,775 | 158,777 |
| LONG-TERM LIABILITIES: | | |
| Long-term debt, net | 566,324 | 565,509 |
| Deferred revenues | 1,843 | 2,878 |
| Long-term leases | 19,973 | 18,762 |
| Employee benefit liabilities | 5,143 | 4,404 |
| Other long-term liabilities | 136 | 148 |
| Total long-term liabilities | 593,419 | 591,701 |
| **TOTAL LIABILITIES** | 742,194 | 750,478 |
| COMMITMENTS AND CONTINGENCIES | | |
| | | |
| SHAREHOLDERS' EQUITY: | | |
| Share capital - | | |
| Ordinary shares no par value, unlimited shares authorized; issued and outstanding: 106,187,162 shares and 105,049,411 shares at March 31, 2023 (unaudited) and December 31, 2022, respectively | - | - |
| Additional paid-in capital | 1,266,358 | 1,222,063 |
| Accumulated other comprehensive income (loss) | (2,691) | (2,433) |
| Retained earnings (accumulated deficit) | (831,521) | (778,460) |
| **TOTAL SHAREHOLDERS' EQUITY** | 432,146 | 441,170 |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | $ 1,174,340 | $ 1,191,648 |

The accompanying notes are an integral part of these unaudited consolidated financial statements.

3

Table of Contents

**NOVOCURE LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

**U.S. dollars in thousands (except share and per share data)**

| | Three months ended March 31, | | Year ended December 31, |
|---|---|---|---|
| | **2023** | **2022** | **2022** |
| | **Unaudited** | | **Audited** |
| Net revenues | $ 122,182 | $ 137,547 | $ 537,840 |
| Cost of revenues | 29,614 | 27,727 | 114,867 |
| Gross profit | 92,568 | 109,820 | 422,973 |
| | | | |
| Operating costs and expenses: | | | |
| Research, development and clinical studies | 59,704 | 42,234 | 206,085 |
| Sales and marketing | 51,169 | 37,884 | 173,658 |
| General and administrative | 41,944 | 30,508 | 132,753 |
| Total operating costs and expenses | 152,817 | 110,626 | 512,496 |
| | | | |
| Operating income (loss) | (60,249) | (806) | (89,523) |
| Financial income (expenses), net | 9,169 | (1,709) | 7,677 |
| | | | |
| Income (loss) before income tax | (51,080) | (2,515) | (81,846) |
| Income tax | 1,981 | 2,132 | 10,688 |
| Net income (loss) | $ (53,061) | $ (4,647) | $ (92,534) |
| | | | |
| Basic net income (loss) per ordinary share | $ (0.50) | $ (0.04) | $ (0.88) |
| Weighted average number of ordinary shares used in computing basic net income (loss) per share | 105,667,072 | 104,186,120 | 104,660,476 |
| | | | |
| Diluted net income (loss) per ordinary share | $ (0.50) | $ (0.04) | $ (0.88) |
| Weighted average number of ordinary shares used in computing diluted net income (loss) per share | 105,667,072 | 104,186,120 | 104,660,476 |

The accompanying notes are an integral part of these unaudited consolidated financial statements.

4

Table of Contents

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
**U.S. dollars in thousands**

| | Three months ended March 31, | | Year ended December 31, |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2022 |
| | Unaudited | | Audited |
| Net income (loss) | $ (53,061) | $ (4,647) | $ (92,534) |
| Other comprehensive income (loss), net of tax: | | | |
| Change in foreign currency translation adjustments | 300 | 330 | 1,425 |
| Unrealized gain (loss) from debt securities | 357 | - | (445) |
| Pension benefit plan | (915) | 1,511 | (244) |
| Total comprehensive income (loss) | $ (53,319) | $ (2,806) | $ (91,798) |

NOVOCURE LIMITED AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY

U.S. dollars in thousands (except share data)

| | Ordinary shares | Additional paid-in capital | Accumulated other comprehensive loss | Retained earnings (accumulated deficit) | Total shareholders' equity |
| --- | --- | --- | --- | --- | --- |
| Balance as of December 31, 2022 (audited) | 105,049,411 | $ 1,222,063 | $ (2,433) | $ (778,460) | $ 441,170 |
| Share-based compensation to employees | - | 39,084 | - | - | 39,084 |
| Exercise of options and vested RSUs | 1,137,751 | 5,211 | - | - | 5,211 |
| Other comprehensive income (loss), net of tax benefit of $0 | - | - | (258) | - | (258) |
| Net income (loss) | - | - | - | (53,061) | (53,061) |
| Balance as of March 31, 2023 (Unaudited) | 106,187,162 | $ 1,266,358 | $ (2,691) | $ (831,521) | $ 432,146 |

| | Ordinary shares | Additional paid-in capital | Accumulated other comprehensive loss | Retained earnings (accumulated deficit) | Total shareholders' equity |
| --- | --- | --- | --- | --- | --- |
| Balance as of December 31, 2021 (audited) | 103,971,263 | $ 1,099,589 | $ (3,169) | $ (685,926) | $ 410,494 |
| Share-based compensation to employees | - | 25,045 | - | - | 25,045 |
| Exercise of options and vested RSUs | 587,825 | 3,148 | - | - | 3,148 |
| Other comprehensive income (loss), net of tax benefit of $0 | - | - | 1,841 | - | 1,841 |
| Net income (loss) | - | - | - | (4,647) | (4,647) |
| Balance as of March 31, 2022 (Unaudited) | 104,559,088 | $ 1,127,782 | $ (1,328) | $ (690,573) | $ 435,881 |

The accompanying notes are an integral part of these unaudited consolidated financial statements.

5

Table of Contents

**NOVOCURE LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**U.S. dollars in thousands**

| | Three months ended March 31, | | Year ended December 31, |
|---|---|---|---|
| | 2023 | 2022 | 2022 |
| | Unaudited | | Audited |
| Cash flows from operating activities: | | | |
| Net income (loss) | $ (53,061) | $ (4,647) | $ (92,534) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 2,722 | 2,610 | 10,624 |
| Accrued Interest | (1,120) | (221) | (2,216) |
| Asset write-downs and impairment of field equipment | 126 | 135 | 955 |
| Share-based compensation | 39,084 | 25,045 | 106,955 |
| Foreign currency remeasurement loss (gain) | (127) | 249 | (3,256) |
| Decrease (increase) in accounts receivables | 14,511 | (7,461) | 2,547 |
| Amortization of discount (premium) | (4,056) | 684 | (1,536) |
| Decrease (increase) in inventories | (2,718) | (4,804) | (4,342) |
| Decrease (increase) in other long-term assets | 1,534 | 1,863 | 7,107 |
| Increase (decrease) in accounts payables and accrued expenses | (10,464) | (14,809) | 14,257 |
| Increase (decrease) in other long-term liabilities | (3,158) | (2,331) | (7,773) |
| Net cash provided by (used in) operating activities | (16,727) | (3,687) | 30,788 |
| Cash flows from investing activities: | | | |
| Purchase of property, equipment and field equipment | (6,088) | (5,093) | (21,358) |
| Proceeds from maturity of short-term investments | 326,287 | 279,000 | 1,179,289 |
| Purchase of short-term investments | (237,912) | (291,317) | (1,297,888) |
| Net cash provided by (used in) investing activities | 82,287 | (17,410) | (139,957) |
| Cash flows from financing activities: | | | |
| Proceeds from issuance of shares, net | - | - | 5,224 |
| Repayment of long-term debt | (7) | (7) | (28) |
| Exercise of options | 5,211 | 3,148 | 10,295 |
| Net cash provided by (used in) financing activities | 5,204 | 3,141 | 15,491 |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | 41 | (25) | (97) |
| | | | |
| Increase (decrease) in cash, cash equivalents and restricted cash | 70,805 | (17,981) | (93,775) |
| Cash, cash equivalents and restricted cash at the beginning of the period | 115,834 | 209,609 | 209,609 |
| | | | |
| Cash, cash equivalents and restricted cash at the end of the period | $ 186,639 | $ 191,628 | $ 115,834 |
| | | | |
| Supplemental cash flow activities: | | | |
| Cash paid during the period for: | | | |
| Income taxes paid (refunded), net | $ 1,712 | $ 1,173 | $ 5,480 |
| Interest paid | $ 1 | $ 1 | $ 41 |
| Non-cash activities: | | | |
| Right-of-use assets obtained in exchange for lease liabilities | $ 3,451 | $ 3,580 | $ 12,117 |

The accompanying notes are an integral part of these unaudited consolidated financial statements.

6

Table of Contents

**NOVOCURE LIMITED AND SUBSIDIARIES**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**
U.S. dollars in thousands (except share data)

**NOTE 1: ORGANIZATION AND BASIS OF PRESENTATION**

*Organization*. NovoCure Limited (including its consolidated subsidiaries, the "Company") was incorporated in the Bailiwick of Jersey and is principally engaged in the development, manufacture and commercialization of Tumor Treating Fields ("TTFields") devices, including Optune and Optune Lua (collectively, our "Products"), for the treatment of solid tumor cancers. The Company currently markets Optune in the United States ("U.S."), Germany, Japan and certain other countries. The Company currently markets Optune Lua in the U.S. and European Union. The Company also has a License and Collaboration Agreement (the "Zai Agreement") with Zai Lab (Shanghai) Co., Ltd. ("Zai") to market Optune in China, Hong Kong, Macau and Taiwan ("Greater China").

*Financial statement preparation*. The accompanying unaudited consolidated financial statements include the accounts of the Company and intercompany accounts and transactions have been eliminated. In the opinion of the Company's management, the consolidated financial statements reflect all adjustments, which are normal and recurring in nature, necessary for fair financial statement presentation for the periods presented. The preparation of these consolidated financial statements in conformity with U.S. generally accepted accounting principles ("GAAP") requires management to make estimates and assumptions that affect the amounts reported in these consolidated financial statements and accompanying notes. Actual results could differ materially from those estimates. These consolidated financial statements and accompanying notes should be read in conjunction with the Company's annual consolidated financial statements and the notes thereto included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K") filed with the Securities and Exchange Commission on February 23, 2023.

The significant accounting policies applied in the audited annual consolidated financial statements of the Company as disclosed in the 2022 10-K are applied consistently in these unaudited interim consolidated financial statements.

Table of Contents

**NOTE 2: CASH, CASH EQUIVALENTS AND SHORT-TERM INVESTMENTS**

Cash equivalents include items almost as liquid as cash, with maturity periods of three months or less when purchased, and short-term investments include items with maturity dates between three months and one year when purchased. As of March 31, 2023 and December 31, 2022, the Company's cash and cash equivalents and short-term investments were composed of:

| | Fair value level | Adjusted cost basis | Unrealized gains | Unrealized losses | Fair market value | Recorded basis | Cash and cash equivalents | Short-term investments |
|---|---|---|---|---|---|---|---|---|
| | | | | **March 31, 2023** | | | | |
| | | | | **Unaudited** | | | | |
| Cash | | $ 11,602 | $ - | $ - | $ 11,602 | $ 11,602 | $ 11,602 | $ - |
| Money market funds | Level 1 | 132,636 | - | - | 132,636 | 132,636 | 132,636 | - |
| Certificate of deposits and term deposits | Level 2 | 295,804 | - | - | 295,804 | 295,804 | 2,000 | 293,804 |
| HTM securities (1) | | | | | | | | |
| U.S. Treasury bills | Level 1 | $ 166,659 | $ 8 | $ (272) | 166,395 | 166,659 | $ - | $ 166,659 |
| Government and governmental agencies | Level 2 | $ 26,512 | $ 95 | $ (9) | 26,598 | 26,512 | $ - | $ 26,512 |
| Corporate debt securities | Level 2 | $ 324,822 | $ 1,570 | $ (1,186) | 325,206 | 324,822 | $ 39,725 | $ 285,097 |
| | | $ 517,993 | $ 1,673 | $ (1,467) | $ 518,199 | $ 517,993 | $ 39,725 | $ 478,268 |
| Total | | $ 958,035 | $ 1,673 | $ (1,467) | $ 958,241 | $ 958,035 | $ 185,963 | $ 772,072 |

| | Fair value level | Adjusted cost basis | Unrealized gains | Unrealized losses | Fair market value | Recorded basis | Cash and cash equivalents | Short-term investments |
|---|---|---|---|---|---|---|---|---|
| | | | | **December 31, 2022** | | | | |
| | | | | **Audited** | | | | |
| Cash | | $ 9,697 | $ - | $ - | $ 9,697 | $ 9,697 | $ 9,697 | $ - |
| Money market funds | Level 1 | 105,629 | - | - | 105,629 | 105,629 | 105,629 | - |
| Certificate of deposits and term deposits | Level 2 | 316,946 | - | - | 316,946 | 316,946 | - | 316,946 |
| HTM securities (1) | | | | | | | | |
| U.S. Treasury bills | Level 1 | $ 188,030 | $ 8 | $ (540) | 187,498 | 188,030 | $ - | $ 188,030 |
| Government and governmental agencies | Level 2 | $ 44,357 | $ 12 | $ (12) | 44,357 | 44,357 | $ - | $ 44,357 |
| Corporate debt securities | Level 2 | $ 304,766 | $ 1,066 | $ (587) | 305,245 | 304,766 | $ - | $ 304,766 |
| | | $ 537,153 | $ 1,086 | $ (1,139) | $ 537,100 | $ 537,153 | $ - | $ 537,153 |
| Total | | $ 969,425 | $ 1,086 | $ (1,139) | $ 969,372 | $ 969,425 | $ 115,326 | $ 854,099 |

Table of Contents

(1) Changes in fair value of held-to-maturity ("HTM") securities are presented for disclosure purposes as required by ASC 320 and are recorded as finance expenses only if the unrealized loss is identified as a credit loss.

In November 2022, the Company transferred all of its available-for-sale portfolio to HTM as part of the Company's investment strategy. Such transfers are made at fair value at the date of transfer. The net unrealized loss on these securities at the date of transfer was $911. These securities continue to be reported in accumulated comprehensive income (loss) and are amortized over the remaining lives of the securities as an adjustment to the yield. As of March 31, 2023 and December 31, 2022, the unamortized unrealized loss balances were $88 and $445, respectively, and are reported in accumulated other comprehensive income (loss).

In accordance with ASC No. 820, the Company measures its money market funds at fair value. The fair value of the money market funds and HTM securities, which is presented for disclosure purposes, are classified within Level 1 or Level 2. This is because these assets are valued using quoted market prices or alternative pricing sources and models utilizing market observable inputs.

As of March 31, 2023 and December 31, 2022, all investments mature in one year or less.

Unrealized losses from debt securities are primarily attributable to changes in interest rates. The Company does not believe any remaining unrealized losses represent impairments based on the evaluation of available evidence.

Debt securities with continuous unrealized losses for less than 12 months and their related fair values were as follows:

|  | March 31, 2023 | | December 31, 2022 | |
|  | Unaudited | | Audited | |
|  | Less than 12 months | | Less than 12 months | |
|  | Fair value | Unrealized loss | Fair value | Unrealized loss |
|---|---|---|---|---|
| U.S. Treasury bills | 116,323 | (272) | 162,813 | (540) |
| Government and governmental agencies | 1,597 | (9) | 38,477 | (12) |
| Corporate debt securities | 224,483 | (1,186) | 162,085 | (587) |
| Total | 342,403 | (1,467) | 363,375 | (1,139) |

As of March 31, 2023, no continuous unrealized losses for 12 months or greater was identified.

## NOTE 3: INVENTORIES

Inventories are stated at the lower of cost or net realizable value. The weighted average methodology is applied to determine cost. As of March 31, 2023 and December 31, 2022, the Company's inventories were composed of:

|  | March 31, 2023 | | December 31, 2022 | |
|  | Unaudited | | Audited | |
|---|---|---|---|---|
| Raw materials | $ | 4,590 | $ | 4,314 |
| Work in progress | | 9,797 | | 9,321 |
| Finished products | | 17,336 | | 15,741 |
| Total | $ | 31,723 | $ | 29,376 |

## NOTE 4: COMMITMENTS AND CONTINGENT LIABILITIES

*Operating Leases.* The facilities of the Company are leased under various operating lease agreements for periods, including options for extensions, ending no later than 2044. The Company also leases motor vehicles under various operating leases, which expire on various dates, the latest of which is in 2026.

*Pledged deposits and bank guarantees.* As of March 31, 2023 and December 31, 2022, the Company pledged bank deposits of $2,341 and $2,296, respectively, to cover bank guarantees in respect of its leases of operating facilities

Table of Contents

and obtained bank guarantees for the fulfillment of the Company's lease and other contractual commitments of $2,700 and $2,459, respectively.

*Senior secured revolving credit facility.* On November 6, 2020, the Company entered into a three-year $150,000 senior secured revolving credit facility ("2020 Credit Facility") with a syndicate of relationship banks. On February 17, 2023, the Company gave irrevocable notice to the administrative agent under the 2020 Credit Facility that the Company terminated all commitments, effective February 22, 2023. This effectively terminated the 2020 Credit Facility, as the Company's ability to borrow and the Company's obligations to comply with all covenants ended on such date. The liens and guaranties in favor of the lenders are released. There was no early termination fee payable and the Company had no outstanding balance borrowed under the 2020 Credit Facility.

The commitments under the 2020 Credit Facility were guaranteed by certain of the Company's subsidiaries and secured by a first lien on the Company's and certain of its subsidiaries' assets. Outstanding loans bore interest per annum at a sliding scale based on the our secured leverage ratio from 2.75% to 3.25% above the applicable interbank borrowing reference rate for the currency in which the loan is denominated. Additionally, the 2020 Credit Facility contained a fee for the unused revolving credit commitments at a sliding scale based on our secured leverage ratio from 0.35% to 0.45%. The 2020 Credit Facility contained financial covenants requiring maintenance of a minimum fixed charge coverage ratio and specifying a maximum senior secured net leverage ratio, as well as customary events of default which include a change of control, which are no longer applicable.

### NOTE 5: CONVERTIBLE NOTE

On November 5, 2020, the Company issued $575,000 aggregate principal amount of 0% Convertible Senior Notes due 2025 (the "Notes").

The Notes mature on November 1, 2025, unless earlier repurchased, redeemed or converted as set forth in the Notes. As of March 31, 2023, the conditions allowing holders of the Notes to convert were not met. The Notes are therefore not convertible as of March 31, 2023 and are classified as long-term liability.

The net carrying amount of the liability of the Notes as of March 31, 2023 and December 31, 2022 are as follows:

| | March 31, 2023 | December 31, 2022 |
|---|---|---|
| | Unaudited | Audited |
| **Liability component, net:** | | |
| Principal amount | $ 575,000 | $ 575,000 |
| Unamortized issuance costs | (8,676) | (9,491) |
| Net carrying amount of liability component (1) | $ 566,324 | $ 565,509 |

) An effective interest rate determines the fair value of the Notes, therefore they are categorized as Level 3 in accordance with ASC 820, "Fair Value Measurements and Disclosures." The estimated fair value of the net carrying amount of liability component of the Notes as of March 31, 2023 and December 31, 2022 were $468,271 and $455,091, respectively.

Finance expense related to the Notes was as follows:

| | Three months ended March 31, | | Year ended December 31, 2022 |
|---|---|---|---|
| | 2023 | 2022 | |
| | Unaudited | | Audited |
| Amortization of debt issuance costs | 815 | 810 | 3,293 |
| Total finance expense recognized | $ 815 | $ 810 | $ 3,293 |

### NOTE 6: SHARE OPTION PLANS AND ESPP

In September 2015, the Company adopted the 2015 Omnibus Incentive Plan (the "2015 Plan"). Under the 2015 Plan, the Company can issue various types of equity compensation awards such as share options, restricted

10

Table of Contents

shares, performance shares, restricted share units ("RSUs"), performance-based share units ("PSUs"), long-term cash awards and other share-based awards.

Options granted under the 2015 Plan generally have a two-year or four-year vesting period and expire ten years after the date of grant. Options granted under the 2015 Plan that are canceled or forfeited before expiration become available for future grants. RSUs granted under the 2015 Plan generally vest over a three year period. PSUs granted under the 2015 Plan generally vest between a three- and six-year period as performance targets are attained. RSUs and PSUs granted under the 2015 Plan that are canceled before expiration become available for future grants. As of March 31, 2023, 19,010,778 ordinary shares were available for grant under the 2015 Plan.

A summary of the status of the Company's option plans as of March 31, 2023 and changes during the period then ended is presented below:

| | Three months ended March 31, 2023 | |
| | Unaudited | |
| | Number of options | Weighted average exercise price |
|---|---|---|
| Outstanding at beginning of year | 8,786,364 | $ 37.27 |
| Granted | 627,764 | 76.97 |
| Exercised | (429,752) | 12.07 |
| Forfeited and canceled | (63,147) | 96.06 |
| Outstanding as of March 31, 2023 | 8,921,229 | $ 40.86 |
| | | |
| Exercisable options | 7,204,441 | $ 30.28 |

For the three months ended March 31, 2023, options to purchase 429,752 ordinary shares were exercised, resulting in the issuance of 429,752 ordinary shares.

A summary of the status of the Company's RSUs and PSUs as of March 31, 2023 and changes during the period then ended is presented below.

| | Three months ended March 31, 2023 | |
| | Unaudited | |
| | Number of RSU/PSUs | Weighted average grant date fair value |
|---|---|---|
| Unvested at beginning of year | 5,377,459 | $ 66.87 |
| Granted | 1,133,373 | 76.97 |
| Vested | (707,999) | 85.08 |
| Forfeited and cancelled | (78,002) | 99.08 |
| Unvested as of March 31, 2023 (1) | 5,724,831 | 66.21 |

(1) Includes PSUs that have a mix of service, market and other milestone performance vesting conditions which are vested upon achievements of performance milestones which are not probable, as of March 31, 2023, in accordance with ASC 718 as follows:

11

Table of Contents

| | March 31, 2023 | | |
|---|---|---|---|
| | Number of PSUs | Fair value at grant date per PSU | Total fair value at grant date |
| | 2,703,852 | $ 48.16 | $ 130,218 |
| | 189,029 | 76.97 | 14,550 |
| | 124,701 | 80.59 | 10,050 |
| | 7,605 | 87.66 | 667 |
| | 10,532 | 94.94 | 1,000 |
| | 161,912 | 114.26 | 18,500 |
| | 3,197,631 | $ | 174,985 |

These PSUs will be expensed over the performance period when the vesting conditions become probable in accordance with ASC 718.

In September 2015, the Company adopted an employee share purchase plan ("ESPP") to encourage and enable eligible employees to acquire ownership of the Company's ordinary shares purchased through accumulated payroll deductions on an after-tax basis. In the United States, the ESPP is intended to be an "employee stock purchase plan" within the meaning of Section 423 of the Internal Revenue Code and the provisions of the ESPP are construed in a manner consistent with the requirements of such section. As of March 31, 2023, 4,868,733 ordinary shares were available to be purchased by eligible employees under the ESPP.

The fair value of share-based awards was estimated using the Black-Scholes model for all equity grants. For market condition awards, the Company also applied the Monte-Carlo simulation model. We assessed fair value using the following underlying assumptions:

| | Three months ended March 31, | | Year ended December 31, 2022 |
|---|---|---|---|
| | 2023 | 2022 | |
| | Unaudited | | Audited |
| **Stock Option Plans** | | | |
| Expected term (years) | 5.75-6.00 | 5.33-5.83 | 5.33-5.83 |
| Expected volatility | 63%-64% | 60%-62% | 60%-62% |
| Risk-free interest rate | 4.08%-4.10% | 1.58%-1.61% | 1.58%-4.23% |
| Dividend yield | 0.00 % | 0.00 % | 0.00 % |
| **ESPP** | | | |
| Expected term (years) | 0.50 | 0.50 | 0.50 |
| Expected volatility | 56 % | 51 % | 51%-77% |
| Risk-free interest rate | 4.76 % | 0.19 % | 0.19%-2.52% |
| Dividend yield | 0.00 % | 0.00 % | 0.00 % |

The total non-cash share-based compensation expense related to all of the Company's equity-based awards recognized for the three months ended March 31, 2023 and 2022 and the year ended December 31, 2022 was:

| | Three months ended March 31, | | Year ended December 31, 2022 |
|---|---|---|---|
| | 2023 | 2022 | |
| | Unaudited | | Audited |
| Cost of revenues | $ 2,006 | $ 952 | $ 4,690 |
| Research, development and clinical studies | 11,779 | 6,801 | 30,790 |
| Sales and marketing | 11,644 | 6,655 | 28,826 |
| General and administrative | 13,655 | 10,637 | 42,649 |
| Total share-based compensation expense | $ 39,084 | $ 25,045 | $ 106,955 |

12

Table of Contents

**NOTE 7: Basic and diluted net income (loss) per ordinary share**

Basic net income (loss) per share is computed based on the weighted average number of ordinary shares outstanding during each period. Diluted net income per share is computed based on the weighted average number of ordinary shares outstanding during the period, plus potential dilutive shares (deriving from options, RSUs, PSUs, convertible notes and the ESPP) considered outstanding during the period, in accordance with ASC 260-10, as determined under the if-converted method.

The following table sets forth the computation of the Company's basic and diluted net income (loss) per ordinary share:

| | Three months ended March 31, | | Year ended December 31, 2022 |
|---|---|---|---|
| | 2023 | 2022 | 2022 |
| | Unaudited | | Audited |
| Net income (loss) attributable to ordinary shares as reported used in computing basic and diluted net income (loss) per share | $ (53,061) | $ (4,647) | $ (92,534) |
| Weighted average number of ordinary shares used in computing basic net income (loss) per share | 105,667,072 | 104,186,120 | 104,660,476 |
| Weighted average number of ordinary shares used in computing diluted net income (loss) per share | 105,667,072 | 104,186,120 | 104,660,476 |
| Weighted anti-dilutive shares outstanding which were not included in the diluted calculation | 7,543,657 | 7,874,118 | 7,272,606 |
| Basic net income (loss) per ordinary share | $ (0.50) | $ (0.04) | $ (0.88) |
| Diluted net income (loss) per ordinary share | $ (0.50) | $ (0.04) | $ (0.88) |

13

Table of Contents

**NOTE 8: SUPPLEMENTAL INFORMATION**

The Company operates in a single reportable segment.

The following table presents long-lived assets by location:

|  | March 31, 2023 | December 31, 2022 |
|---|---|---|
|  | Unaudited | Audited |
| United States | $ 32,859 | $ 30,012 |
| Israel | 7,335 | 7,180 |
| Switzerland | 5,049 | 5,084 |
| Japan | 1,077 | 1,063 |
| Germany | 1,086 | 762 |
| Others | 1,264 | 1,261 |
| Total long lived assets | $ 48,670 | $ 45,362 |

The Company's revenues by geographic region, based on the customer's location, are summarized as follows:

|  | Three months ended March 31, | | Year ended December 31, 2022 |
|---|---|---|---|
|  | 2023 | 2022 | |
|  | Unaudited | | Audited |
| United States | $ 85,228 | $ 97,416 | $ 406,894 |
| Germany | 15,120 | 19,238 | 46,120 |
| Japan | 8,669 | 8,750 | 32,781 |
| Greater China (1) | 5,315 | 4,368 | 21,332 |
| Others | 7,850 | 7,775 | 30,713 |
| Total net revenues | $ 122,182 | $ 137,547 | $ 537,840 |

For additional information, see Note 12 to the Consolidated Financial Statements in the 2022 10-K.

14

Table of Contents

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is intended to provide information to assist you in better understanding and evaluating our financial condition and results of operations. We encourage you to read this MD&A in conjunction with our unaudited consolidated financial statements and the notes thereto for the period ended March 31, 2023 included in Part I, Item 1 of this Quarterly Report on Form 10-Q. This discussion contains forward-looking statements that involve risks and uncertainties. Please refer to the information under the heading "Cautionary Note Regarding Forward-Looking Statements" elsewhere in this report. References to the words "we," "our," "us," and the "Company" in this report refer to NovoCure Limited, including its consolidated subsidiaries.*

**Critical Accounting Policies and Estimates**

In accordance with U.S. generally accepted accounting principles ("GAAP"), in preparing our financial statements, we must make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amounts of net revenues and expenses during the reporting period. We develop and periodically change these estimates and assumptions based on historical experience and on various other factors that we believe are reasonable under the circumstances. Actual results may differ from these estimates.

The critical accounting policies requiring estimates, assumptions and judgments that we believe have the most significant impact on our consolidated financial statements can be found in our 2022 10-K. For additional information, see Note 1 to our unaudited consolidated financial statements in Part I, Item 1 of this Quarterly Report. There were no other material changes to our critical accounting policies and estimates as compared to the critical accounting policies and estimates described in our 2022 10-K.

**Overview**

We are a global oncology company with a proprietary platform technology called Tumor Treating Fields ("TTFields"), which are electric fields that exert physical forces to kill cancer cells via a variety of mechanisms. Our key priorities are to drive commercial adoption of Optune, our commercial TTFields device, and to advance clinical and product development programs intended to extend overall survival in some of the most aggressive forms of cancer.

Optune is approved by the U.S. Food and Drug Administration ("FDA") under the Premarket Approval ("PMA") pathway for the treatment of adult patients with newly diagnosed glioblastoma ("GBM") together with temozolomide, a chemotherapy drug, and for adult patients with GBM following confirmed recurrence after chemotherapy as monotherapy treatment. We also have a CE certificate to market Optune for the treatment of GBM in the European Union ("EU"), as well as approval or local registration in the United Kingdom ("UK"), Japan, Canada and certain other countries. Optune Lua is approved by the FDA under the Humanitarian Device Exemption ("HDE") pathway to treatment malignant pleural mesothelioma ("MPM") together with standard chemotherapies. We have also received CE certification in the EU and approval or local registration to market Optune Lua in certain other countries. We market Optune and Optune Lua in multiple countries around the globe with the majority of our revenues coming from the use of Optune in the U.S., Germany and Japan. We are actively evaluating opportunities to expand our international footprint.

In March 2023, we announced the reimbursement and availability of Optune together with temozolomide for the treatment of adult patients with newly diagnosed GBM in France. The order registering Optune on the List of Reimbursable Product and Services became effective March 15, 2023 and we are now treating patients.

We believe the physical mechanisms of action behind TTFields therapy may be broadly applicable to solid tumor cancers. In January 2023, we announced top line results from our pivotal LUNAR study evaluating the use of TTFields in the treatment of non-small cell lung cancer ("NSCLC") together with standard therapies. Patients treated with TTFields and standard therapies demonstrated a statistically significant and clinically meaningful improvement in overall survival over standard therapies alone. The LUNAR study also showed a statistically significant and clinically meaningful improvement in overall survival when patients were treated with TTFields and immune checkpoint inhibitors, as compared to those treated with immune checkpoint inhibitors alone, and a positive trend in overall survival when patients were treated with TTFields and docetaxel versus docetaxel alone. Full results from the LUNAR study will be presented at the American Society of Clinical Oncology annual meeting in June.

Table of Contents

In addition to the LUNAR study, we are conducting pivotal studies evaluating the use of TTFields in the treatment of ovarian cancer, brain metastases from NSCLC ("brain metastases") and pancreatic cancer. We are also conducting a global pivotal study testing the potential survival benefit of initiating Optune concurrent with radiation therapy versus following radiation therapy in patients with newly diagnosed GBM.

In March 2023, we announced the final patient enrolled in the pivotal METIS study evaluating the efficacy of TTFields therapy following stereotactic radiosurgery for the treatment of patients with brain metastases from NSCLC. Following the completion of enrollment, patients will be followed for a minimum of 12 months with final data anticipated in 2024.

We have one ongoing pilot study evaluating the use of TTFields in the treatment of stage 3 NSCLC and are designing several additional pilot and pivotal studies in partnership with oncology leaders to further explore the capabilities of TTFields. We anticipate expanding our clinical pipeline over time to study the safety and efficacy of TTFields for additional solid tumor indications and combinations with other cancer treatment modalities.

The table below presents the current status of the ongoing clinical studies in our pipeline and anticipated timing of data.



Our therapy is delivered through a medical device and we continue to advance our Products with the intention to extend survival and maintain quality of life for patients. We have several product development programs underway that are designed to optimize TTFields delivery to the target tumor and enhance patient ease of use. One of these initiatives is the launch of new arrays, which are thinner, lighter and more flexible. We plan to submit for regulatory approval in the U.S. via PMA supplement in the second half of this year.

Our intellectual property portfolio contains hundreds of issued patents and numerous patent applications pending worldwide. We believe we possess global commercialization rights to our Products in oncology and are well-positioned to extend those rights into the future as we continue to find innovative ways to improve our Products.

In 2018, we granted Zai Lab (Shanghai) Co., Ltd. ("Zai") a license to commercialize Optune in China, Hong Kong, Macau and Taiwan ("Greater China") under a License and Collaboration Agreement (the "Zai Agreement"). The Zai Agreement also establishes a development partnership intended to accelerate the development of TTFields in multiple solid tumor cancer indications. For additional information, see Note 12 to the Consolidated Financial Statements in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K").

We view our operations and manage our business in one operating segment. For the three months ended March 31, 2023, our net revenues were $122.2 million. Our net loss for the three months ended March 31, 2023 was $53.1 million. As of March 31, 2023, we had an accumulated deficit of $831.5 million. Our net loss resulted primarily from increasing investments designed to support our commercial business, geographic expansion and pre-commercial activities associated with potential future indication launches.

Table of Contents

**Impact of COVID-19**

In March 2020, the World Health Organization ("WHO") declared COVID-19 a global pandemic. Since the pandemic began, we have been following the guidance of the WHO, the U.S. Centers for Disease Control and Prevention, and local health authorities in all of our active markets and we have adjusted the way we conduct business to adapt to the evolving situation. The COVID-19 pandemic did not have a material impact on our financial results through the first quarter of 2023. The pandemic has had and is having an impact on our day-to-day operations, which varies by region based on factors such as geographical spread, stage of containment and recurrence of the pandemic in each region. We believe the prolonged disruption caused by COVID-19 is resulting in increased volatility across global health care systems, such as fluctuations in patient volumes and changes in patterns of care in certain regions, which is currently impacting and might continue to impact our business and clinical studies in the future. For example, outside the U.S., localized lockdowns are causing disruptions in the ability to monitor clinical studies. TTFields is an emerging modality in cancer care and requires significant educational effort to drive awareness and acceptance of our therapy. We have relied heavily on virtual engagement to manage these educational efforts since the onset of the pandemic, which poses challenges to our ability to effectively communicate and engage with our customers and partners around the world.

Given the aggressive nature of the cancers that we treat, we believe that the fundamental value proposition of the TTFields platform remains unchanged. We continue to evaluate and plan for the potential effects of COVID-19 on our business moving forward. The extent to which the COVID-19 pandemic may impact our business and clinical studies in the future will depend on further developments, which are highly uncertain and cannot be predicted with confidence. The COVID-19 pandemic may also have the effect of heightening many of the other risks described in our risk factors disclosed in our 2022 10-K.

**Commentary on Results of Operations**

*Net revenues*. Our revenues are primarily derived from patients using our Products in our active markets. We charge for treatment with our Products on a monthly basis. Our potential net revenues per patient are determined by our ability to secure payment, the monthly fee we collect and the number of months that the patient remains on therapy.

We also receive revenues pursuant to the Zai Agreement. For additional information regarding the Zai Agreement, see Note 12 to the Consolidated Financial Statements in our 2022 10-K.

*Cost of revenues.* We contract with third parties to manufacture our Products. Our cost of revenues is primarily comprised of the following:

- disposable arrays;
- depreciation expense for the field equipment, including the electric field generator used by patients;
- patient support and other personnel costs; and
- overhead costs, such as facilities, freight and depreciation of property, plant and equipment associated with managing our inventory, warehousing and order fulfillment functions.

*Operating expenses.* Our operating expenses consist of research, development and clinical studies, sales and marketing and general and administrative expenses. Personnel costs are a significant component for each category of operating expenses and consist of wages, benefits and bonuses. Personnel costs also include share-based compensation.

*Financial income (expenses), net.* Financial income (expenses), net primarily consists of interest income from cash balances and short-term investments, credit facility interest expense and related debt issuance costs,  and gains (losses) from foreign currency transactions. Our reporting currency is the U.S. dollar. We have historically held substantially all of our cash balances in U.S. dollar denominated accounts to minimize the risk of translational currency exposure.

Table of Contents

**Results of Operations**

The following discussion provides an analysis of our results of operations and reasons for material changes therein for the three months ended March 31, 2023 as compared to the three months ended March 31, 2022. The tables contained in this section report U.S. dollars in thousands (except share, patient, and prescription data).

The following table sets forth our consolidated statements of operations data:

| | Three months ended March 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| | Unaudited | |
| Net revenues | $ 122,182 | $ 137,547 |
| Cost of revenues | 29,614 | 27,727 |
| Gross profit | 92,568 | 109,820 |
| | | |
| Operating costs and expenses: | | |
| Research, development and clinical studies | 59,704 | 42,234 |
| Sales and marketing | 51,169 | 37,884 |
| General and administrative | 41,944 | 30,508 |
| Total operating costs and expenses | 152,817 | 110,626 |
| | | |
| Operating income (loss) | (60,249) | (806) |
| Financial income (expenses), net | 9,169 | (1,709) |
| | | |
| Income (loss) before income taxes | (51,080) | (2,515) |
| Income taxes | 1,981 | 2,132 |
| Net income (loss) | $ (53,061) | $ (4,647) |
| | | |
| Basic net income (loss) per ordinary share | $ (0.50) | $ (0.04) |
| Weighted average number of ordinary shares used in computing basic net income (loss) per share | 105,667,072 | 104,186,120 |
| Diluted net income (loss) per ordinary share | $ (0.50) | $ (0.04) |
| Weighted average number of ordinary shares used in computing diluted net income (loss) per share | 105,667,072 | 104,186,120 |

The following table details the share-based compensation expense included in costs and expenses:

| | Three months ended March 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| | Unaudited | |
| Cost of revenues | $ 2,006 | $ 952 |
| Research, development and clinical studies | 11,779 | 6,801 |
| Sales and marketing | 11,644 | 6,655 |
| General and administrative | 13,655 | 10,637 |
| Total share-based compensation expense | $ 39,084 | $ 25,045 |

18

Table of Contents

*Key performance indicators*

We believe certain commercial operating statistics are useful to investors in evaluating our commercial business as they help our management team and investors evaluate and compare the adoption of our Products from period to period. The number of active patients on therapy is our principal revenue driver. An "active patient" is a patient who is receiving treatment under a commercial prescription order as of the measurement date, including patients who may be on a temporary break from treatment and who plan to resume treatment in less than 60 days. Prescriptions are a leading indicator of demand. A "prescription received" is a commercial order for Optune or Optune Lua that is received from a physician certified to treat patients with our Products for a patient not previously on Optune or Optune Lua. Orders to renew or extend treatment are not included in this total.

The following table includes certain commercial operating statistics for and as of the end of the periods presented.

| | March 31, | |
|---|---|---|
| Operating statistics | 2023 | 2022 |
| Active patients at period end | | |
| United States (1) | 2,168 | 2,257 |
| Germany | 477 | 529 |
| Japan | 382 | 327 |
| Others | 440 | 436 |
| Total | 3,467 | 3,549 |

| | Three months ended March 31, | |
|---|---|---|
| | 2023 | 2022 |
| Prescriptions received in period | | |
| United States (1) | 1,051 | 935 |
| Germany | 208 | 220 |
| Japan | 72 | 102 |
| Others | 165 | 127 |
| Total | 1,496 | 1,384 |

(1) United States includes data for Canada for the first quarter of 2022 and the United States only for all other periods. For the first quarter of 2023, Canada is included in "Others".

There were 12 active MPM patients on therapy as of March 31, 2023 and 15 MPM prescriptions were received in the three months ended March 31, 2023.

**Three months ended March 31, 2023 compared to three months ended March 31, 2022**

| | Three months ended March 31, | | |
|---|---|---|---|
| | 2023 | 2022 | % Change |
| Net revenues | $ 122,182 | $ 137,547 | (11)% |

**Net revenues.** Net revenues decreased 11% to $122.2 million for the three-month period ended March 31, 2023 from $137.5 million for the same period in 2022. The decrease resulted primarily from $5.4 million in reduced collections from previously denied or appealed claims in the U.S., a $2.1 million negative impact in Germany following contract negotiations with several large German payers, and a decrease of 82 global active patients on therapy.

We believe the outstanding denied and appealed claims that were most accessible were largely exhausted in 2022 and the remaining outstanding claims will take time to collect. As a result, we expect future net revenue to more closely reflect core drivers: number of active patients on therapy, duration of therapy, and net realized price per month. We continue to actively appeal and pursue the remaining previously denied claims, but the cadence and size of these collections are difficult to predict.

Table of Contents

| | Three months ended March 31, | | |
|---|---|---|---|
| | 2023 | 2022 | % Change |
| Cost of revenues | $ 29,614 | $ 27,727 | 7% |

***Cost of revenues.*** Our cost of revenues increased by 7% to $29.6 million for the three months ended March 31, 2023 from $27.7 million for the same period in 2022. The increase in cost of revenues was primarily due to an increase in patient support capacity in anticipation of treating larger patient populations in new cancer indications and new geographic regions, as well as increased shipments of equipment to Zai Lab.

Gross margin was 76% for the three months ended March 31, 2023 and 80% for the three months ended March 31, 2022. Excluding sales to Zai, cost of revenues per active patient per month was $2,608 for the three months ended March 31, 2023, an increase of 8% from $2,413 for the same period in 2022, primarily due to increased patient support capacity. Cost of revenues per active patient is calculated by dividing the cost of revenues for the quarter less equipment sales to Zai for the quarter by the average of the active patients at the end of the prior quarter and the ending active patients in the current quarter. This quarterly figure is then divided by three to estimate the monthly cost of revenues per active patient. Sales to Zai are deducted because they are sold at cost and in anticipation of future royalties from Zai, and Zai patient counts are not included in our active patient population. Product sales to Zai totaled $2.6 million for the three months ended March 31, 2023 compared to $1.9 million for the three months ended March 31, 2022. Our gross margins are impacted by current and future product enhancements, such as the ongoing launch of next generation arrays. We continue to focus on opportunities to increase efficiencies and scale within our supply chain. This includes evaluating new materials, manufacturers, and processes that could lead to lower costs.

***Operating Expenses.***

| | Three months ended March 31, | | |
|---|---|---|---|
| | 2023 | 2022 | % Change |
| Research, development and clinical studies | $ 59,704 | $ 42,234 | 41% |
| Sales and marketing | 51,169 | 37,884 | 35% |
| General and administrative | 41,944 | 30,508 | 37% |
| Total operating expenses | $ 152,817 | $ 110,626 | 38% |

*Research, development and clinical study expenses.* Research, development and clinical study expenses increased 41% to $59.7 million for the three-month period ended March 31, 2023 from $42.2 million in the same period in 2022, primarily driven by a $8.7 million increase in clinical trial and personnel costs primarily from PANOVA-3 and METIS, an increase of $3.3 million in engineering and regulatory affairs costs and an increase of $5.0 million in other personnel expenses. Total research and development expenses can fluctuate quarter-to-quarter dependent upon the amount of clinical research organization services delivered, clinical materials procured and the number of trials actively underway within a given quarter.

*Sales and marketing expenses.* Sales and marketing expenses increased 35% to $51.2 million for the three-month period ended March 31, 2023 from $37.9 million for the same period in 2022. This change was primarily due to an increase of $5.0 million in costs associated with geographic expansion and pre-launch activities intended to increase awareness in TTFields in anticipation of future approvals in new indications and $5.0 million in other personnel expenses. Additionally, we are investing in market access capabilities in order to evaluate opportunities, identify optimal access pathways, and successfully gain reimbursement in new geographies.

*General and administrative expenses.* General and administrative expenses increased 37% to $41.9 million for the three months ended March 31, 2023 from $30.5 million for the same period in 2022. This change was primarily due to increased personnel to support potential new indication launches, new geographic launches, supply chain expansion and information technology enhancements.

Table of Contents

| | Three months ended March 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | % Change |
| Financial income (expenses), net | $ 9,169 | $ (1,709) | (636)% |

***Financial income (expenses), net.*** Financial expenses decreased 636% to $9.2 million in income for the three months ended March 31, 2023 from $1.7 million in expenses for the same period in 2022. The change was primarily due to $9.2 million in increased interest income and $1.5 million in foreign exchange rate fluctuations.

| | Three months ended March 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | % Change |
| Income taxes | $ 1,981 | $ 2,132 | (7)% |

***Income taxes.*** Income taxes decreased $0.2 million, or 7% to $2.0 million for the three months ended March 31, 2023 compared to a tax expense of $2.1 million for the same period in 2022. The change reflects a change in the mix of applicable statutory tax rates in active jurisdictions.

### Non-GAAP financial measures

We also measure our performance using a non-GAAP measurement of earnings before interest, taxes, depreciation, amortization and shared-based compensation ("Adjusted EBITDA"). We believe Adjusted EBITDA is useful to investors in evaluating our operating performance because it helps investors evaluate and compare the results of our operations from period to period by removing the impact of earnings attributable to our capital structure, tax rate and material non-cash items, specifically share-based compensation.

We calculate Adjusted EBITDA as operating income before financial expenses and income taxes, net of depreciation, amortization and share-based compensation. The following table reconciles net income (loss), which is the most directly comparable GAAP operating performance measure, to Adjusted EBITDA.

| | Three months ended March 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | % Change |
| Net income (loss) | $ (53,061) | $ (4,647) | 1,042% |
| Add: Income tax | 1,981 | 2,132 | (7)% |
| Add: Financial expenses (income), net | (9,169) | 1,709 | (636)% |
| Add: Depreciation and amortization | 2,722 | 2,610 | 4% |
| EBITDA | $ (57,527) | $ 1,804 | (3,289)% |
| Add: Share-based compensation | 39,084 | 25,045 | 56% |
| Adjusted EBITDA | $ (18,443) | $ 26,849 | (169)% |

Adjusted EBITDA decreased by $45.3 million, or 169%, to a loss of $18.4 million for the three month period ended March 31, 2023 from income of $26.8 million for the same period in 2022. This decrease was primarily attributable to increased growth investments intended to expand our capacity to treat larger patient populations, to enhance commercial capabilities and to increase awareness of TTFields in anticipation of potential future approvals in new indications, and a reduction in revenue as described above.

### Liquidity and Capital Resources

We have incurred significant losses and cumulative negative cash flows from operations since our founding in 2000. As of March 31, 2023, we had an accumulated deficit of $831.5 million. To date, we have primarily financed our operations through the issuance and sale of equity and the proceeds from long-term loans.

At March 31, 2023, we had $958.0 million in cash, cash equivalents and short-term investments, a decrease of $11.4 million compared to $969.4 million at December 31, 2022. We believe our cash, cash equivalents and short-term investments as of March 31, 2023 are sufficient for our operations for at least the next 12 months based on our existing business plan and our ability to control the timing of significant expense commitments. We expect that our operating expenses will continue to increase over the next several years and may outpace our gross profit as we

21

Table of Contents

prepare to expand into additional indications beyond GBM. As a result, we may need to raise additional capital to fund our operations.

The following summary of our cash flows for the periods indicated has been derived from our unaudited consolidated financial statements, which are included elsewhere in this Quarterly Report:

| | Three months ended March 31, | | | |
| | 2023 | 2022 | Change | % Change |
|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $ (16,727) | $ (3,687) | $ (13,040) | 354% |
| Net cash provided by (used in) investing activities | 82,287 | (17,410) | 99,697 | (573)% |
| Net cash provided by financing activities | 5,204 | 3,141 | 2,063 | 66% |
| Effect of exchange rate changes on cash and cash equivalents | 41 | (25) | 66 | (264)% |
| Net increase (decrease) in cash, cash equivalents and restricted cash | $ 70,805 | $ (17,981) | $ 88,786 | (494)% |

*Operating activities.* Net cash used in or provided by operating activities represents our net income (loss) for the periods presented, share-based compensation and depreciation and amortization. Operating cash flows are also impacted by changes in working capital.

Net cash used in operating activities increased by $13.0 million million from $3.7 million net cash used in operating activities for the three months ended March 31, 2022 to $16.7 million net cash used in operating activities for the three months ended March 31, 2023. This increase was a result of net income decreasing $48.4 million, offset by a $27.2 million decrease in working capital and a further offset of $8.1 million in cash to non-cash based expenses, primarily consisting of shared-based compensation. The decrease in working capital includes a $22.0 million decrease in accounts receivable, an increase of $4.3 million in accounts payable and accrued expenses and a $2.1 million decrease in inventories.

*Investing activities.* Our investing activities consist primarily of investments in and redemptions of our short-term investments as well as investments in property and equipment.

Net cash provided by investing activities was $82.3 million for the three months ended March 31, 2023, compared to $17.4 million used in investing activities for the three months ended March 31, 2022. The $82.3 million net cash provided by investing activities for the three months ended March 31, 2023 was primarily attributable to $88.4 million of net proceeds from the maturity of short-term investments and the purchase of $6.1 million of property and equipment. The $17.4 million net cash used in investing activities for the three months ended March 31, 2022 was primarily attributable to $12.3 million of net purchase in short-term investments and by the purchase of $5.1 million of property and equipment.

*Financing activities.* To date, our primary financing activities have been the sale of equity and the proceeds from long-term loans. Net cash provided by financing activities was $5.2 million for the three months ended March 31, 2023, as compared to $3.1 million provided by financing activities for the three months ended March 31, 2022. The net cash provided by financing activities for the three months ended March 31, 2023 and March 31, 2022 included proceeds from the exercise of options under the Company's stock option plan.

### Convertible Notes

On November 5, 2020, we issued $575.0 million aggregate principal amount of 0% Convertible Senior Notes due 2025 (the "Notes"). The Notes are senior unsecured obligations. The Notes do not bear regular interest, and the principal amount of the Notes will not accrete. The Notes are convertible at an initial conversion rate of 5.9439 ordinary shares per $1,000 principal amount of the Notes, which is equivalent to an initial conversion price of approximately $168.24 per ordinary share. The Notes are convertible at the option of the holders upon the satisfaction of certain other conditions and during certain periods, and if the Company exercises its right to redeem the Notes as permitted or required by the indenture. On or after August 1, 2025 until the close of the business on the business day immediately preceding the maturity date, holders may convert all or any portion of their Notes at the conversion rate at any time irrespective of the foregoing conditions.

Table of Contents

In January 2021, we irrevocably elected to settle all conversions of Notes by a combination of cash and our ordinary shares and that the cash portion per $1,000 principal amount of Notes for all conversion settlements shall be $1,000. Accordingly, from and after the date of the election, upon conversion of any Notes, holders of Notes will receive, with respect to each $1,000 principal amount of Notes converted, cash in an amount up to $1,000 and the balance of the conversion value, if any, in our ordinary shares.

For more information, see Note 10a. to the Consolidated Financial Statements in the 2022 10-K.

*Term loan credit facility*

On November 6, 2020, we entered into a new three-year $150.0 million senior secured revolving credit facility with a syndicate of relationship banks (the "2020 Credit Facility"). On February 17, 2023, we gave irrevocable notice to the administrative agent under the 2020 Credit Facility that we terminated all commitments, effective February 22, 2023. This effectively terminated the 2020 Credit Facility, as our ability to borrow and our obligations to comply with all covenants ended on such date. The liens and guaranties in favor of the lenders are released. There was no early termination fee payable.

The commitments under the 2020 Credit Facility were guaranteed by certain of our subsidiaries and secured by a first lien on our and certain of our subsidiaries' assets. Outstanding loans bore interest per annum at a sliding scale based on the our secured leverage ratio from 2.75% to 3.25% above the applicable interbank borrowing reference rate for the currency in which the loan is denominated. Additionally, the 2020 Credit Facility contained a fee for the unused revolving credit commitments at a sliding scale based on our secured leverage ratio from 0.35% to 0.45%. The 2020 Credit Facility contained financial covenants requiring maintenance of a minimum fixed charge coverage ratio and specifying a maximum senior secured net leverage ratio, as well as customary events of default which include a change of control, which are no longer applicable.

## Contractual Obligations and Commitments

There have been no material changes from the information disclosed in our 2022 10-K.

## Off-Balance Sheet Arrangements

We did not have during the periods presented, and we do not currently have, any off-balance sheet arrangements as defined under U.S. Securities and Exchange Commission ("SEC") rules.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

There have been no material changes from the information disclosed in our 2022 10-K.

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

As required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2023. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate, to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of March 31, 2023, our Chief Executive Officer and Chief Financial Officer have concluded that, as of March 31, 2023, our disclosure controls and procedures were effective at the reasonable assurance level.

Table of Contents

**Changes in Internal Control over Financial Reporting**

There has been no change in our internal control over financial reporting during the quarter ended March 31, 2023 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

24

Table of Contents

**PART II-OTHER INFORMATION**

**Item 1. Legal Proceedings**

From time to time, we are involved in various legal proceedings, claims, investigations and litigation that arise in the ordinary course of our business. Litigation is inherently uncertain. Accordingly, we cannot predict with certainty the outcome of these matters. After considering a number of factors, including (but not limited to) the views of legal counsel, the nature of contingencies to which the Company is subject and prior experience, management believes that the ultimate disposition of these legal actions will not materially affect its consolidated financial position or results of operations.

**Item 1A. Risk Factors**

There have been no material changes to our risk factors disclosed in Part I, Item 1A "Risk Factors" in the 2022 10-K.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

None.

**Item 3. Defaults Upon Senior Securities**

None.

**Item 4. Mine Safety Disclosures**

Not applicable.

**Item 5. Other Information**

Due to modifications in our management team's reporting structure, effective May 3, 2023, the role of President—CNS Cancers held by Frank Leonard was determined by our Board of Directors to no longer meet the criteria of "executive officer" as defined in Rule 13b-7 or "officer" as defined in Rule 16a-1(f), in each case under the Securities Exchange Act of 1934, as amended. Mr. Leonard's role and responsibilities have not otherwise changed.

Table of Contents

**Item 6. Exhibits**

| E X H I B I T | | I N D E X | | | | |
|---|---|---|---|---|---|---|

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | Filed Herewith |
|---|---|---|---|---|---|
| | | Form | Date | Number | |
| 31.1 | Certification of Principal Executive Officer Required Under Rule 13a-14(a) and 15d-14(a) of the Securities Exchange Act of 1934, as amended | | | | X |
| 31.2 | Certification of Principal Financial Officer Required Under Rule 13a-14(a) and 15d-14(a) of the Securities Exchange Act of 1934, as amended | | | | X |
| 32.1* | Certification of Principal Executive Officer Required Under Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended, and 18 U.S.C. §1350 | | | | X |
| 32.2* | Certification of Principal Financial Officer Required Under Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended, and 18 U.S.C. §1350 | | | | X |
| 10.1 | Employment Agreement, dated as of May 3, 2023, by and between NovoCure USA LLC and Francis Leonard# | | | | X |
| 101.INS | Inline XBRL Instance Document | | | | X |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | | | | X |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | | | | X |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | | | | X |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document | | | | X |
| 101.PRE | Inline XBRL Extension Presentation Linkbase Document | | | | X |
| 104 | Cover Page Interactive Date File (formatted as Inline XBRL and contained in Exhibit 101) | | | | X |

---

\* The certifications attached as Exhibits 32.1 and 32.2 that accompany this Quarterly Report on Form 10-Q are not deemed filed with the Securities and Exchange Commission and are not to be incorporated by reference into any filing of NovoCure Limited under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date of this Form 10-Q, irrespective of any general incorporation language contained in such filing.

# Compensation plans and arrangements for executive officers and others.

26

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**NovoCure Limited**

Date: May 4, 2023

/s/ Ashley Cordova
Ashley Cordova
Chief Financial Officer
(principal financial and accounting officer
and duly authorized officer)

27

Ex. 10.1

May 3, 2023

Mr. Frank Leonard
Novocure USA LLC
1550 Liberty Ridge Drive, Suite 115
Wayne, Pennsylvania 19087

Dear Frank:

The purposes of this letter (this "Agreement") are to amend and restate the terms and conditions of your Prior Agreement (as defined below) and to set forth and acknowledge certain terms of your continued employment with the Novocure Group. Your formal employment relationship will continue to be with Novocure USA LLC, a Delaware limited liability company (the "Company") and a wholly owned subsidiary of NovoCure Limited, a Jersey (Channel Islands) corporation (the "Parent"). References herein to the "Novocure Group" shall mean and refer to, collectively, the Parent, the Company and their respective direct and indirect subsidiaries and affiliates. Upon the date specified above (the "Effective Date"), this Agreement will supersede and replace in its entirety the employment letter agreement between you and the Company, dated as of September 1, 2020 (the "Prior Agreement").

1.  **Start Date**. The Company shall continue to employ you, and you shall continue to serve the Company, on the terms and conditions set forth in this Agreement. Your employment with the Company initially commenced on June 14, 2010 (the "Start Date"). From and after the Effective Date, you will continue to carry out your day-to-day activities hereunder in an office of the Company located in the Philadelphia area.

2.  **Duties and Responsibilities**. While you are employed by the Company, you will serve as and have the title of President, CNS Cancers, U.S. of the Novocure Group, and you will report to, and be subject to the reasonable direction and control of, the Chief Executive Officer of the Company (the "CEO") as well as the board of managers (or similar governing body) of the Company and the board of directors of Parent (the "Board"). You will have such duties and responsibilities that are commensurate with your position and such other duties and responsibilities as are from time to time reasonably and lawfully assigned to you by the CEO and of a similarly-situated executive officer of a similarly-sized public company. While you are employed by the Company, you will devote your full business time, energy and skill to the performance of your duties and responsibilities hereunder; provided, that nothing in this Agreement shall prevent you from accepting appointment to or continuing to serve on any board of directors or trustees of any non-competing business corporation, charitable organization or other entity with the consent of the CEO or the Board, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, you will not engage in any activities that could create an actual or perceived business or fiduciary conflict of interest with the Novocure Group or unreasonably interfere with the conduct of your obligations under this Agreement or any Novocure Group policy or applicable law or regulation (including the laws of any stock exchange on which the shares of Parent stock are listed).

3.  **Base Salary and Discretionary Annual Bonus**.
    a.  While you are employed by the Company, the Company will pay you a base salary at the rate of $410,000 per year (the "Base Salary"). Your Base Salary will be paid in accordance with the usual payroll practices of the Company. While you are employed by the Company, your Base Salary will be reviewed from time to time for possible adjustment by the compensation committee of the Board.

b.  You will be eligible to receive a discretionary annual cash bonus having a payout at the target level of performance of fifty percent (50%) of your Base Salary (the "Target Bonus") for each calendar year that you are employed by the Company, payable during the first calendar quarter of the year following the year to which the bonus relates, subject to your continued employment through the payment date. Such bonus will be subject to your successful achievement of performance goals set by the CEO or the Board (or committee thereof), in their sole discretion, including, without limitation, goals based on the operating results of the Novocure Group or your individual performance.

4.  **Stock Options**. While you are employed by the Company, you will be eligible to participate in the Parent's 2015 Omnibus Incentive Plan or such other equity-based long-term incentive compensation plan, program or arrangement generally made available to similarly situated senior executives of the Company from time to time (the "Plan"), as determined in the sole and absolute discretion of the Board of Directors of the Parent (the "Parent Board") or authorized committee thereof.

5.  **Benefits and Fringes**.

    a.  **General**. Except as provided otherwise herein and except as provided in paragraph (b) below in respect of health benefits, while you are employed by the Company, you will be entitled to such benefits and fringes, if any, as are generally provided from time to time by the Company to its similarly-situated executive employees, subject to the satisfaction of any eligibility requirements.

    b.  **Health Benefits**. While you are employed by the Company, you and your eligible dependents will be permitted to participate in such medical, dental and other benefit plans, programs or arrangements established by the Company from time to time for similarly-situated executive employees, subject to the satisfaction of any eligibility requirements.

    c.  **Vacation**. You will be entitled to four (4) weeks of annual paid vacation in accordance with the Company's vacation policies in effect from time to time, which may be taken at such times as you elect with due regard to the needs of the Company.

    d.  **Reimbursement of Business and Other Allowances**. (i) Upon presentation of appropriate documentation and subject to Section 11(c), you will be reimbursed in accordance with the Company's expense reimbursement policy as in effect from time to time for all reasonable and necessary business expenses incurred in connection with the performance of your duties and responsibilities hereunder, and (ii) you will be reimbursed promptly for all reasonable legal fees and expenses incurred in assisting with the negotiation of this Agreement.

6.  **Termination of Employment**.

    a.  At all times, your employment with the Company is "at-will," which means that employment with the Company may be terminated by the Company at any time with or without Cause (as defined below) or by you at any time with or without Good Reason (as defined below). For purposes of this Agreement, "Cause" shall mean a determination by the Board that any of the following have occurred: (i) your failure to follow the lawful and reasonable directives of the Company or the Board; (ii) your material violation of any material Company policy, including any provision of a Code of Conduct or Code of Ethics adopted by the Company; (iii) your commission of any act of fraud,

embezzlement, dishonesty or any other willful or gross misconduct that in the reasonable judgment of the Board has caused or is reasonably expected to result in material injury to the Company; (iv) your unauthorized use or disclosure of any proprietary information or trade secrets of any member of the Novocure Group or any other party to whom you owe an obligation of nondisclosure as a result of your relationship with the Company that in the reasonable judgment of the Board has caused or is reasonably expected to result in material injury to the Company; (v) your conviction of, or plea of guilty or "*nolo contendere*" to, a felony or misdemeanor (other than a minor traffic offense); or (vi) your material breach of any of your obligations under this Agreement or any written agreement between you and any member of the Novocure Group. Except for any such event or condition which, but its nature, cannot reasonably be expected to be cured, with respect to the events or conditions described in clauses (i), (ii) or (vi), you shall have thirty (30) days after receipt of written notice from the Company specifying the events or conditions constituting Cause in reasonable detail within which to cure any events or conditions constituting Cause, provided that the Company serves notice of such events or conditions and intended termination within sixty (60) days of the occurrence thereof, and such Cause shall not exist unless either you are not entitled to notice under this sentence, or, if you are entitled to such notice, you fail to cure such acts constituting Cause within such thirty (30)-day cure period. Termination of your employment shall not be deemed to be for Cause unless, prior to termination, the Company delivers to you copies of resolutions duly adopted by the affirmative vote of not less than a majority of the Board (after reasonable written notice is provided to you and you are given a reasonable opportunity, together with counsel, to be heard before the Board), finding that you have engaged in the conduct described in any of (i)-(vi) above.

b.  Subject to Sections 6(c), 6(d) and 11(c), upon termination of your employment for any reason, the Company will have no obligations under this Agreement other than to pay or provide you: (w) any unpaid Base Salary through the date of termination, in a lump sum in cash within 30 days after the date of termination; (x) payment in respect of your earned but unused vacation time through the date of termination (but not in excess of one year's vacation time, ignoring any vacation carried over from prior years) in a lump sum in cash within 30 days after the date of termination; (y) reimbursement for any unreimbursed expenses reasonably incurred consistent with Novocure Group policies then in effect through the date of termination, in a lump sum in cash within 30 days after the date of termination; and (z) benefits in accordance with the terms of the applicable plans and programs of the Company (collectively, including the timing of payment or provision, the "Accrued Benefits").

c.  In addition to the Accrued Benefits, upon a termination of your employment by (i) the Company other than (A) for Cause or (B) as a result of your death or Disability (as defined in the Plan) or (ii) you for Good Reason (a "Qualifying Termination"), then, except as otherwise set forth in Section 6(d) below, and subject to your timely execution and delivery to the Company of a release of claims in substantially the form attached hereto as Exhibit A (the "Release") within twenty-one (21) days, or if required by law, forty-five (45) days, following the date of the Qualifying Termination, and the expiration of the seven (7)-day right of revocation with respect to the Release, the Company shall provide you with the following: (I) an aggregate amount equal to seventy-five percent (75%) of your annual Base Salary, at the level in effect as of the date of the Qualifying Termination, payable in substantially equal installments in accordance with the Company's payroll practices over a period of nine (9) months from the date of the Qualifying Termination and (II) provided you timely elect and remain eligible for continuation coverage pursuant to Part 6 of Title I of ERISA ("COBRA"), the Company

shall pay or reimburse you an amount equal to the full monthly premium for COBRA continuation coverage under the Company's medical plan as in effect as of the date of the Qualifying Termination with respect to the level of coverage in effect for you and your eligible dependents as of such date, on a monthly basis on the first business day of the calendar month next following the calendar month in which the applicable COBRA premiums were paid (the "COBRA Benefit"), with respect to the period from the date of the Qualifying Termination until the earlier of (x) the date nine (9) months following such date and (y) the date on which you accept employment from a third party which third party employer provides to you comparable health and medical benefits. Subject to Section 11(c) of this Agreement, the payments described in this Section 6(c) will be paid or provided (or begin to be paid or provided) as soon as administratively practicable after the Release becomes irrevocable (and any amount which would have otherwise been paid prior to such date paid in a lump sum at such time, and any remaining payments on the schedule described above); provided that with respect to any such amounts that constitute "nonqualified deferred compensation" subject to Section 409A (as defined below), if the period during which you may consider and revoke the Release begins in one taxable year and ends in a second taxable year, no such payments shall be made until the second taxable year.

d.  In addition to the Accrued Benefits, upon a Qualifying Termination within twelve (12) months following a Change in Control (as defined in the Plan), then, in lieu of the payments and benefits under Section 6(c) above, and subject to your timely execution and non-revocation of the Release within twenty-one (21) days, or if required by law, forty-five (45) days, following the date of such Qualifying Termination, and the expiration of the seven (7)-day right of revocation with respect to the Release, the Company shall provide you with the following: (I) an aggregate amount equal to one hundred fifty percent (150%) of the sum of your annual Base Salary and your Target Bonus, at the levels in effect as of the date of the Qualifying Termination, payable in substantially equal installments in accordance with the Company's payroll practices over a period of eighteen (18) months from the date of the Qualifying Termination; (II) the COBRA Benefit with respect to the period from the date of the Qualifying Termination until the earlier of (x) the date twelve (12) months following such date and (y) the date on which you accept employment from a third party which third party employer provides to you comparable health and medical benefits; and (III) all stock options or other equity or equity-based awards held by you that have not previously become vested and (if applicable) exercisable as of the date of the Qualifying Termination shall, upon such termination, become immediately and fully vested and exercisable, without regard to the terms of any applicable award agreement or plan document, and such awards shall otherwise continue to apply on the same terms. Subject to Section 11(c) of this Agreement, the payments described in this Section 6(d) will be paid or provided (or begin to be paid or provided) as soon as administratively practicable after the Release becomes irrevocable (and any amount which would have otherwise been paid prior to such date paid in a lump sum at such time, and any remaining payments on the schedule described above); provided that with respect to any such amounts that constitute "nonqualified deferred compensation" subject to Section 409A (as defined below), if the period during which you may consider and revoke the Release begins in one taxable year and ends in a second taxable year, no such payments shall be made until the second taxable year.

e.  For purposes of this Agreement, "Good Reason" shall mean that you have complied with the "Good Reason Process" following the occurrence of any of the following events: (i) the Company's material failure to make any required payment to you hereunder; (ii) the substantial diminution of your position, reporting relationship, duties or responsibilities

through no fault of your own; (iii) a reduction in your Base Salary or Target Bonus of more than ten percent (10%), unless such reduction is applied to all senior executives; (iv) a requirement that you move your principal business location to one that would increase your commute by more than thirty (30) miles from the location in effect on the Effective Date; or (v) the Company's willful breach of any of its material obligations under any written agreement with you. For purposes of this Agreement, "Good Reason Process" shall mean that (a) you notify the Company and the Board in writing of the occurrence of the alleged Good Reason condition within sixty (60) days of you becoming aware of the occurrence of such condition; (b) the Company shall have a period of not less than thirty (30) days following such notice (the "Cure Period") to remedy the alleged condition, during which time you cooperate in good faith with the Company's efforts to remedy the condition; (c) the alleged Good Reason condition is not remedied during the Cure Period; and (d) you terminate your employment within sixty (60) days after the end of the Cure Period. If the Company cures the alleged Good Reason condition during the Cure Period in your reasonable good faith judgment, Good Reason shall be deemed not to have occurred.

7. **Covenants**.

    a. **Non-Competition**. So long as you are employed by the Company under this Agreement and for the nine (9)-month period following the termination of your employment with the Company for any reason (the "Restricted Period"), you agree that you will not, directly or indirectly, without the prior written consent of the Company, engage in Competition with the Novocure Group. "Competition" means participating, directly or indirectly, as an individual proprietor, partner, stockholder, officer, employee, director, joint venturer, investor, lender, consultant or in any other capacity whatsoever in any business or in the development of any business if (A) such business competes or would compete with the business of the Novocure Group (it being understood that the business of the Novocure Group is the development and commercialization of its proprietary tumor treating fields (TTF) therapy for the treatment of solid tumor cancers (the "Business")) and (B) your activities related to such business would create the opportunity for you to use confidential and proprietary information of the Novocure Group in connection with any other product being developed, manufactured, supplied or sold by any such business or business under development that competes with or upon introduction of a product would compete with the Business. For the avoidance of doubt and by way of example, the foregoing restrictions would not preclude you from being employed by a pharmaceutical company during the Restricted Period to the extent that your activities at such pharmaceutical company would not be directly related to the development, marketing or sale of products that are directly competitive with the Business. Notwithstanding the foregoing, nothing contained in this Section 7(a) shall prohibit you from (i) investing, as a passive investor, in any publicly held company provided that your beneficial ownership of any class of such publicly held company's securities does not exceed one percent (1%) of the outstanding securities of such class, or (ii) with the consent of the Board, entering the employ of any academic institution or governmental or regulatory instrumentality of any country or any domestic or foreign state, county, city or political subdivision.

    b. **Confidentiality**. You agree that you will not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any person or entity, other than in the course of your assigned duties hereunder and for the benefit of the Novocure Group, either while you are employed by the Company hereunder or at any time thereafter, any business and technical information or trade secrets, nonpublic, proprietary or confidential information, knowledge or data relating to the Novocure Group, whether the foregoing will have been

obtained by you during your employment or otherwise. The foregoing will not apply to information that (i) was known to the public prior to its disclosure to you; (ii) becomes generally known to the public or in the industry subsequent to disclosure to you through no wrongful act by you or any of your representatives; or (iii) you are required to disclose by applicable law, regulation or legal process (provided that you provide the Company with prior notice of the contemplated disclosure and cooperate with the Company in seeking a protective order or other appropriate protection of such information). Notwithstanding the foregoing or any other provision in this Agreement or otherwise, nothing herein shall prohibit you from reporting possible violations of federal or state law or regulation to any governmental agency or entity or self-regulatory organization including but not limited to the Department of Justice, the Securities and Exchange Commission, Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal or state law or regulation (it being understood that you do not need the Company's prior authorization to make any such reports or disclosures and you are not required to notify the Company that you have made such reports or disclosures).

c.   **Non-Solicitation of Customers**. You agree that during the Restricted Period, you will not, directly or indirectly, solicit or influence, or attempt to solicit or influence, customers of the Novocure Group to purchase goods or services then sold by the Novocure Group from any other person or entity.

d.   **Non-Solicitation of Suppliers**. You agree that during the Restricted Period, you will not, directly or indirectly, solicit or influence, or attempt to solicit or influence, the Novocure Group's suppliers to provide goods or services then provided to the Novocure Group to any other person or entity in Competition with the Novocure Group.

e.   **Non-Solicitation of Employees**. You recognize that you will possess confidential information about other employees of the Novocure Group relating to their education, experience, skills, abilities, compensation and benefits, and inter-personal relationships with customers of the Novocure Group. You recognize that the information you possess and will possess about these other employees is not generally known, is of substantial value to the Novocure Group in developing its business and in securing and retaining customers, and has been and will be acquired by you because of your business position with the Novocure Group. You agree that, during the Restricted Period, you will not (x) directly or indirectly, individually or on behalf of any other person or entity solicit or recruit any employee of the Novocure Group to leave such employment for the purpose of being employed by, or rendering services to, you or any person or entity unaffiliated with the Novocure Group, or (y) convey any such confidential information or trade secrets about other employees of the Novocure Group to any person or entity other than in the course of your assigned duties hereunder and for the benefit of the Novocure Group or as otherwise required by law or judicial or administrative process.

f.   **Non-Disparagement**. You and the Novocure Group agree that neither will, nor induce others to, Disparage the Novocure Group or any of their past or present officers, directors, employees or products, or you. "Disparage" will mean you or any Novocure Group officer or director making comments or statements to the press, the Novocure Group's employees or any individual or entity with whom the Novocure Group has a business relationship, or any prospective new employer of yours, that would adversely affect in any manner: (i) the conduct of the business of the Novocure Group (including, without limitation, any products or business plans or prospects); or (ii) the business reputation of the Novocure Group, or any of its products, or its past or present officers,

directors, employees, stockholders and affiliates, or you. Nothing in this Section 7(f) shall prevent you or representatives of the Novocure Group from (x) pleading or testifying, to the extent that he or she reasonably believes such pleadings or testimony to be true, in any legal or administrative proceeding if such testimony is compelled or requested, (y) from otherwise complying with legal requirements, or (z) your making any truthful and normal competitive comments and statements that do not violate Section 7 of this Agreement or, directly or indirectly, mention the Novocure Group or any of its executives or officers and are not directed at customers or employees of the Novocure Group.

g. **Inventions**.

i. You acknowledge and agree that all trade secrets, works, concepts, drawings, materials, documentation, procedures, diagrams, specifications, models, processes, formulae, data, programs, knowhow, designs, techniques, ideas, methods, inventions, discoveries, improvements, work products or developments or other works of authorship ("Inventions"), whether patentable or unpatentable, (x) that relate to your work with the Company or any other member of the Novocure Group, made, developed or conceived by you, solely or jointly with others or with the use of any of the Novocure Group's equipment, supplies, facilities or trade secrets or (y) suggested by any work that you perform in connection with the Novocure Group, either while performing your duties with the Novocure Group or on your own time, but only insofar as the Inventions are related to your work as an employee of the Company or the Novocure Group, will belong exclusively to the Company (or its designee and assigns, including without limitation the Parent), whether or not patent applications are filed thereon. You will keep full and complete written records (the "Records"), in the manner prescribed by the Company, of all Inventions, and will promptly disclose all Inventions completely and in writing to the Company. The Records will be the sole and exclusive property of the Company (or its designee and assigns, including without limitation the Parent), and you will surrender them upon the termination of your employment, or upon the Company's request. You do hereby assign to the Company (and its designees and assigns) the Inventions, including all rights in and to patents and other intellectual property rights that may issue thereon in any and all countries, whether during or subsequent to the term of this Agreement, together with the right to file, in your name or in the name of the Company (or its designee), applications for patents and equivalent rights (the "Applications"). You will, at any time during and subsequent to the term of this Agreement, make such Applications, sign such papers, take all rightful oaths, and perform all acts as may be requested from time to time by the Company with respect to the Inventions and the underlying intellectual property. You will also execute assignments to the Company (or its designee or assigns) of the Applications, and give the Company and its attorneys all reasonable assistance (including the giving of testimony) to obtain the Inventions and the underlying intellectual property for its benefit, all without additional compensation to you from the Company, but entirely at the Company's expense.

ii. In addition, the Inventions will be deemed "work made for hire," as such term is defined under the copyright law of the United States, on behalf of the Company and you agree that the Company (or its designees or assigns) will be the sole owner of the Inventions, and all underlying rights therein, in all media now known or hereinafter devised, throughout the universe and in perpetuity without

any further obligations or compensation to you. If the Inventions, or any portion thereof, are deemed not to be "work made for hire," you hereby irrevocably convey, transfer, assign and deliver to the Company (or its designees or assigns), all rights, titles and interests in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Inventions and the underlying intellectual property, including without limitation, (A) all of your rights, titles and interests in the copyrights (and all renewals, revivals and extensions thereof) related to the Inventions and the underlying intellectual property; (B) all rights of any kind or any nature now or hereafter recognized, including without limitation, the unrestricted right to make modifications, adaptations and revisions to the Inventions, to exploit and allow others to exploit the Inventions and the underlying intellectual property; and (C) all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Inventions, known or unknown, prior to the date hereof, including without limitation the right to receive all proceeds and damages therefrom. In addition, you hereby waive any so-called "moral rights" with respect to the Inventions. You hereby waive any and all currently existing and future monetary rights in and to the Inventions and all patents and other intellectual property rights that may issue thereon, including, without limitation, any rights that would otherwise accrue to your benefit by virtue of you being an employee of or other service provider to the Company.

iii.   To the extent that you are unable to assign any of your right, title or interest in any Invention under applicable law, for any such Invention and the underlying intellectual property rights, you hereby grant to the Company (or its designees or assigns) an exclusive, irrevocable, perpetual, transferable, worldwide, fully paid license to such Invention and the underlying intellectual property, with the right to sublicense, use, modify, create derivative works and otherwise fully exploit such Invention and the underlying intellectual property, to assign this license and to exercise all rights and incidents of ownership of the Invention.

iv.   To the extent that any of the Inventions are derived by, or require use by the Company of, any works, Inventions, or other intellectual property rights that you own, which are not assigned hereby, you hereby grant to the Company an irrevocable, perpetual, transferable, worldwide, non-exclusive, royalty free license, with the right to sublicense, use, modify and create derivative works using such works, Inventions or other intellectual property rights, but only to the extent necessary to permit the Company (or its designees or assigns) to fully realize their ownership rights in the Inventions.

v.

h.   **Cooperation**. Upon the receipt of notice from the Company (including outside counsel), you agree that while employed by the Company or any member of the Novocure Group and for a reasonable period thereafter, you will respond and provide information with regard to matters in which you have knowledge as a result of your employment with the Company, and will provide reasonable assistance to the Novocure Group and its representatives in defense of any claims that may be made against the Novocure Group, and will assist the Novocure Group in the prosecution of any claims that may be made by the Novocure Group, to the extent that such claims may relate to the period of your employment with the Company (or any predecessor) and were within your knowledge. You agree to promptly inform the Company if you become aware of any lawsuits involving such claims that may be filed or threatened against the Novocure Group. You also agree to promptly inform the Company (to the extent you are legally permitted to do

so) if you are asked to assist in any investigation of the Novocure Group (or their actions), regardless of whether a lawsuit or other proceeding has then been filed against the Novocure Group with respect to such investigation, and will not do so unless legally required. Subject to any customary and reasonable limitations as may be set forth in any other written agreement between you and any member of the Novocure Group, the Company will reimburse you for pre-approved out-of-pocket expenses incurred in connection with such cooperation.

i.   **Return of Property**. On the date of the termination of your employment with the Company for any reason (or at any time prior thereto at the Company's request), you will return all property belonging to the Novocure Group (including, but not limited to, any Novocure Group provided laptops, computers, cell phones, wireless electronic mail devices or other equipment, or documents and property belonging to the Novocure Group, but not your personal rolodex to the extent it contains only contact information).

j.   **Injunctive Relief**. It is further expressly agreed that the Company will or would suffer irreparable injury if you were to violate the provisions of this Section 7 and that the Novocure Group would by reason of such violation be entitled to injunctive relief in a court of appropriate jurisdiction and you further consent and stipulate to the entry of such injunctive relief in such court prohibiting you from violating the provisions of this Section 7.

k.   **Survival of Provisions**. The obligations contained in this Section 7 will survive the termination of your employment with the Company or any member of the Novocure Group and will be fully enforceable thereafter. If it is determined by a court of competent jurisdiction in any state that any restriction in this Section 7 is excessive in duration or scope or extends for too long a period of time or over too great a range of activities or in too broad a geographic area or is unreasonable or unenforceable under the laws of that state, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the law of that state or jurisdiction.

8.   **Representation**. You represent and warrant that your execution and delivery of this Agreement and your performing the contemplated services does not and will not conflict with or result in any breach or default under any agreement, contract or arrangement which you are a party to or violate any other legal restriction, nor will any member of the Novocure Group knowingly request or require you to take any action that would violate any prior agreement, contract or arrangement of which the Company has been made aware on or prior to the date of this Agreement.

9.   **Assignment**. Notwithstanding anything else herein, this Agreement is personal to you and neither the Agreement nor any rights hereunder may be assigned by you. The Company may assign the Agreement to an affiliate or to any acquiror of all or substantially all of the assets of the Company or otherwise to any person in connection with a Change in Control. This Agreement will inure to the benefit of and be binding upon the personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees, legatees and permitted assignees of the parties.

10.  **Arbitration**. You agree that all disputes and controversies arising under or in connection with this Agreement, other than seeking injunctive or other equitable relief under Section 7(j), will be settled by arbitration conducted before one (1) arbitrator mutually agreed to by the Company and you, sitting in New York, New York or such other location agreed to by you and the Company, in

accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association then in effect; provided, however, that if the Company and you are unable to agree on a single arbitrator within thirty (30) days of the demand by another party for arbitration, an arbitrator will be designated by the New York Office of the American Arbitration Association. The determination of the arbitrator will be final and binding on you and the Novocure Group. Judgment may be entered on the award of the arbitrator in any court having proper jurisdiction. Each party will bear their own expenses of such arbitration.

11. **Taxes**.

    a. **Withholding Taxes**. The Company may withhold from any and all amounts payable to you such federal, state and local taxes as may be required to be withheld pursuant to any applicable laws or regulations.

    b. **Parachute Payments**. Anything in this Agreement to the contrary notwithstanding, in the event it shall be determined that receipt of all payments or distributions by the Company or its affiliates in the nature of compensation to or for your benefit, whether paid or payable pursuant to this Agreement or otherwise, would subject you to the excise tax under Section 4999 of the Internal Revenue Code of 1986, as amended (the "Code"), the amount of "parachute payments" (within the meaning of Section 280G of the Code) paid or payable pursuant to this Agreement (the "Agreement Payments") shall be reduced to the greatest amount of Agreement Payments that can be paid that would not result in the imposition of the excise tax under Section 4999 of the Code (the "Reduced Amount") only if it is determined that you would be better-off, on a net after-tax basis, if the Agreement Payments were reduced to the Reduced Amount. All determinations required to be made under this Section 11(b) shall be made by an independent accounting firm (the "Accounting Firm"), and all fees and expenses of the Accounting firm shall be borne solely by the Company. The Accounting Firm shall provide detailed supporting calculations to both the Company and to you, and absent manifest error, shall be binding upon the Company and you.

    c. **Code Section 409A**.

        i.    The intent of the parties is that payments and benefits under this Agreement comply with or be exempt from Section 409A of the Code and the regulations and guidance promulgated thereunder (collectively, "Section 409A") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith or exempt therefrom. For purposes of Section 409A, your right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period with reference to a number of days (e.g., "payment shall be made within thirty (30) days following the date of termination"), the actual date of payment within the specified period shall be within the sole discretion of the Company.

        ii.    A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." If you are deemed on the date of termination to be a "specified employee" within

the meaning of that term under Section 409A(a)(2)(B), then with regard to any payment or the provision of any benefit that is specified herein as subject to this Section or is otherwise considered "deferred compensation" under Section 409A (whether under this Agreement, any other plan, program, payroll practice or any equity grant) and is due upon your separation from service, such payment or benefit shall not be made or provided until the date which is the earlier of (A) the expiration of the six (6)-month period measured from the date of your "separation from service," and (B) the date of your death (the "<u>Delay Period</u>") and this Agreement and each such plan, program, payroll practice or equity grant shall hereby be deemed amended accordingly. Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section 11(c) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to you in a lump sum on the first business day of the Delay Period, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

iii. All expenses or other reimbursements paid pursuant to Sections 5(b) or 5(d) hereof or otherwise hereunder that are taxable income to you shall in no event be paid later than the end of the calendar year next following the calendar year in which you incur such expense or pays such related tax. With regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A, (i) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, (ii) the amount of expenses eligible for reimbursement, of in-kind benefits, provided during any taxable year shall not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year, provided that the foregoing clause (ii) shall not be violated without regard to expenses reimbursed under any arrangement covered by Section 105(b) of the Code solely because such expenses are subject to a limit related to the period the arrangement is in effect and (iii) such payments shall be made on or before the last day of your taxable year following the taxable year in which the expense occurred.

12. **<u>Governing Law</u>**. This Agreement will be governed by, and construed under and in accordance with, the internal laws of the State of New York, without reference to rules relating to conflicts of laws.

13. **<u>Entire Agreement; Amendments</u>**. This Agreement and the agreements referenced herein contain the entire agreement of the parties relating to the subject matter hereof, and supersede in their entirety any and all prior agreements, understandings or representations relating to the subject matter hereof, and upon the Effective Date, this Agreement shall supersede the Prior Agreement in its entirety. No amendments, alterations or modifications of this Agreement will be valid unless made in writing and signed by the parties hereto. To the extent implied herein, the applicable provisions of this Agreement shall survive any termination of your employment.

14. **<u>Section Headings</u>**. The section headings used in this Agreement are included solely for convenience and will not affect, or be used in connection with, the interpretation of this Agreement.

15. **<u>Severability; Waiver</u>**. The provisions of this Agreement will be deemed severable and the invalidity of unenforceability of any provision will not affect the validity or enforceability of the

other provisions hereof. No failure to exercise, delay in exercising, or single or partial exercise of any right, power or remedy by either party, and no course of dealing between the parties, shall constitute a waiver of, or shall preclude any other or further exercise of, any right, power or remedy.

16. **Counterparts**. This Agreement may be executed in several counterparts (including via facsimile), each of which will be deemed to be an original but all of which together will constitute one and the same instruments.

17. **Compensation Recovery**. Any amounts paid pursuant to this Agreement shall be subject to recoupment in accordance with any clawback policy that Parent and/or the Company has adopted, adopts or is otherwise required by law to adopt, whether pursuant to the listing standards of any national securities exchange or association on which the Parent's securities are listed, the Dodd-Frank Wall Street Reform and Consumer Protection Act and/or other applicable law.

18. **Notices**. All notices, consents or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given when delivered personally or one business day after being sent by a nationally recognized overnight delivery service, charges prepaid. Notices also may be given by facsimile or electronically via PDF and shall be effective on the date transmitted if confirmed within 48 hours thereafter by a signed original sent in the manner provided in the preceding sentence. Notice to you shall be sent to your most recent address on file with the Company. Notice to the Company shall be sent to its address set forth on the first page hereto. Either party may change its address for notice and the address to which copies must be sent by giving notice of the new addresses to the other party in accordance with this Section 18, provided, however, that any such change of address notice shall not be effective unless and until received.

19. **Indemnification; Directors and Officers Liability Insurance**. In addition to any rights to indemnification to which you may be entitled under the Company's and/or Parent's governing documents or other agreement, the Company and/or Parent (as applicable) shall indemnify you at all times during and after your employment terminates for any reason to the maximum extent permitted under applicable law, including its provisions regarding advancement of costs and attorneys' fees, in connection with any action, suit, investigation or proceeding based in whole or in part upon your actions, inaction, or status as an employee, officer, or director of any member of the Novocure Group, except to the extent it is finally determined by a court of competent jurisdiction that you are either not entitled to indemnification hereunder or otherwise or that any such action or inaction by you that gave rise to any such action, suit, investigation or proceeding arose out of your own gross negligence, willful misconduct or fraud. The Company and/or Parent shall maintain directors and officers liability insurance in commercially reasonable amounts (as reasonably determined by the Board or the Parent Board (as applicable)), and you shall be covered under such insurance to the same extent as any other senior executives of the Company and/or the Novocure Group, both during employment and thereafter while potential liability exists.

[*Remainder of page intentionally blank*]

We hope that you find the foregoing terms and conditions acceptable. You may indicate your agreement with the terms and conditions set forth in this Agreement by signing the enclosed duplicate original of this Agreement and returning it to me.

We look forward to your employment with the Company.

Very truly yours,

**NOVOCURE USA LLC**
By: /s/ Asaf Danziger
Name: Asaf Danziger
Title: CEO
Dated: May 3, 2023

**Accepted and Agreed**:
/s/ Frank Leonard
Frank Leonard
Dated: May 3, 2023

RELEASE AGREEMENT

This RELEASE AGREEMENT ("Agreement") made this [ ], [ ] (the "<u>Effective Date</u>"), between Novocure USA LLC (including its successors and assigns, the "<u>Company</u>"), and Frank Leonard (the "<u>Executive</u>").

1.  <u>Release</u>.

a.    In consideration of the amounts to be paid by the Company pursuant to the employment letter agreement, effective as of April 3, 2023 (the "<u>Employment Agreement</u>"), Executive, on behalf of himself and his heirs, executors, devisees, successors and assigns, knowingly and voluntarily releases, remises, and forever discharges the Company and its parent company, subsidiaries and affiliates, together with each of their current and former principals, officers, directors, shareholders, agents, representatives and employees, and each of their heirs, executors, successors and assigns (collectively, the "<u>Releasees</u>"), from any and all debts, demands, actions, causes of action, accounts, covenants, contracts, agreements, claims, damages, omissions, promises, and any and all claims and liabilities whatsoever, of every name and nature, known or unknown, suspected or unsuspected, both in law and equity ("<u>Claims</u>"), which Executive ever had, now has, or may hereafter claim to have against the Releasees by reason of any matter or cause whatsoever arising from the beginning of time to the time he signs this Agreement arising out of his employment by, or termination from employment by, the Company or the Novocure Group (the "<u>General Release</u>"). References herein to the "<u>Novocure Group</u>" shall mean and refer to, collectively, the Company, Novocure Limited, a Jersey (Channel Islands) corporation, and their respective direct and indirect subsidiaries and affiliates. This General Release of Claims shall apply to any Claim of any type, including, without limitation, any and all Claims of any type that Executive may have arising under the common law, under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Older Workers Benefit Protection Act, the Americans With Disabilities Act of 1967, the Family and Medical Leave Act of 1993, the Employee Retirement Income Security Act of 1974, the Sarbanes-Oxley Act of 2002, each as amended, and any other federal, state or local statutes, regulations, ordinances or common law, or under any policy, agreement, contract, understanding or promise, written or oral, formal or informal, between any of the Releasees and Executive and shall further apply, without limitation, to any and all Claims in connection with, related to or arising out of Executive's employment relationship, or the termination of his employment, with the Company.

b.    For the purpose of implementing a full and complete release, Executive understands and agrees that this Agreement is intended to include all claims, if any, which Executive or his heirs, executors, devisees, successors and assigns may have and which Executive does not now know or suspect to exist in his favor against the Releasees, from the beginning of time until the time he signs this Agreement, and this Agreement extinguishes those claims.

c.    In consideration of the promises of the Company set forth in the Employment Agreement, Executive hereby releases and discharges the Releasees from any and all Claims that Executive may have against the Releasees arising under the Age Discrimination Employment Act of 1967, as amended, and the applicable rules and regulations promulgated thereunder ("ADEA"). Executive acknowledges that he understands that the ADEA is a federal statute that prohibits discrimination on the basis of age in employment, benefits and benefit plans. Executive also understands that, by signing this Agreement, he is waiving all Claims against any and all of the Releasees.

    d.   Except as provided in Section 6 of the Employment Agreement, Executive acknowledges and agrees that the Company has fully satisfied any and all obligations owed to him arising out of his employment with or termination from the Company, and no further sums or benefits are owed to him by the Company or by any of the other Releasees at any time.

    e.   Excluded from this General Release are any claims which cannot be waived by law in a private agreement between employer and employee, including but not limited to, the right to enforce this Agreement or the Employment Agreement and recover for any breach of it and the right to file a charge with or participate in an investigation conducted by the Equal Employment Opportunity Commission ("EEOC") or state or local fair employment practices agency. Executive, however, waives any right to any monetary recovery or other relief should the EEOC or any other agency pursue a claim on his behalf. Additionally, this General Release does not waive any right Executive may have (i) to accrued and vested benefits or benefits otherwise due (other than severance, termination or change in control benefits) under any employee benefit plan of the Company or (ii) to coverage and/or indemnification by the Company pursuant to any directors' and officers' liability insurance coverage of the Company or pursuant to the organizational or governance documents of the Company.

2. <u>Release</u>. The Company advises Executive to consult with an attorney of his choosing prior to signing this Agreement. Executive understands and agrees that he has the right and has been given the opportunity to review this Agreement and, specifically, the General Release in Section 1 above, with an attorney. Executive also understands and agrees that he is under no obligation to consent to the General Release set forth in Section 1 above. Executive acknowledges and agrees that the payments to be made to Executive pursuant to the Employment Agreement are sufficient consideration to require him to abide with his obligations under this Agreement, including but not limited to the General Release set forth in Section 1. Executive represents that he has read this Agreement, including the General Release set forth in Section 1, and understands its terms and that he enters into this Agreement freely, voluntarily, and without coercion.

3. <u>Effective Date; Revocation</u>. Executive acknowledges and represents that he has been given [twenty-one (21)/forty-five (45)][1] days during which to review and consider the provisions of this Agreement and, specifically, the General Release set forth in Section 1 above. Executive further acknowledges and represents that he has been advised by the Company that he has the right to revoke this Agreement for a period of seven (7) days after signing it. Executive acknowledges and agrees that, if he wishes to revoke this Agreement, he must do so in a writing, signed by him and received by the Company no later than 5:00 p.m. Eastern Time on the seventh (7th) day of the revocation period. If no such revocation occurs, the General Release and this Agreement shall become effective on the eighth (8th) day following his execution of this Agreement.

4. <u>Severability</u>. In the event that any one or more of the provisions of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remainder of the Agreement shall not in any way be affected or impaired thereby.

5. <u>Governing Law</u>. This Agreement and any other document or instrument delivered pursuant hereto, and all claims or causes of action that may be based upon, arise out of or relate to this Agreement will be governed by, and construed under and in accordance with, the internal laws of the State of New York, without reference to rules relating to conflicts of laws.

6. <u>Entire Agreement</u>. This Agreement, the Employment Agreement and the other agreements referred to in the Employment Agreement constitute the entire agreement and understanding of the parties with respect to the subject matter herein and supersedes all prior agreements, arrangements and understandings, written or oral, between the parties. Executive acknowledges and agrees that he is

not relying on any representations or promises by any representative of the Company concerning the meaning of any aspect of this Agreement.

7. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the dates set forth below.

NOVOCURE USA LLC
By: _
Name:
Title:

EXECUTIVE
By: _
Name: Frank Leonard
Dated:

[1] Consideration period to be determined at time of termination.

**Exhibit 31.1**

**CERTIFICATIONS**

I, Asaf Danziger, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of NovoCure Limited;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: May 4, 2023

/s/ Asaf Danziger
Asaf Danziger
Chief Executive Officer and Director

**Exhibit 31.2**

**CERTIFICATIONS**

I, Ashley Cordova, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of NovoCure Limited;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: May 4, 2023

/s/ Ashley Cordova
Ashley Cordova
Chief Financial Officer
(Principal Accounting and Financial Officer)

**Exhibit 32.1**

**NOVOCURE LIMITED**
**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of NovoCure Limited (the "Company") on Form 10-Q for the quarter ended March 31, 2023, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Asaf Danziger, Chief Executive Officer (Principal Executive Officer) of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ Asaf Danziger
Asaf Danziger
Chief Executive Officer
(Principal Executive Officer)


Date: May 4, 2023

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff on request.

This certification accompanies the Report to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of NovoCure Limited under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Report), irrespective of any general incorporation language contained in such filing.

**Exhibit 32.2**

**NOVOCURE LIMITED**
**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of NovoCure Limited (the "Company") on Form 10-Q for the quarter ended March 31, 2023, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Ashley Cordova, Chief Financial Officer (Principal Financial and Accounting Officer) of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

    (1)      The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    (2)      The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ Ashley Cordova
Ashley Cordova
Chief Financial Officer
(Principal Financial and Accounting Officer)


Date: May 4, 2023

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff on request.

This certification accompanies the Report to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of NovoCure Limited under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Report), irrespective of any general incorporation language contained in such filing.