UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

WILLIAM E. BAZZELLE, SR., Individually   :   Civil Action No. 1:23-cv-05146-GHW
and on Behalf of All Others Similarly Situated, :

  :   <u>CLASS ACTION</u>

Plaintiff,   :

  :

vs.   :

  :

NOVOCURE LIMITED, WILLIAM DOYLE,   :
ASAF DANZIGER and ASHLEY   :
CORDOVA,   :

  :

Defendants.   :

  :

—————————————————————— x

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ....................................................................................3

        A.      NovoCure and Its TTFields Therapy ......................................................3

        B.      The LUNAR Trial....................................................................................4

        C.      Treatments for NSCLC and the Current Standards-of-Care...................5

        D.      Defendants Announce LUNAR's Topline Results but Mislead Investors
                About the Nature of the Results...............................................................6

        E.      In Contrast to Defendants' Characterizations and Assurances, LUNAR
                Suffered from Serious Flaws and Missing Data that Undermined the
                Positive Topline Results .......................................................................10

        F.      The Truth Is Revealed............................................................................11

III.    ARGUMENT......................................................................................................13

        A.      The Standards Governing This Motion...................................................13

        B.      The AC Pleads Actionable Misrepresentations .....................................14

                1.      Defendants' Statements Created a Duty to Disclose ..................15

                2.      Any Statements of Opinion Are Actionable Under *Omnicare* and
                        *Abramson* .................................................................................21

                        a.      Characterizations of LUNAR .........................................22

                        b.      Responses to Analyst Questions About PD-L1 Status ..................26

                3.      The AC "Attacks" Defendants' Misrepresentations, Not LUNAR's
                        Design .........................................................................................29

                4.      Defendants' Additional Statements Are Not Puffery or Forward-
                        Looking.........................................................................................34

        C.      The AC Pleads a Strong Inference of Scienter .....................................35

                1.      Defendants Acted with Conscious Misbehavior or Recklessness .............36

                2.      Motive Allegations Contribute to a Strong Inference of Scienter ............39

**Page**

       3.     Defendants Have Not Presented a More Compelling Nonculpable
            Inference ........................................................................................43

   D.    Plaintiff Has Pled a Control-Person Claim Under §20(a).......................................44

IV.   CONCLUSION...................................................................................................45

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Abely v. Aeterna Zentaris Inc.*,
  2013 WL 2399869
  (S.D.N.Y. May 29, 2013) ................................................................................ 21, 30, 39

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020) ....................................................................... *passim*

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co., Ltd.*,
  19 F.4th 145 (2d Cir. 2021) ................................................................................ 14

*Ark. Pub. Emps.' Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ................................................................................ 20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................. 13

*Biondolillo v. Roche Holding AG*,
  2018 WL 4562464
  (D.N.J. Sept. 24, 2018) ........................................................................................ 21

*Christiansen v. Spectrum Pharms., Inc.*,
  2024 WL 246020
  (S.D.N.Y. Jan. 23, 2024) ............................................................................. *passim*

*City of Edinburgh Council v. Pfizer, Inc.*,
  754 F.3d 159 (3d Cir. 2014) ................................................................................ 34

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
  967 F. Supp. 2d 771 (S.D.N.Y. 2013) .................................................................. 41

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020) ............................................................. 42, 43

*Dragon State Int'l Ltd. v. Keyuan Petrochemicals, Inc.*,
  2016 WL 439022
  (S.D.N.Y. Feb. 3, 2016) ....................................................................................... 42

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ................................................................................ 36

**Page**

*Emps.' Ret. Sys. of the City of Baton Rouge v. Macrogenics, Inc.*,
  2021 WL 4459218
  (D. Md. Sept. 29, 2021) ........................................................................................20, 21

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)............................................................................ *passim*

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)...............................................................40, 42

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................................31

*Fries v. N. Oil & Gas, Inc.*,
  285 F. Supp. 3d 706 (S.D.N.Y. 2018)......................................................................42

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)....................................................................................33

*Gould v. Winstar Commc'ns, Inc.*,
  692 F.3d 148 (2d Cir. 2012)....................................................................................36

*In re Amarin Corp. PLC Sec. Litig.*,
  2016 WL 1644623
  (D.N.J. Apr. 26, 2016) ............................................................................................21

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) ..................................................................................24

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)......................................................................42

*In re Carlotz, Inc. Sec. Litig.*,
  2024 WL 1348749
  (S.D.N.Y. Mar. 29, 2024) ........................................................................................38

*In re Delcath Sys., Inc. Sec. Litig.*,
  36 F. Supp. 3d 320 (S.D.N.Y. 2014)................................................................ *passim*

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)......................................................................30

*In re Intercept Pharms., Inc. Sec. Litig.*,
  2015 WL 915271
  (S.D.N.Y. Mar. 4, 2015) ...............................................................................37, 38, 43

**Page**

*In re Keryx Biopharm., Inc. Sec. Litig.*,
2014 WL 585658
(S.D.N.Y. Feb. 14, 2014) ...................................................................................21, 42

*In re Philip Morris Int'l Inc. Sec. Litig.*,
89 F. 4th 408 (2d Cir. 2023) ........................................................................34

*In re Salix Pharms., Ltd.*,
2016 WL 1629341
(S.D.N.Y. Apr. 22, 2016)................................................................................35

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)......................................................................14, 39

*In re Vale S.A. Sec. Litig.*,
2020 WL 2610979
(E.D.N.Y. May 20, 2020) .............................................................................35

*In re Wells Fargo & Co. Sec. Litig.*,
2021 WL 4482102
(S.D.N.Y. Sept. 30, 2021)..........................................................................25, 26

*Karimi v. Deutsche Bank Aktiengesellschaft*,
607 F. Supp. 3d 381 (S.D.N.Y. 2022)..............................................................33

*Kendall v. Odonate Therapeutics, Inc.*,
2021 WL 3406271
(S.D. Cal. Aug. 4, 2021) ...............................................................................16

*Kleinman v. Elan Corp., PLC*,
706 F.3d 145 (2d Cir. 2013)...............................................................20, 30, 33

*Kusnier v. Virgin Galactic Holdings*,
2022 WL 16745512
(E.D.N.Y. Nov. 7, 2022)................................................................................39

*Lehman v. Ohr Pharm. Inc.*,
2019 WL 4572765
(S.D.N.Y. Sept. 20, 2019)..............................................................................24

*Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*,
838 F.3d 76 (1st Cir. 2016)............................................................................41

*Lynch v. City of New York*,
952 F.3d 67 (2d Cir. 2020)............................................................................13

**Page**

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. ----, 144 S. Ct. 885 (2024) ...............................................................17, 19

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)......................................................................................14, 15, 16

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)................................................................................15, 16

*Micholle v. Ophthotech Corp.*,
  2019 WL 4464802
  (S.D.N.Y. Sept. 18, 2019).......................................................................24, 25, 36, 43

*Noto v. 22nd Century Grp., Inc.*,
  35 F.4th 95 (2d Cir. 2022) .......................................................................................15

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)................................................................................ *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015).............................................................................. *passim*

*Pitman v. Immunovant, Inc.*,
  2024 WL 964258
  (E.D.N.Y. Feb. 25, 2024)..........................................................................................43

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
  2020 WL 1877821
  (S.D.N.Y. Apr. 14, 2020)...........................................................................................34

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
  2019 WL 2360942
  (S.D.N.Y. Mar. 4, 2019) .....................................................................................41, 42

*Rex & Roberta Ling Living Tr. U/A Dec. 6, 1990 v. B Commc'ns Ltd.*,
  346 F. Supp. 3d 389 (S.D.N.Y. 2018)........................................................................44

*Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*,
  2024 WL 775195
  (S.D.N.Y. Feb. 26, 2024).....................................................................13, 14, 36, 45

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ....................................................................................19

**Page**

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
 348 F. Supp. 3d 313 (S.D.N.Y. 2018).................................................................................35

*Sharette v. Credit Suisse Int'l*,
 127 F. Supp. 3d 60 (S.D.N.Y. 2015)...................................................................................39

*Shields v. Citytrust Bancorp, Inc.*,
 25 F.3d 1124 (2d Cir. 1994)...............................................................................................44

*Skiadas v. Acer Therapeutics Inc.*,
 2020 WL 3268495
 (S.D.N.Y. June 16, 2020)......................................................................................14, 15, 19

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
 531 F.3d 190 (2d Cir. 2008)...............................................................................................44

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
 551 U.S. 308 (2007)............................................................................................................36

*Tongue v. Sanofi*,
 816 F.3d 199 (2d Cir. 2016).........................................................................................26, 34

*U.S. Sec. & Exch. Comm'n v. Takeyasu*,
 2018 WL 2849777
 (S.D.N.Y. June 11, 2018)....................................................................................................37

*Van Dongen v. CNinsure Inc.*,
 951 F. Supp. 2d 457 (S.D.N.Y. 2013)..........................................................................43, 44

*Wang v. Cloopen Grp. Holding Ltd.*,
 661 F. Supp. 3d 208 (S.D.N.Y. 2023).................................................................................37

*Yannes v. SCWorx Corp.*,
 2021 WL 2555437
 (S.D.N.Y. June 21, 2021)....................................................................................................38

*Zagami v. Cellceutix Corp.*,
 2016 WL 3199531
 (S.D.N.Y. June 8, 2016)......................................................................................................26

**Page**

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
 §78j(b)................................................................................................................13, 14, 44
 §78t(a)..........................................................................................................................44, 45
 §78u-4(b)(1)............................................................................................................................14

Federal Rules of Civil Procedure
 Rule 9(b) .................................................................................................................................14
 Rule 12(b)(6) ..........................................................................................................................13

**LEGISLATIVE HISTORY**

Private Securities Litigation Reform Act of 1995
 Pub. L. No. 104-67, 109 Stat. 737 (1995)............................................................................14

Lead Plaintiff Clendon T. Rice ("Plaintiff") respectfully submits this memorandum in opposition to Defendants'[1] motion to dismiss the AC.

## I.    INTRODUCTION

NovoCure is an oncology company that conducted a clinical trial (called "LUNAR") testing a wearable device that is intended as an add-on therapy (called Tumor Treating Fields, or "TTFields") for certain patients with Non-Small Cell Lung Cancer ("NSCLC"). On January 5, 2023, Defendants announced that LUNAR had succeeded and that the full trial data would be presented at an upcoming medical conference. Over the next five months, they went on to repeatedly describe the results of the trial as "clinically meaningful" and "profound."

LUNAR had tested TTFields alongside two standard cancer treatments: a chemotherapy drug called docetaxel, and a type of immunotherapy called immune checkpoint inhibitors ("ICIs"). Patients in LUNAR may or may not have received ICIs before enrolling in the trial, and they would also have received an ICI during the trial if they were assigned to the ICI "cohort." Significantly, the effectiveness of ICIs is dependent upon a biomarker called "PD-L1," and patients who have higher PD-L1 scores respond better to ICIs.

Because of this, a significant concern among analysts and investors during the Class Period[2] was whether LUNAR's favorable topline results may have been impacted by patients in the trial's four subgroups responding differently to ICIs based on their PD-L1 scores. When analysts asked

---

[1] "Defendants" refers to NovoCure Limited ("NovoCure" or the "Company"), and the "Individual Defendants": William F. Doyle (Executive Chairman), Asaf Danziger (CEO), and Ashley Cordova (CFO). ¶¶15, 21-24. References to "¶" or "¶¶" are to the Amended Complaint for Violations of the Federal Securities Laws (ECF 52, the "AC"). "MTD" refers to Defendants' Memorandum of Law in Support of Their Motion to Dismiss (ECF 64). Capitalized terms not defined herein are as defined in the AC. "Def. Ex. __" refers to exhibits to the Declaration of Francesca Brody (ECF 65). "Pl. Ex." refers to exhibits to the declaration of Erin W. Boardman, submitted herewith. Unless otherwise noted, emphasis is added and citations are omitted.

[2] The Class Period is January 5, 2023 to June 5, 2023.

about this issue, Defendants declared that the trial "arms were well balanced," that "all the indications . . . show[ed] balance," there was "nothing funky here," and that concerns about PD-L1 imbalances were "a red herring." They further assured analysts that NovoCure would "address all the issues with respect to balance and PD-L1 status" when it presented the full data.

As Defendants knew—or should have known—but investors did not, NovoCure did not have PD-L1 data for nearly half of the patients in the trial. The large portion of missing data meant that NovoCure would never be able to alleviate concerns that imbalances in patients' PD-L1 scores among the trial's four subgroups had thrown off the LUNAR results—absent a new trial that collected PD-L1 data.

At the same time, although LUNAR's overall results had shown a statistically significant benefit with the addition of TTFields to standard therapies, the trial had actually failed to show a statistically significant benefit in *any* subset of patients who met current standards of care. Although some of the patients in LUNAR's docetaxel cohort met current standards of care, the results in that cohort had failed to reach statistical significance. And while the results in the ICI cohort had reached statistical significance, just 2% of the patients in that group had previously received ICIs, in accordance with the current "first-line" standard of care. Even that miniscule group of patients did not meet the current "second-line" standard of care of going on to receive chemotherapy.

All of this meant that the LUNAR results were the precise opposite of "clinically meaningful"—they were not meaningful to doctors engaged in clinical practice treating NSCLC patients under current standards of care.

When investors learned the truth about the LUNAR trial, NovoCure's stock plummeted 43%. But during the five months before that happened, company insiders, including defendants Danziger and Cordova, cashed out their stock for proceeds of more than *$35 million*.

In moving to dismiss these straightforward allegations, Defendants attack claims that Plaintiff does not make. They mischaracterize the AC as a critique of the trial's design, and contend that Plaintiff's claims require speculation about future commercial success. And they attempt to hide from liability for their misstatements behind the guise of having issued scientific opinions.

But all of these arguments rest on false premises. This case is not about the design of the LUNAR trial, TTFields' commercial potential, or interpretations of scientific data. It is about Defendants' uncharacteristically positive descriptions of the LUNAR results, and their statements summarily dismissing concerns that turned out to be spot-on. Because Defendants' statements are actionable, and because the AC's allegations further demonstrate a strong inference of Defendants' "knowledge of facts or access to information contradicting their public statements," *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000), Defendants' motion to dismiss should be denied.

## II.    STATEMENT OF FACTS

### A.    NovoCure and Its TTFields Therapy

NovoCure is an oncology company focused on the development and commercialization of its proprietary cancer therapy, TTFields. ¶¶2, 27. TTFields are mild electrical pulses that theoretically disrupt cancer cells' ability to divide and proliferate. ¶¶2, 28. The therapy is administered through a device that is supposed to be worn for at least 18 hours per day. ¶¶2, 29-31. It is intended for use together with standard cancer treatments, including chemotherapy and immunotherapy. ¶¶2, 28. Currently, TTFields therapy is approved and marketed primarily to treat adults with a type of brain cancer called glioblastoma. ¶¶2, 29.

Because NovoCure generates revenues by charging fees for the use of its TTFields devices, a key corporate priority has been to expand the approved usage of TTFields therapy to other forms of cancer. ¶¶3, 32, 34. NovoCure's "pivotal" LUNAR trial of TTFields therapy in certain patients with NSCLC—the most prevalent form of lung cancer—was an early and critical test of that initiative.

¶¶3, 33.[3]  Accordingly, investors were keenly focused on the LUNAR trial and the likelihood that it would ultimately support approval of TTFields therapy for NSCLC patients.  ¶¶3, 34.

### B.    The LUNAR Trial

The LUNAR trial evaluated whether adding TTFields to standard treatments extended overall survival in NSCLC patients who were receiving a second round of cancer treatments after the first round of treatments had failed (known as "second-line" and "first-line" treatments, respectively). ¶¶4, 40-41.  Patients in the trial had "stage four" NSCLC, meaning their cancer had "progressed" (*i.e.*, spread) to at least one other part of the body, during or after first-line treatment that had included a type of chemotherapy known as platinum-based chemo.  ¶¶36, 40 & n.2, 41.

LUNAR's primary endpoint was superior overall survival of patients treated with TTFields plus one of two types of standard-of-care treatments (the experimental arm), compared to patients receiving only those standard-of-care treatments (the control arm).  ¶41.  In particular, patients received: (1) a chemotherapy drug called docetaxel, administered either alone, or together with TTFields therapy, to patients in the docetaxel cohort; or (2) a type of immunotherapy called ICIs, administered either alone, or together with TTFields therapy, to patients in the ICI cohort.  ¶¶4, 42. LUNAR also tested the secondary endpoints of superior overall survival of patients receiving TTFields therapy in the docetaxel cohort, and in the ICI cohort.  The structure of the trial is illustrated as follows:

---

[3]  Clinical trials of medical devices proceed in three phases known as "pre-clinical," "pilot," and "pivotal," with a successful pivotal trial typically required to obtain regulatory approval.  ¶33 n.1.



NovoCure began enrolling patients in the LUNAR trial in early 2017, completed enrollment in November 2021, and completed patient follow-ups in November 2022. ¶¶44, 47. Ultimately, 276 patients were enrolled in the trial. ¶47.

### C.    Treatments for NSCLC and the Current Standards-of-Care

Of the current treatments for NSCLC, taxane chemotherapy—which includes the drug docetaxel—and platinum-based chemotherapy both inhibit the division of cancer cells and cause cell death. ¶36.

ICIs—developed more recently—act on a patient's "immune checkpoints," which function as on/off switches for the immune system, helping it to differentiate between normal cells and foreign cells such as cancer, and to attack only the foreign cells. ¶37. Specifically, ICIs work by blocking checkpoint proteins from binding with their partner proteins on the surface of cancer cells, preventing the "off" signal from being sent, and enabling the immune system's T-cells to continue attacking cancer cells. ¶38. In the case of NSCLC, the proteins on the surface of the cancer cells are called PD-L1, and the partner proteins on a patient's T-cells are called PD-1. ¶39.

Significantly, ICIs do not have equal efficacy for all NSCLC patients. *Id.* Rather, their effectiveness generally increases in tandem with a patient's levels of PD-L1 proteins. ¶¶7, 39, 59. Therefore, it is standard practice to test patients' PD-L1 levels, and ICIs are generally given to patients whose PD-L1 score is greater than 1%. ¶¶7, 39, 50.

While LUNAR evaluated TTFields as a second-line therapy, beginning in 2016, and during

the course of the trial, the standard of care in the United States rapidly shifted to the use of ICIs as a first-line therapy for NSCLC.  ¶¶48, 50.  This meant that in order for LUNAR to reflect current clinical practice—such that doctors were likely to consider TTFields as a second-line therapy if the trial was a success—it would need to enroll a patient population with a high rate of first-line ICI therapy (administered together with platinum-based chemo).  ¶51.

Moreover, it was critical for LUNAR's four subgroups to contain patient populations that were relatively balanced with respect to patients' PD-L1 scores.  ¶¶7, 51.  This would ensure that the trial results actually reflected the addition of TTFields therapy, and were not skewed by patients responding differently to ICIs based on their PD-L1 scores, or whether they were receiving an ICI for the first time during the trial.  *Id*.

Although the effectiveness of ICIs generally increases with higher PD-L1 scores, LUNAR did not "stratify" patients by PD-L1 scores—meaning patients were not assigned to the trial's four subgroups in a manner that ensured each group contained roughly equal numbers of patients with similar PD-L1 scores.  ¶59 & n.4.[4]  Because of this, a key question among analysts and investors while awaiting the LUNAR data was whether the trial's results may have been skewed by imbalances in patients' PD-L1 status among the subgroups.  ¶59.  For example, an Evercore ISI analyst report stated that it would be "impossible . . . to draw a conclusion on efficacy without knowledge of PD[-L]1 status[.]"  ¶60.  Similarly, a J.P. Morgan analyst report noted that "the potential for imbalance" in PD-L1 scores "could invite skepticism around the results . . . ."  ¶61.

D.      **Defendants Announce LUNAR's Topline Results but Mislead Investors About the Nature of the Results**

At the start of the Class Period, on January 5, 2023, NovoCure issued a press release

---

[4]  Stratification is used in clinical trials when differences in characteristics that are not being studied may affect the results. ¶59 n.4. By controlling for such confounding variables, stratification helps ensure that true conclusions can be made about the trial results. *Id*.

announcing that LUNAR had met its primary endpoint, by demonstrating a statistically significant improvement in overall survival with the addition of TTFields.  ¶¶5, 52, 73.  The press release went on to characterize the results as "*clinically meaningful*" (*id.*), and defendant Doyle described the results in the ICI cohort as "*profound[.]*"  ¶¶5, 53, 74.

The Company explained that the "full LUNAR data" would "be presented at a future medical" conference.  ¶¶54, 73.  Analysts and investors responded to the positive topline results with enthusiasm, sending NovoCure's share price soaring 40% that day.  ¶¶5, 55-56.

Thereafter, Defendants repeatedly emphasized their characterizations of the combined results in LUNAR's two cohorts, as well as the results in the ICI cohort, as "clinically meaningful":

- ¶76 (January 9, 2023 press release, stating that LUNAR had "*demonstrat[ed] a . . . clinically meaningful improvement* in overall survival" with TTFields and "*showed a . . . clinically meaningful improvement* in overall survival" in the ICI cohort);

- ¶80 (defendant Doyle, stating at the J.P. Morgan Healthcare Conference on January 10, 2023, that LUNAR had "*produced a clinically meaningful conclusion*");

- ¶88 (February 23, 2023 press release, stating that LUNAR had "*demonst[ed] a . . . clinically meaningful improvement* in overall survival over standard therapies (either immune checkpoint inhibitors or docetaxel) alone[,]" and had "also *showed a . . . clinically meaningful improvement* in overall survival" in the ICI cohort);

- ¶92 (NovoCure's 2022 Form 10-K, filed on February 23, 2023, stating that LUNAR had "*demonstrat[ed] a . . . clinically meaningful improvement* in overall survival for patients treated with TTFields and standard therapies compared to those treated with standard therapies alone[,]" and had "also *showed a . . . clinically meaningful improvement* in overall survival when patients were treated with TTFields and [ICIs], as compared to those treated with [ICIs] alone");[5]

- ¶94 (defendant Doyle, stating, during a February 23, 2023 conference call, that LUNAR had "*demonstrat[ed] a . . . clinically meaningful extension* in overall survival for patients treated with TTFields together with standard therapies[,]" and

---

[5] The Form 10-K also stated that: "We believe our protocol [for the LUNAR trial] incorporates the evolving standard of care for second-line treatment of NSCLC" and "LUNAR was designed to generate data that contemplates multiple outcomes, all of which we believe will be clinically meaningful." ¶92.

had shown a "*clinically meaningful extension* in overall survival for patients treated with TTFields and [ICIs] versus [ICIs] alone");

- ¶102 (April 26, 2023 press release, stating that LUNAR had "*demonstrat[ed] a . . . clinically meaningful improvement* in overall survival when TTFields therapy was added to standard pharmacological therapies compared to standard pharmacological therapies alone"); and

- ¶104 (Form 10-Q, filed on May 4, 2023, stating that "[p]atients" in the trial who were "treated with TTFields and standard therapies *demonstrated a . . . clinically meaningful improvement* in overall survival over standard therapies alone[,]" and that "LUNAR . . . also *showed a . . . clinically meaningful improvement* in overall survival when patients were treated with TTFields and [ICIs], as compared to those treated with [ICIs] alone").

Defendant Doyle also reiterated his description of the results in the ICI cohort as "profound":

- ¶80 (stating at the J.P. Morgan Healthcare Conference on January 10, 2023, that the ICI cohort had "achieved . . . a *profound* result");

- ¶97 (stating during a February 23, 2023 conference call, that "*the data*" is "*profound* when TTFields are combined with [ICIs,]" and that "we saw . . . *profound* improvement in the patients treated with [ICIs] plus TTFields compared to [ICIs] alone"); and

- ¶106 (stating during a May 4, 2023 conference call that "LUNAR *demonstrated a profound benefit* when TTFields therapy was combined with [ICIs]").

And Doyle similarly extolled LUNAR's "groundbreaking data" in a press release on April 26, 2023. ¶102.

In the January 5, 2023 press release announcing LUNAR's topline results, Defendants further represented that "*[p]atient enrollment was well balanced between the ICI and docetaxel cohorts of the experimental and control arms*" of the trial. ¶73. They echoed this statement on multiple occasions thereafter. *See* ¶92 (same statement, made in NovoCure's 2022 Form 10-K, filed on February 23, 2023); ¶84 (defendant Doyle, stating in response to an analyst's question at the J.P. Morgan Healthcare Conference on January 10, 2023: "So these arms were well balanced"); ¶99 (defendant Doyle, stating in response to an analyst's question during a February 23, 2023 conference call, "all the indications . . . show balance").

On three separate occasions, defendant Doyle was questioned by analysts about patients' PD-L1 status, and whether the potential existed for missing data or imbalances in PD-L1 scores to have impacted LUNAR's results.  And on each occasion, he attempted to dismiss those concerns. First, during a January 10, 2023 investor conference, an analyst asked: "did you guys measure PD-[L]1 status at baseline?," and Doyle responded:

> So the first thing I'll remind you, this is a trial in the second line, not the first line. And *PD-[L]1 status has not shown any relevance in second line*.
>
> Secondly, I will tell you that . . . *there was nothing unusual about the control group*. So when you report top line data, it's very encouraging to hear that the trial was successful in the top line.  But then you have to ask . . . [w]as there anything funky about the controls.  *So these arms were well balanced* and the controls behaved as expected, in line with prior studies.  *So there was nothing funky here.  So this is a well-powered, randomized study where we showed a profound benefit.  And the full data, including PD-[L]1 status will be presented later.  But I think that's a red herring*.

¶84.

Second, during a February 23, 2023 conference call, an analyst asked: "Can you talk about your confidence level that the active and control arms in the study are balanced in terms of patient characteristics[,]" and Doyle responded: "[W]e've said that . . . the arms were well balanced in terms of numbers.  And we look forward to sharing all the details with you . . . .  But *all the indications . . . show balance*."  ¶99.

And third, during a May 4, 2023 conference call, an analyst asked whether NovoCure's upcoming presentation at the American Society of Clinical Oncology ("ASCO") would "address" "[s]ome of the questions . . . related to PD-L1 status" including "whether you have data on PD-L1 status for a large percentage of the patients, [and] whether there was an imbalance, . . . such that there won't be ambiguity about the results for the [ICI] groups following ASCO," and Doyle responded: "[W]e would *expect to address all the issues with respect to balance and PD-L1 status* at that time."  ¶108.

**E.    In Contrast to Defendants' Characterizations and Assurances, LUNAR Suffered from Serious Flaws and Missing Data that Undermined the Positive Topline Results**

In truth—and in contrast to Defendants' characterizations of the results as "clinically meaningful" and "profound," and their assurances about balance and PD-L1 data—LUNAR was marred by a large amount of missing data, and had failed to credibly show a statistically significant benefit in any group of patients meeting current standards of care. As a result, the seemingly favorable results were unreliable, uninterpretable, and essentially meaningless. ¶¶6, 58-69.

First, PD-L1 scores were missing for 45%—*nearly half*—of the patients in the trial. ¶¶9, 64. With this key data missing for such a substantial portion of patients, NovoCure would never be able to alleviate concerns that LUNAR's results had been skewed by imbalances in PD-L1 scores among the trial's four subgroups. *Id.*

The probability that PD-L1 imbalances among the LUNAR trial's subgroups had skewed the results was amplified by the fact that *98%* of patients in the ICI cohort had received ICIs for the first time as a second-line therapy during the trial. ¶¶10, 65. Thus, the "profound" survival benefit from TTFields that LUNAR appeared to show may have been due to these patients benefiting from receiving ICIs for the first time—with the magnitude of the benefit reflecting patients' PD-L1 scores, instead of being attributable to the addition of TTFields therapy. *Id.* This explanation was all the more plausible because the docetaxel cohort did *not* show a statistically significant improvement in overall survival with the addition of TTFields. *Id.* And without sufficient PD-L1 data, NovoCure could never show that this was not the case.

At the same time, LUNAR had failed to credibly show a survival benefit with the addition of TTFields in *any* currently-relevant NSCLC patient population. ¶¶11, 69. Only 31% of patients in the trial had previously received first-line treatment with ICIs (together with platinum-based chemo)—making them the only patients who fit the current first-line standard of care for NSCLC

patients. ¶66. But the only patients in the trial who fit the current first-line *and* second-line standards of care, whereby patients whose cancer worsens after receiving first-line ICIs are given second-line chemotherapy with a drug such as docetaxel, were the 58% of patients in the docetaxel cohort who had previously received first-line ICIs. ¶67. And the docetaxel cohort had *not* shown a statistically significant overall survival benefit with the addition of TTFields. *Id*. Although the ICI cohort did show a statistically significant improvement in survival with TTFields, *just 2%* of patients in the ICI cohort had received ICIs as a first-line treatment, in accordance with current standards of care—a number so small that the results were meaningless. ¶¶11, 68.

The confluence of LUNAR's failure to show a statistically significant improvement in overall survival in *any* group of patients meeting current standards of care, and the fact that PD-L1 scores were missing for *nearly half* of patients in the trial, meant that the results were unlikely to be credited by the oncology community. ¶¶12, 69-70.

During the five months that NovoCure insiders were in possession of this information, but investors were still in the dark, defendants Danziger and Cordova, along with other insiders, collectively sold 346,520 shares of their personally-held NovoCure stock, for proceeds of more than $35 million—with Danziger alone selling over one-third of his stock for proceeds of $23 million. ¶¶15, 136-142.

### F.    The Truth Is Revealed

The investing public learned of LUNAR's serious issues on June 6, 2023, when NovoCure issued a press release before the markets opened, providing details about the trial data, in advance of the ASCO conference taking place that day. ¶¶13, 110. The press release revealed that "PD-L1 expression data" was "available for 151 patients globally (55%)"—and thus was *missing for 45%* of the patients in the trial. ¶111. It further revealed that only "31% of patients" in the trial had previously "been treated with an ICI"—comprising "58% of patients randomized to the docetaxel

- 11 -

cohort and [just] *2%* of patients randomized to the ICI cohort[].” *Id*.

Later that day, the LUNAR data was presented at ASCO’s annual meeting. ¶113. In response to questions from physicians about the missing PD-L1 scores, LUNAR’s lead author confirmed that “we don’t have that data.” *Id*. When a physician noted that an imbalance in PD-L1 scores “would give a false . . . difference in survival that’s actually related to the PD-L1 status,” rather than the addition of TTFields—and that anyone looking at the LUNAR data could never “be sure” that the ICI cohort had “a balance between the two arm[s]” with respect to PD-L1 scores, LUNAR’ lead author conceded that he was “[c]orrect.” *Id*. Another physician similarly questioned whether “there [was] any imbalance” in the trial, given the “surprising” result of “an [overall survival] benefit in ICI, but not doce[taxel]-treated patients[,]” since “the proposed mechanism of action of [TTFields] should have an effect in doce[taxel]-treated patients as well.” ¶114. This “lack of clarity” and the “major caveat” that LUNAR had not enrolled patients who “reflect[ed] the current standard of care” led the physician to conclude that the utility of TTFields’ was “unclear.” *Id*.

Finally, NovoCure held an investor event before the markets closed, during which an analyst asked whether “the lack of the use of ICI in the frontline” would cause “clinicians” to require “more data [from] . . . a follow-up study . . . to drive uptake?” ¶115. In response, LUNAR’s lead author acknowledged that it was “important to get more data in that patient population . . . .” *Id*. Defendant Cordova then provided details about NovoCure’s efforts to compensate for the shortcomings with the LUNAR data by launching three additional trials that would reflect current standards of care for NSCLC. ¶116.

Just like physicians at ASCO, analysts were quick to point out the “very significant proportion of missing data” that would make “it difficult to prove that PD-L1 expression was ultimately balanced across treatment arms,” as well as the “distinct mis-match” between the patients

receiving first-line ICIs "versus today's second-line NSCLC population"—predicting that "these two factors will leave physicians wanting more[.]" ¶¶14, 119. Other analysts cautioned that the LUNAR "results . . . will raise questions from the FDA (given [the] missing PD[-L]1 data)," and that "pressure on shares may not lift until more supportive data from a different [pivotal] trial is available[.]" ¶¶14, 120-121. *See also* ¶¶122-123 (noting concerns about missing PD-L1 scores and whether imbalances in PD-L1 status may have skewed the results); ¶¶68, 121, 123-125 (noting the lack of patients in the trial who met current standards of care).

As it became apparent to the investing public that even if the U.S. Food and Drug Administration ("FDA") approved TTFields therapy based on LUNAR, it would not be widely adopted unless and until NovoCure was able to complete additional, successful trials—a prospect that was years away—NovoCure's share price plummeted more than 43%, from a closing price of $82.51 per share on June 5, 2023, to close at $47.00 per share on June 6, 2023. ¶¶12-13, 70-72, 117.

## III.    ARGUMENT

### A.    The Standards Governing This Motion

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), "[t]he court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*, 2024 WL 775195, at *16 (S.D.N.Y. Feb. 26, 2024). The question is whether a claim is plausible and, therefore, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A "'court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side.'" *Saskatchewan Healthcare Emp.'s Pension Plan*, 2024 WL 775195, at *17 (quoting *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)).

To state a claim under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"),

a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[6]  Although claims under §10(b) of the Exchange Act are subject to the particularity requirements of Rule 9(b), and to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), courts "'must be careful not to mistake heightened pleading standards for impossible ones.'" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co., Ltd..*, 19 F.4th 145, 150 (2d Cir. 2021).

### B.        The AC Pleads Actionable Misrepresentations

The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" 15 U.S.C. §78u-4(b)(1).  To do so, a plaintiff must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Novak*, 216 F.3d at 306.  Although securities fraud actions are subject to the heightened pleading requirements of the PSLRA and Rule 9(b), the Second Circuit "do[es] not require the pleading of detailed evidentiary matter[,]" *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but simply facts sufficient "to support a *reasonable belief*" that defendants' statements were materially false or misleading.  *Novak*, 216 F.3d at 314 n.1.

"'A statement is misleading if a reasonable investor would have received a false impression from the statement.'"  *Saskatchewan Healthcare Emp.'s Pension Plan*, 2024 WL 775195, at *18. Even "'literally true statements' are actionable if they 'create a materially misleading impression[.]'" *Id*.  "At the motion to dismiss stage of a securities fraud action, 'the court reads ambiguities' in challenged statements 'in [the plaintiff's] favor.'"  *Skiadas v. Acer Therapeutics Inc.*, 2020 WL

---

[6]  Here, Defendants challenge the elements of falsity and scienter.

3268495, at *9 (S.D.N.Y. June 16, 2020).

### 1.    Defendants' Statements Created a Duty to Disclose

Contrary to Defendants' arguments, the AC does not allege that Defendants "deceived investors" merely "by waiting" until the end of the Class Period "to release detailed clinical trial data[,]" or that "reporting topline . . . results" *itself* obligated them to disclose information that "put the results in a less positive light." MTD at 13-14; *see also id*. at 15-16. Indeed, Defendants could have refrained from editorializing about the nature of the LUNAR results, and simply stated that the trial had met its primary endpoint of a statistically significant improvement in overall survival with the addition of TTFields. *See Matrixx*, 563 U.S. at 45 ("companies can control what they have to disclose . . . by controlling what they say to the market").[7]

But once Defendants chose to make statements repeatedly characterizing the results as "clinically meaningful" and "profound," and describing "the data" as "groundbreaking," those statements created a duty to disclose the deficiencies with the LUNAR data. *See* ¶132. "'Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.'" *Noto v. 22nd Century Grp., Inc*., 35 F.4th 95, 105 (2d Cir. 2022) (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)). Thus, "when a pharmaceutical company makes statements about its product, the company is required to disclose information that would render those statements not misleading." *In re Delcath Sys., Inc. Sec. Litig*., 36 F. Supp. 3d 320, 332 (S.D.N.Y. 2014); *see also Meyer*, 761 F.3d at 250-51 (when a defendant "'makes a disclosure about a particular topic, whether voluntary or required, the

---

[7] Defendants' arguments concerning some of the statements in the AC are based on a misapprehension. Plaintiff does not claim that Defendants' statements that LUNAR "met its primary endpoint," and that the results were "statistically significant" (*e.g*., ¶73) were materially false or misleading. *See* MTD at 10, 16, 25. Rather, these portions of Defendants' public statements are quoted in the AC to provide context. In Plaintiff's Response to Defendants' Exhibit A, Plaintiff has highlighted only the specific portions of the statements alleged to be actionable. *See* Pl. Ex. 1.

representation must be complete and accurate'").

Defendants chose to highlight and emphasize these characterizations time and again. *See* ¶¶73, 76, 80, 88, 92, 94, 102, 104 (describing the combined results for the ICI and docetaxel cohorts as "clinically meaningful"); ¶¶73, 76, 88, 92, 94, 104 (stating that the results in the ICI cohort were "clinically meaningful"); ¶¶74, 80, 97, 106 (defendant Doyle, characterizing the results in the ICI cohort as "profound"); ¶84 (defendant Doyle, stating that LUNAR "showed a profound benefit"). Indeed, by lauding LUNAR's "groundbreaking data" (¶102), Defendants put not just the nature of the results, but also the nature of the data itself "'in play[.]'" *Meyer*, 761 F.3d at 250 n.3,

Doing so obligated Defendants to speak fully and completely, by disclosing that: (i) PD-L1 scores were missing for 45% of patients, making it impossible to ascertain whether PD-L1 imbalances had thrown off the results (¶¶9, 64); (ii) nearly all (98%) of patients in the ICI cohort showing a "profound" survival benefit had received ICIs for the first time during the trial, raising serious questions that could not be answered as to whether ICIs (and not TTFields) were actually responsible for that benefit (¶¶10, 65); and (iii) LUNAR actually had not shown a statistically significant survival improvement in any group of patients meeting current standards of care—with only 2% of patients in the ICI cohort having received first-line ICIs, and the docetaxel cohort failing to reach statistical significance (¶¶11, 66-69). Defendants' descriptions of the LUNAR results as "clinically meaningful" and "profound" conveyed a picture of the results that "was materially different" from this "undisclosed reality[.]" *Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271, at *5 (S.D. Cal. Aug. 4, 2021); *id*. at *5-*6 (statements characterizing "top-line results" from cancer trial as "'positive'" were materially misleading for omitting company had made a protocol change after drug's side effects made patients drop out of the trial); *see also Matrixx*, 131 S. Ct. at 1323 (statements that drug was safe and effective, when company had inconclusive evidence

undermining those statements, were materially misleading).

*Delcath*, 36 F. Supp. 3d 320, is particularly instructive here.  In *Delcath*, the defendants made statements about the results of their company's clinical trial of a chemotherapy delivery device, which "praised the [device] as a treatment option, and touted the Phase 3 results in particular, but failed to disclose the toxicity shown in the Phase 3 results." *Id*. at 328.  In particular, the defendants "failed to disclose that" the trial's therapy group had "suffered (1) a 24% [serious adverse event] rate, which was a higher rate than for other available treatments, and (2) a 7% mortality rate, which was a higher rate than that in the [c]ontrol [g]roup." *Id*.  The court determined that these omissions were "sufficient to allege that investors were misled about the safety of the [device]." *Id*. at 332.  Similarly here, Defendants' omitted critical facts that undermined the utility of the trial results, while making statements that affirmatively praised the results' "meaningful[ness]" to clinicians. *E.g.*, ¶73.  Those statements "were misleading without the disclosure of additional facts that would cast [the] results in a more negative light." *Delcath*, 36 F. Supp. 3d at 333.

Defendants also represented—on multiple occasions—that the trial arms were "well balanced" in terms of patient enrollment.  ¶¶73, 84, 92.  When an analyst pressed defendant Doyle to "*talk about [his] confidence level that the active and control arms in the study are balanced in terms of patient characteristics . . .,*" Doyle responded: "[W]e've said that . . . the arms were well balanced in terms of numbers.  And we look forward to sharing all the details with you, as I said, later in the summer.  But *all the indications*, as we announced in the press release *show balance*." ¶99.  At best, these statements were misleading "[h]alf-truths"—*i.e.*, "'representations that state the truth only so far as it goes, while omitting critical qualifying information.'" *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. ----, 144 S. Ct. 885, 891 (2024); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("literal accuracy is not

- 17 -

enough: An issuer must as well desist from misleading investors by saying one thing and holding back another"). Doyle's response held back that although patient enrollment *numbers* may have been "well balanced" between the ICI and docetaxel cohorts of the trial's experimental and control arms, the fact that PD-L1 data was missing for nearly half of patients meant that Defendants *could not tell* whether the key patient *characteristic* of PD-L1 status was well-balanced between the trial arms (¶¶75, 86, 93)—and *could not tell* whether "all the indications . . . show[ed] balance." ¶100.

Similarly, when an analyst asked whether the ASCO presentation would "address" "[s]ome of the questions . . . related to PD-L1 status"—namely "whether you have data on PD-L1 status for a large percentage of the patients, [and] whether there was an imbalance, . . . such that there won't be ambiguity about the results for the [ICI] groups following ASCO," Doyle responded with another half-truth, stating: "[W]e would *expect to address all the issues with respect to balance and PD-L1 status* at that time." ¶108. In truth, Defendants did not "expect to address all the issues with respect to balance and PD-L1 status" in the ASCO presentation, and knew that there would continue to be "ambiguity about the results for the [ICI] groups following ASCO," because the missing PD-L1 data meant that NovoCure could never show that the LUNAR results were not impacted by imbalances in patients' PD-L1 scores. ¶109.

Indeed, a reasonable investor could have construed Doyle's statements that "all the indications . . . show balance" (¶99); and that the ASCO presentation would "address all the issues with respect to balance and PD-L1 status" (¶108) as indicating that NovoCure had enough data to address concerns about whether PD-L1 imbalances had impacted LUNAR's results, when, in fact, it did not. *See Christiansen v. Spectrum Pharms., Inc.*, 2024 WL 246020, at \*9 (S.D.N.Y. Jan. 23, 2024) (statements "that patients were 'being randomized'" in lung cancer trial were actionable "because a reasonable investor could have construed these statements as indicating that at least *some*

- 18 -

patients had been enrolled . . . when, in fact, none had"); *see also Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 707-08 (9th Cir. 2016) (statements that defendants "had 'all of the data in hand' [and] that 'everything that they had compiled so far' was 'favorable'" were actionable for failing to disclose that the FDA had expressed concerns about an animal study, because "once defendants chose to tout [a drug's] likely approval by referencing allegedly positive . . . studies, they were bound to do so in a manner that wouldn't mislead investors as to potentially negative information within their possession").

Defendants continued to dodge making complete and accurate disclosures when questioned by analysts. When an analyst asked whether LUNAR had "measure[d] PD-[L]1 status at baseline," defendant Doyle responded with a litany of assurances designed to dismiss investor concerns about PD-L1 scores: (i) "PD-[L]1 status has not shown any relevance in second line"; (ii) "there was nothing unusual about the control group"; and (iii) "the[] arms were well balanced[.]"  ¶84.  He continued: "*So there was nothing funky here.  So this is a well-powered, randomized study where we showed a profound benefit.  And the full data, including PD-[L]1 status will be presented later.  But I think that's a red herring.*"  *Id*.

Doyle's response was materially misleading—if not outright false—because he omitted the "'critical qualifying information'" (*Macquarie*, 601 U.S. ----, 144 S. Ct. at 891) that NovoCure did not have PD-L1 data for 45% of the patients in LUNAR.  Not only did the missing data drastically undermine the probability that the trial had actually "show[n] a profound benefit" from the addition of TTFields therapy, but "the full data, including PD-[L]1 status" *could not* "be presented later" because it had never been collected.  ¶¶85, 87.[8]  And the missing data meant that NovoCure *could*

---

[8]  At a minimum, Doyle's statement that "the full data, including PD-[L]1 status will be presented later" (¶84) was "ambiguous," and so the Court should credit Plaintiff's interpretation that it implied NovoCure would be able to present PD-L1 data for all or most patients. *Skiadas*, 2020 WL 3268495, at *9 (construing ambiguous statement in accordance with plaintiff's interpretation).

*not tell* whether the trial "arms were well-balanced" with respect to PD-L1 scores, or whether there was anything "unusual about" the PD-L1 scores of patients in "the control group."  ¶86.

Consequently, Doyle had no basis to brush off concerns about PD-L1 status as a "red herring," or to declare that "there was nothing funky here."  ¶¶86-87.  His response falsely implied that investors had no cause to be worried about whether imbalances in PD-L1 scores may have undermined LUNAR's seemingly favorable results, when those concerns were highly warranted and would not be alleviated when NovoCure presented the data.  *See Spectrum Pharms.*, 2024 WL 246020, at *10 (response to analyst that company "could not provide enrollment 'numbers' but was 'very active' in opening clinical testing sites" was actionable when no patients had been enrolled, because it "falsely implied that" a lung cancer trial "was sufficiently underway for there to be patient enrollment 'numbers,' even if the [c]ompany declined to provide those numbers").

In each of the cases upon which Defendants' rely, there were no inaccurate or incomplete statements that gave rise to a duty to disclose the alleged omissions, as here.  MTD at 13-15.  *See Ark. Pub. Emps.' Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 353-54 (2d Cir. 2022) (company's description of trial population as "strong" expressers of PD-L1 was accurate where company used a 5% threshold to define "strong" expression, because "the Complaint itself reflect[ed] the lack of consensus on the meaning of strong or high expression," by "detail[ing] varied thresholds used for PD-L1 positivity, ranging from 1% to 49%, depending on the study"); *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 154-55 (2d Cir. 2013) (omission of methodology used in post-hoc analysis did not render any statements misleading where company "simply stated that a post-hoc analysis was used without specifying the methodology" and "accurately disclosed that the only positive results from the . . . study stemmed from the use of post-hoc analysis"); *Emps.' Ret. Sys. of the City of Baton Rouge v. Macrogenics, Inc.*, 2021 WL 4459218, at *10-*11 (D. Md. Sept. 29,

2021) (accurate statement that cancer trial "met [its] primary endpoint" of progression-free survival did not give rise to a duty to simultaneously disclose interim data about secondary endpoint of overall survival); *Biondolillo v. Roche Holding AG*, 2018 WL 4562464, at \*5 (D.N.J. Sept. 24, 2018) (company accurately announced trial "found a 'statistically significant improvement in . . . survival'" and "'met its primary endpoint'"); *In re Amarin Corp. PLC Sec. Litig.*, 2016 WL 1644623, at \*15 (D.N.J. Apr. 26, 2016) (plaintiff failed to identify any false or misleading statements that were inconsistent with alleged omission).

*Keryx* and *Abely* are also inapposite. MTD at 13-14. In each case, the court rejected allegations that statements describing trial results as "statistically significant"—statements Plaintiff does not challenge here (*see* p. 3 n.7, above)—were misleading in light of alleged flaws in the trials' designs—a claim Plaintiff does not make here. *See* Section III.B.3., below. *In re Keryx Biopharm., Inc. Sec. Litig.*, 2014 WL 585658, at \*3, \*9-\*10 (S.D.N.Y. Feb. 14, 2014) (rejecting allegations that statements "tout[ing] the Phase 2 results as 'statistically significant'" were misleading because company did not "adjust the P-values it used to evaluate the statistical significance" to account for the alleged effects of "multiplicity, hypothesis generation, and interim analysis data comparisons"); *Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at \*10-\*11 (S.D.N.Y. May 29, 2013) (statement that study showed a "'statistically significant improvement' in survival" was not misleading where alleged flaws in study's design were accurately disclosed, and the "plaintiff [did] not dispute that, under the defendants' methodology, the . . . results found statistically significant improvement").

### 2. Any Statements of Opinion Are Actionable Under *Omnicare* and *Abramson*

Defendants' misstatements are not all statements of opinion, as they contend. MTD at 25-32.[9] But regardless, "[b]y increasing the ability of plaintiffs to plead material omissions with

---

[9] The statements that: (i) "there was nothing unusual about the control group" (¶84); (ii) "the full

respect to statements of opinion . . ., *Omnicare* reduced the significance of district courts' classification of statements as those of fact or opinion." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020); *see also Spectrum Pharms.*, 2024 WL 246020, at \*8, n.15 (whether a statement was "one or fact" or "one of opinion" was "not 'significant' at this stage in light of *Omnicare*").

Under *Omnicare*, a statement of opinion is actionable if: (i) the opinion is not sincerely held by the speaker (575 U.S. at 184); (ii) the opinion contains an embedded or "underlying" fact that is false (*id.* at 185); *or* (iii) the opinion omits a fact that renders it misleading to an ordinary investor (*id.* at 189). "*Omnicare* [thus] established two principal ways of challenging statements of opinion that do not require plaintiffs to show that the speaker subjectively disbelieved the statement." *Abramson*, 965 F.3d at 175.[10] "First, plaintiffs can allege that a statement of opinion contained one or more embedded factual statements that can be proven false." *Id.* "Second and relevant here, plaintiffs can allege that a statement of opinion, without providing critical context, implied facts that can be proven false." *Id.* "In other words, when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b-5 may follow." *Id.*

### a.    Characterizations of LUNAR

Here, Defendants' descriptions of the LUNAR results as "clinically meaningful" and "profound," and the data as "groundbreaking" (*e.g.*, ¶¶73-74, 102) "implie[d] . . . the absence of

---

data, including PD-[L]1 status will be presented later" (*id.*); (iii) trial arms were "well balanced" (¶¶73, 84, 92); and (iv) "all the indications . . . show balance" (¶99) were not opinions.

[10]  Defendants argue that the AC "does not allege facts showing that any Defendant stated an opinion he or she did not honestly hold[.]" MTD at 26. However, recognizing that "it could be difficult for plaintiffs to locate evidence suggesting as plausible that a defendant's subjective beliefs conflicted with that defendant's stated opinion[,]" the Supreme Court in "*Omnicare* rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made." *Abramson*, 965 F.3d at 175.

contrary facts," when Defendants "kn[ew] or reasonably should [have] know[n] of different material facts that were omitted." *Abramson*, 965 F.3d at 175. The phrase "clinically meaningful" (¶¶73, 76, 80, 88, 92, 94, 102, 104) implied that the LUNAR results would be credible and useful to doctors who were engaged in clinical practice, treating NSCLC patients using current standards of care. It also implied that LUNAR credibly showed what it purported to show—a benefit from the addition of TTFields.

Conversely, it implied the absence of the contrary fact that PD-L1 scores were missing for 45% of patients, and therefore NovoCure could never show that the trial results had not been impacted by imbalances in PD-L1 scores among the four subgroups. ¶¶9, 64. "Clinically meaningful" also implied the absence of the contrary fact that 98% of patients in the ICI cohort had received ICIs as a second-line therapy for the first time during the trial, making it entirely plausible that the benefit this group of patients appeared to experience from TTFields was actually due to their receiving ICIs for the first time (with the difference between the control and therapy groups reflecting imbalances in PD-L1 scores), instead of being attributable to TTFields therapy—and that NovoCure could not disprove this. ¶¶10, 65.

And it implied the absence of the contrary fact that LUNAR had not credibly shown a survival benefit from TTFields therapy in *any* currently-relevant NSCLC patient population because: (i) only 30% of patients in the trial fit both the current first-line and second-line standards of care, whereby patients whose cancer worsens after receiving first-line ICIs are given a second-line chemotherapy drug such as docetaxel—yet the docetaxel cohort failed to show a statistically significant benefit with TTFields therapy; and (ii) although the ICI cohort did show a statistically significant overall survival benefit with the addition of TTFields therapy, just 2% of patients in the ICI cohort had previously received first-line treatment with ICIs, in accordance with current

standards of care—a number so small that the results were meaningless. ¶¶11, 66-69.

Likewise, labeling the results in the ICI cohort "profound" (¶¶74, 80, 97, 106) implied the absence of the contrary fact that only 2% of patients in that group even partly met current standards of care. And describing the "data" as "groundbreaking" (¶102) implied the absence of the contrary facts that: (i) "data" on a key patient characteristic was missing for 45% of patients; and (ii) the "data" did not show a statistically significant benefit in any subset of patients meeting current standards of care.

"These statistics suggest that" Defendants' "characterizations" of the LUNAR results as clinically meaningful, profound, and groundbreaking "did not 'fairly align with the information in Defendants' possession' at the time their statements were made." *Micholle v. Ophthotech Corp.*, 2019 WL 4464802, at *12 (S.D.N.Y. Sept. 18, 2019) (quoting *Omnicare*, 575 U.S. at 189) (statement that company had "made no *meaningful* changes" to the enrollment criteria from its phase 2 to phase 3 clinical trials was an actionable opinion because "[d]efendants' characterization . . . may well have been 'inconsistent' with the data known to them" showing the change made eligible for the phase 3 trial 17% of patients who would have been excluded from the phase 2 trial).[11] *See also In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 802-803 (9th Cir. 2017) ("opinion statement that FDA clearance risk has been achieved" for breast cancer screening product was misleading for omitting "lack of [FDA] clearance, and the FDA's concerns about that lack of clearance" because it

---

[11] *Ophthotech* and *Ohr* both involved clinical trials of companies' drug candidates for treating wet AMD patients, in combination with the existing drug Lucentis. *Compare Ophthotech*, 2019 WL 4464802, at *12 *with* MTD at 27, 31 (citing *Lehman v. Ohr Pharm. Inc.*, 2019 WL 4572765, at *1-*2 (S.D.N.Y. Sept. 20, 2019)). In *Ophthotech*, Judge Broderick found actionable the term "meaningful" when it was contradicted by specific statistics in defendants' possession, as here. 2019 WL 4464802, at *12. By contrast, in *Ohr*, cited by Defendants, that term was not actionable where the plaintiffs alleged that the trial results were not meaningful because the control group had underperformed in comparison to other studies in wet AMD. *Ohr*, 2019 WL 4572765, at *4. No similar omission is alleged here.

"did not 'fairly align with the information in [defendant's] possession'").

Similarly, the opinion statement in NovoCure's February 23, 2023 Form 10-K that: "We believe our protocol [for the LUNAR trial] incorporates the evolving standard of care for second-line treatment of NSCLC" and "LUNAR was designed to generate data that contemplates multiple outcomes, all of which we believe will be clinically meaningful" (¶92) is actionable because it "did not 'fairly align with the information in Defendants' possession' at the time the[] statement[] w[as] made." *Ophthotech*, 2019 WL 4464802, at *12.

At the time of this statement, Defendants were no longer speaking about future expectations or beliefs. Rather, they were in possession of the LUNAR results, which showed that the *actual* patient population that had been enrolled in the trial did *not* meet the current "standard of care for second-line treatment of NSCLC," and that LUNAR had *not* shown a benefit in any currently-relevant group of patients. ¶¶92-93. Yet their statement omitted the contrary facts that: (i) only the docetaxel cohort contained any patients who fit the current second-line standard of care—but the results in that cohort did *not* reach statistical significance; and (ii) while the ICI cohort did show a statistically significant overall survival benefit with the addition of TTFields therapy, just 2% of patients in the ICI cohort had previously received first-line treatment with ICIs—a number so small that the results were meaningless. ¶¶66-69, 93.[12] *See, e.g.*, *Spectrum Pharms.*, 2024 WL 246020, at *7-*8 (opinion statement that defendants "believe[d]" they were "aligned with the FDA" regarding dosage used in lung cancer trial was "actionable because FDA officials had allegedly communicated to [d]efendants . . . that [the company] needed more data before the FDA could determine" whether the proposed dosage was appropriate); *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at

---

[12] Therefore, the AC does not "critique [] trial design" by alleging this statement is actionable (MTD at 25)—it critiques Defendants' omission of presently-existing material facts. *See* Section III.B.3., below.

\*14-\*15, \*24 (S.D.N.Y. Sept. 30, 2021) (opinion statements concerning executives' "expectations" and "thoughts" were actionable where they omitted existing facts that conflicted with those statements).[13]

### b. Responses to Analyst Questions About PD-L1 Status

Defendants' "responses to questions about PD-L1 status" are likewise actionable even if analyzed as opinions. MTD at 25. Defendants assert that, by challenging Doyle's responses to analysts' questions about PD-L1 data, including whether missing data or score imbalances may have impacted LUNAR's results, the AC merely pleads a "disagree[ment] with Doyle about oncology" that cannot be actionable. MTD at 29. But while courts do not "'police disagreements in the cancer research community'" (*id*.; citing *Zagami v. Cellceutix Corp*., 2016 WL 3199531, at \*13 (S.D.N.Y. June 8, 2016)), that sound bite does not give Defendants a license to mislead investors.

Recognizing this, the Second Circuit in *Abramson* found actionable a defendant's opinion statements about oncology, where he opined that "'all the major studies' show survival rates of at most 20 months for resected pancreatic cancer patients" (965 F.3d at 174); and "'we don't have any reason to believe that median survival for the[] patients'" in the company's clinical trial "'w[ould] be more than low 20s.'" *Id*. at 178. Reasoning that these statements "implied that there were no competing facts on survival rates, not that [the defendant] had deemed competing facts less persuasive[,]" the Second Circuit held that the omission of the "competing fact[]" that "several studies show[ed] survival rates above 20 months" was "plausibly more than 'some fact cutting the other way'" under *Omnicare*, and required him "either to speak less confidently about the control

---

[13] By contrast, in *Sanofi*, statements concerning the likelihood of FDA approval did not "conflict with that a reasonable investor would take from the statement[s]" because the FDA had informed the company that its allegedly-omitted concerns about single-blind studies could be overcome by showing a large treatment effect, and the "treatment effect was, in fact, large." *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016).

group's survival rate or to disclose the existence of studies showing survival rates above 20 months." *Id*. at 178.

The same analysis applies here. Each of Doyle's three responses (¶¶84, 99, 108) was aimed at downplaying analysts' concerns about: (i) the potential for missing PD-L1 data—given that the LUNAR protocol did not mandate collecting PD-L1 scores (*see* ¶¶60-63); and (ii) the potential for imbalances in PD-L1 scores to have thrown off LUNAR's results—given that patients were not stratified by PD-L1 scores to control for this confounding variable (¶59 & n.4). And each response omitted the "competing fact[]" that PD-L1 data was missing for 45% of patients (*Abramson*, 965 F.3d at 178)—and so NovoCure could not tell whether the trial "arms were well-balanced" with respect to PD-L1 scores, or whether there was anything "unusual about" the PD-L1 scores of patients in "the control group" or anything "funky" about the trial. ¶¶84, 86.[14] A reasonable investor could also understand Doyle's summation: "I think that's a red herring" (¶84) "to imply that no knowledgeable person could reasonably" be concerned that differences in patients' PD-L1 scores had impacted LUNAR's results. *Abramson*, 965 F.3d at 177.

"Both because of its posture as a response to a specific question and its categorical nature," Doyle's statements "implied that there were no competing facts" about PD-L1 status that called into question LUNAR's topline results. *Id.* at 178. Yet the large amount of missing PD-L1 data was "plausibly more than 'some fact cutting the other way.'" *Id.* Its significance "required [Doyle] either to speak less confidently . . . or to disclose" that NovoCure did not have PD-L1 data on almost half of the LUNAR patients. *Id.*

Doyle's response that "all the indications . . . show balance" (¶99) further implied that he had

---

[14] It is also pertinent that most of Doyle's responses were "not framed like [] statement[s] of opinion" because he "did not couch his representation[s] with prefatory language[.]" *Abramson*, 965 F.3d at 176.

enough information to conclude that significant imbalances did not exist, when in fact he could not reliably make that determination given the high percentage of missing PD-L1 data. In the context of responding to analysts' concerns about whether NovoCure had "measure[d] PD-[L]1 status" (¶84), and whether the company "ha[d] data on PD-L1 status for a large percentage of the patients" (¶108), Doyle's assurances that "the full data, including PD-[L]1 status will be presented later" (¶84), and that NovoCure "expect[ed] to address all the issues with respect to balance and PD-L1 status" at ASCO (¶108) likewise implied that NovoCure had enough data to address concerns about whether PD-L1 imbalances has impacted LUNAR's results, when it could actually only address those concerns by conducting another trial that captured PD-L1 data.

Because the missing PD-L1 data "substantially undermine[d] the conclusion[s] a reasonable investor would reach from [Doyle's] statement[s] of opinion," his "statement[s] [are] misleading and actionable." *Abramson*, 965 F.3d at 177.

The portion of Doyle's response that "PD-[L]1 status has not shown any relevance in [the] second line" is also actionable. ¶84. *See* MTD at 29, 32-33. Doyle's statement, "whether characterized as one of fact or opinion, would . . . lead a reasonable investor to the falsifiable conclusion" (*Abramson*, 965 F.3d at 177) that because LUNAR was "a trial in the second line" (¶84), there was no potential for patients' PD-L1 scores to impact the effectiveness of the ICIs they received during the trial.

But as the AC alleges, the effectiveness of ICIs generally increases in tandem with higher PD-L1 scores, regardless of whether a patient is given ICIs as a first-line or second-line treatment. ¶¶7, 39, 59, 87. And PD-L1 scores were particularly relevant for the 69% of LUNAR patients—including 98% of patients in the ICI cohort—who were receiving ICIs *for the first time* during the trial. ¶87.

- 28 -

Defendants improperly attempt to dispute the truth of this allegation by citing materials outside of the pleadings: three FDA labels for ICIs, which indicate that two ICIs have been approved for use in NSCLC patients with low PD-L1 scores, and a third has been approved regardless of PD-L1 status. MTD at 29 (citing Def. Exs. 17-19). But that is entirely consistent with the AC's allegation that ICIs work *better* as PD-L1 scores increase. Indeed, it makes little sense that PD-L1 scores would have no "relevance" for the ICI-naïve patients, who had only received chemotherapy as a first-line treatment. And one does not need to be an oncologist to recognize as plausible the premise that the key efficacy biomarker for ICIs would have "relevance" for patients receiving an ICI for the first time.

Plaintiff is not required to plead scientific evidence in support of the allegation that the effectiveness of ICIs generally increases as a patient's PD-L1 score increases—including when ICIs are a second-line treatment. But in any event, such evidence is abundant. *See* Pl. Ex. 2 at 2 (meta-analysis of 11 studies, stating that "PD-L1 expression has been described as a *continuous biomarker* with posited correlation to immunotherapy efficacy in patients with NSCLC"); *id*. at 5 (finding that in "2L [*i.e.*, second-line] NSCLC [patients] treated with ICI therapy[,]" overall survival "generally increased with increasing PD-L1 expression . . . . Similarly, [progression-free survival] generally increased with increasing PD-L1 expression . . . .").

### 3.    The AC "Attacks" Defendants' Misrepresentations, Not LUNAR's Design

In an effort to analogize this case to ones that have been dismissed, Defendants spend much of their brief attempting to rewrite the AC as claiming "that LUNAR was improperly designed[.]" MTD at 17; *see also id*. at 16-25. Specifically, Defendants mischaracterize the AC as alleging that LUNAR: (i) "did not match the evolving standard of care" (MTD at 17); and (ii) "did not stratify patients for PD-L1 status" (*id*. at 21), and that the trial's flawed methodology "undermined the

- 29 -

reported topline results" (*id*. at 17).  But the AC is not premised upon an attack on "the methodology of [the LUNAR] trial"—instead, it alleges that "[D]efendant[s'] *statements* about [the trial] were false and misleading."  *Abely*, 2013 WL 2399869, at *7 (citing *Kleinman*, 706 F.3d at 154-55).

With respect to Defendants' first mischaracterization, "Plaintiff's claim is" *not* that LUNAR was improperly designed, and so "NovoCure studied the wrong patient population."  MTD at 18; *see also id*. at 17-21.  Instead, Plaintiff's claim is that *because* LUNAR was testing TTFields as a second-line therapy, and *because* the standard of care had shifted to the use of ICIs as a first-line therapy, LUNAR needed to show a benefit with the addition of TTFields in at least *some* patients who reflected current standards of care, in order for doctors to consider using TTFields as a second-line therapy in clinical practice.  *See* ¶¶48-51.

Yet the LUNAR results showed that: (i) the subset of patients in the docetaxel cohort who met current standards of care did *not* show a statistically significant improvement; and (ii) while the results in the ICI cohort did reach statistical significance, only 2% of the patients in that cohort even partly met current standards of care—having met the first-line standard of receiving an ICI, but not the second-line standard of receiving chemotherapy following first-line ICIs.  *See* ¶¶66-70.  Because LUNAR did *not* show a benefit with the addition of TTFields in *any* group of patients meeting current standards of care, the results were *not* "clinically meaningful" (*e.g.*, ¶73) and Defendants' statements to the contrary were materially misleading.[15]

Relatedly, while analysts and investors "knew about the changing standard of care, knew

---

[15]  Defendants take their mischaracterization even further, asserting that "Plaintiff claims that the trial *became* flawed when" the standard of care shifted to the use of ICIs "as a first-line treatment for certain NSCLC patients"; and that "NovoCure should have abandoned LUNAR . . . [or] sought to radically modify the trial design in order to exclude most or all patients who had received only chemotherapy—and not an ICI—in the first line."  MTD at 18-19.  Such "claims" appear nowhere in the AC.  *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 332-33 (S.D.N.Y. 2003) (rejecting defendants' effort to "rewrit[e] the [c]omplaint[] in a way that they believe favors dismissal").

about LUNAR's eligibility criteria, and knew that the trial and current U.S. patient populations" might "diverge[] during the course of the trial" (MTD at 21), they *did not know* that the purportedly "clinically meaningful," "profound" and "groundbreaking" results (*e.g.*, ¶¶73-74, 102) actually showed that *no* subset of patients *both*: (i) met current standards of care; and (ii) showed a statistically significant benefit with the addition of TTFields.

The fact that analysts predicted only a portion of the patients in LUNAR would have received first-line ICIs speaks to the known change in the standard of care, but says nothing about this undisclosed, material fact.  For example, while a J.P. Morgan analyst report found overall first-line ICI use of 31% *across all four* trial cohorts to be "consistent" with the analyst's "expectation[s]" (MTD at 20, citing Def. Ex. 11 at 1), the same report went on to state: "Meanwhile just *2%* of patients randomized to the [ICI] cohort" received first-line treatment with ICIs, which was "*not . . . representative of today's treatment paradigm* in commercially-relevant markets." Def. Ex. 11 at 1.

The 43% drop in NovoCure's share price when the LUNAR data was disclosed (¶110)— notwithstanding that the overall survival benefit was "in-line with expectations" (Def. Ex. 11 at 1)— confirms that analysts and investors were surprised by the disclosure.  *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 203 (S.D.N.Y. 2010) (market reaction to a disclosure "evidences [d]efendants' [prior] concealment" of pertinent facts).

Defendants' second mischaracterization fares no better.  Plaintiff's claim is *not* "that NovoCure *was required* to balance (or 'stratify') PD-L1 scores across the four trial subgroups 'in order to ensure that the results of the trial actually reflected the addition of TTFields therapy, and were not skewed by patients responding differently to ICIs based on their PD-L1 scores.'"  MTD at 21 (selectively quoting ¶51).[16]  Rather, the AC *explains* that since effectiveness of ICIs generally

---

[16]  In asserting that: "Plaintiff claims that the overall survival benefit was a false positive—and that the trial was flawed insofar as it failed to prevent that result" (MTD at 22), Defendants once again

increases in tandem with higher PD-L1 scores (¶59), "it was critical for the LUNAR trial's four subgroups to contain patient populations that were relatively balanced with respect to patients' PD-L1 scores, in order to ensure that the results . . . were not skewed by patients responding differently to ICIs based on their PD-L1 scores." ¶51. The AC further *explains* that because LUNAR did not "stratif[y] [patients] to ensure that PD-L1 status was balanced among the trial's four subgroups[,]" whether this had occurred was "a key question among analysts and investors while awaiting the full LUNAR data" (¶59)—as reflected by analysts' multiple questions on this topic. ¶¶84, 99, 108.

Against this backdrop, the AC *alleges* that because PD-L1 scores were missing for 45% of patients in the trial, NovoCure could never answer that question. ¶¶9, 64. In other words, Plaintiff's claim is not that the LUNAR results *were* skewed by patients responding differently to ICIs based on their PD-L1 scores. It is that NovoCure could not show that this had *not* occurred, absent a new trial. ¶¶12, 70.[17]

And that is exactly what doctors and market participants alike realized after the end of the Class Period. *See* ¶113 (physician at ASCO stating he could never "be sure" that the ICI cohort had "a balance between the two arm[s]" with respect to PD-L1 scores, and that such an imbalance "would give a false . . . difference in survival that's actually related to the PD-L1 status"); ¶114 (another physician at ASCO noting the "lack of clarity" around whether "there [was] any imbalance" in the trial); ¶119 (analyst observing that the "very significant proportion of missing data" would make "it difficult to prove that PD-L1 expression was ultimately balanced across treatment arms");

---

re-write the AC in order to attack a non-existent claim.

[17] Defendants' assertion that PD-L1 scores ostensibly *were* balanced for the other 55% of patients (at least under NovoCure's *post-hoc* stratification) misses this point entirely. MTD at 24-25 (citing Def. Ex. 10 at slide 15). At the same time, their argument that "Plaintiff ignores that LUNAR was both controlled (*i.e.*, it employed experimental and control arms) and randomized (*i.e.*, patients were assigned randomly to the arms)" ignores the PD-L1 issue. MTD at 23. And Defendants' discussion of statistics—and the extraneous sources they cite—have no bearing on whether their misrepresentations are actionable. *Id*. at 24.

¶120 (analyst stating that "with ~45% of patients missing PD[-L]1 data, this is a problem and could have skewed [the] data"); ¶123 (analyst stating that due to missing PD-L1 data, "it is hard to determine whether or not there was a PD-L1 imbalance that could have skewed results").

Defendants' Class Period statements—including that "all the indications . . . show balance" (¶99), that NovoCure would "address all the issues with respect to balance and PD-L1 status" (¶108) at ASCO, and that "there was nothing funky here. . . . [a]nd the full data, including PD-[L]1 status will be presented later" (¶84) created an obligation to either "speak less confidently . . . or to disclose" the fact of the missing PD-L1 data (*Abramson*, 965 F.3d at 178), so that investors could make their own, informed assessment of the probability that LUNAR had actually demonstrated a benefit from TTFields.[18]

Plaintiff's claims also are not "based on his disagreement with NovoCure's interpretation of the LUNAR data." MTD at 32; *see also id*. at 26, 31. No interpretation of data was required to see that PD-L1 scores were missing for 45% of patients, or that 98% of patients in the ICI cohort were receiving ICIs for the first time during LUNAR—or to assess the basic data point of which patients had previously received ICIs as part of their first-line therapy. By contrast, in *Kleinman*, 706 F.3d at 153-55, "the defendant . . . disclosed the negative data at issue, and then attempted to explain it away by applying statistical analysis the plaintiff believed was misleading." *Delcath*, 36 F. Supp. 3d at 333 (discussing *Kleinman*). As the court explained in *Delcath*, "[t]he allegations here do not involve differing interpretations of disclosed data, but rather data that was not disclosed." 36 F. Supp. 3d at

---

[18] Defendants' argument that "[s]ome market participants" were aware of the potential for incomplete PD-L1 data (MTD at 21 n.9) overlooks Defendants' assurances on this topic, the extent of the missing data, and that "'[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint[.]'" *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 395 (S.D.N.Y. 2022) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)).

333.[19]

### 4. Defendants' Additional Statements Are Not Puffery or Forward-Looking

In the context of their characterizations of the LUNAR results, and their assurances about PD-L1 data, Defendants also made several optimistic statements that they now contend are immaterial puffery, protected by the safe-harbor, and non-actionable opinions.  MTD at 33-35.  *See* ¶78 (LUNAR "mark[ed] the beginning of a transformational period" and Defendants were "energized by the prospect of treating tens of thousands of patients who could benefit from [TT]Fields"); ¶82 (NovoCure was "now standing on the threshold of the opportunity to treat many, many, many more patients by extending the reach of [TTFields]" and "the promise to bring [TT]Fields into new indications is here"); ¶90 (LUNAR "marked the beginning of a transformational 24 months for Novocure" and, along with other trials, "could dramatically increase the number of patients eligible for [TTFields]").

First, considered in the "'context'" of Defendants' other representations, and their failure to disclose either the missing PD-L1 data or LUNAR's failure to show a statistically significant benefit in any subset of patients meeting current standards of care, these statements are not immaterial puffery.  *See Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *10 (S.D.N.Y. Apr. 14, 2020) (statements "touting" company's success were not puffery).  These statements were also made ""'to reassure the investing public" about matters particularly important

---

[19] Defendants' additional cases involving interpretations of clinical data are likewise inapposite. *See, e.g.*, *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F. 4th 408, 422 (2d Cir. 2023) (defendants' statements interpreting data were not misleading where the FDA endorsed that same interpretation); *Sanofi*, 816 F.3d at 214 (statements about trial results "were not misleading simply because the FDA disagreed with [d]efendants' interpretation of the data"); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170-71 (3d Cir. 2014) (defendants' "reasonable" interpretation of data from a phase 2 trial did not render false their statement that the decision to initiate a phase 3 trial was based in part on the phase 2 trial).

to the company and investors"'" (*In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *12 (E.D.N.Y. May 20, 2020)—namely, the utility of the LUNAR results, and their concomitant ability to advance NovoCure's financial prospects (¶¶3, 33-34), which removes them from the realm of puffery.

Second, these three statements are not protected by the PSLRA's safe-harbor provision. Each statement discussed presently-existing facts. *See* ¶78 (LUNAR "*mark[ed] the beginning*"); ¶90 (same); ¶82 ("*now standing* on the threshold"); *id*. ("bring[ing] [TT]Fields into new indications *is here*."). Moreover, "[t]he safe harbor also does not protect material omissions." *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016). The AC alleges these statements were misleading because *due to LUNAR's significant issues*, even if the FDA approved TTFields therapy as a second-line treatment for NSCLC, it would not be widely adopted by the medical community until NovoCure was able to complete additional trials. ¶¶79, 83, 91. Since the omitted facts—LUNAR's significant issues—were presently-existing, Defendants' argument that the falsity of these statements rests on "speculation" about TTFields future commercial success (MTD at 35) "misconstrue[s] . . . Plaintiffs' allegations." *Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 324 (S.D.N.Y. 2018). "At issue here are not Defendants' opinions about [TTFields'] prospects . . . , but Defendants' allegedly false descriptions" of the trial results. *Id*. at 324-25.[20]

## C.    The AC Pleads a Strong Inference of Scienter

A plaintiff may plead scienter by alleging "facts showing either: 1) a 'motive and opportunity to commit the fraud'; or 2) 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). The Court must "consider the complaint in its entirety" to determine "whether *all* of the facts

---

[20] As discussed above in Section III.B.2., to the extent the statements in ¶¶78, 82 and 90 reflected opinions, the AC alleges that the missing PD-L1 data and LUNAR's failure to show a statistically significant benefit in any subset of patients meeting current standards of care, were "more than 'some fact cutting the other way'" under *Omnicare*, and required Defendants to temper their optimistic statements, or to disclose these omitted facts. *See Abramson*, 965 F.3d at 178.

alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). The inference "need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but merely "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. In other words, "a tie . . . goes to the plaintiff." *Ophthotech*, 2019 WL 4464802, at *15.

### 1.    Defendants Acted with Conscious Misbehavior or Recklessness

Notwithstanding Defendants' bizarre attempt to change the well-settled scienter standards to "intentional fraud" (MTD at 35, 41) or "intentional deceit" (*id*. at 4, 38), "'recklessness is a sufficiently culpable mental state for securities fraud in this circuit.'" *Saskatchewan Healthcare Emp.'s Pension Plan*, 2024 WL 775195, at *27 (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co*., 553 F.3d 187, 198 (2d Cir. 2009)).[21] Recklessness is "conduct that [i]s 'highly unreasonable . . . [such] that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158-59 (2d Cir. 2012). "[S]ecurities fraud claims typically [] suffice[] to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. The key question is whether "defendants knew or, more importantly, should have known that they were misrepresenting material facts." *Id*.

Here, there is no reasonable dispute that Defendants were in possession of the LUNAR data as of January 5, 2023, when they announced the topline results. Not only was the LUNAR dataset

---

[21] Defendants are mistaken that "reckless has little if any application here" because some of their misstatements were opinions. MTD at 42-43. *Omnicare* did not alter the pleading standard for scienter, but rather "rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made." *Abramson*, 965, F.3d at 175.

complete by November 2022, when patient follow-ups concluded (¶47), but "'it would be absurd to suggest'" that Defendants had not looked at the LUNAR data before publicly discussing the trial results. *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 235 (S.D.N.Y. 2023).[22]  Indeed, defendant Doyle acknowledged on February 23, 2023 that NovoCure was "[a]nalyzing the data" and was "in the process of both preparing" to publish the LUNAR data "and submitting [an] abstract for presentation at an upcoming medical conference."  ¶132.

Defendants' suggestion that they might not have yet "calculated the number of LUNAR patients who received ICIs in the first line, or the percentage of patients for whom PD-L1 scores were available" at the time of their public statements is unconvincing.  MTD at 37.  These basic data points did not require time-consuming calculations or interpreting data, but merely looking at readily-apparent, key patient characteristics.  The high portion (45%) of missing PD-L1 scores, and the lack of fist-line ICIs for nearly the entire ICI cohort (98%)—the only cohort that reached statistical significance—were obvious and would not have taken a lengthy or in-depth analysis to discover.  Even if it took "at least several weeks" after patient follow-ups were completed in November 2022 "to enter and consolidate data" (MTD at 6), the January 5, 2023 announcement provided that amount of time.

Yet Defendants repeatedly described the LUNAR results as "clinically meaningful," "groundbreaking," and "profound."  *See e.g.*, ¶132.  In making these statements, "[Defendants] chose, [] only to report the positive [], engaging in the sort of selective disclosure that creates a real possibility of misleading investors." *In re Intercept Pharms., Inc. Sec. Litig.*, 2015 WL 915271, at

---

[22]  Of course, if they had not done so, that would amount to "turn[ing] a blind eye," which would also "support an inference of scienter." *U.S. Sec. & Exch. Comm'n v. Takeyasu*, 2018 WL 2849777, at *19 (S.D.N.Y. June 11, 2018); *see also Novak*, 216 F.3d at 308 (an "egregious refusal to see the obvious, or to investigate the doubtful" can establish recklessness).  Therefore, this is not a case where it is necessary to rely on witnesses or reports.  MTD at 37, 44.

*7 (S.D.N.Y. Mar. 4, 2015).

Doyle further assured analysts who expressed concern about whether potential imbalances in PD-L1 scores among the trial's subgroups may have impacted LUNAR's results, that those concerns were a "*red herring*" because the trial "arms were *well balanced*," and there was "*nothing funky*" about the trial. ¶84. He subsequently stated: (i) that "all the indications . . . show balance" (¶99)—although the missing PD-L1 data meant NovoCure could not tell whether PD-L1 expression was balanced; and (ii) that NovoCure would "address all the issues with respect to balance and PD-L1 status" at ASCO (¶108)—although the missing PD-L1 data meant it could not address those issues. These statements "evince[] a familiarity with the data in the trials" and "raise a strong inference that [Defendants] knew and/or had access to facts that contradicted their public statements regarding" the LUNAR results. *Delcath*, 36 F. Supp. 3d at 335; *see also Spectrum Pharms.*, 2024 WL 246020, at *16 (allegations that executives "repeatedly discussed [a lung cancer drug's] development with investors" gave rise to an inference that they were "aware of the FDA's [differing opinion on the dosing regimen] but decided to communicate to investors that the Company and the FDA were aligned on the [] dosage regimen anyway").[23]

Taken collectively with the AC's other allegations of recklessness, the following provide additional circumstantial evidence of scienter: (i) Defendants' positions as the highest-level officers of a small company whose prospects depended heavily on expanding approved indications for TTFields (¶¶22-24, 33-34); (ii) the termination of NovoCure's Chief Medical Officer less than two weeks after NovoCure announced LUNAR's topline results (¶135); and (iii) NovoCure's end-of-

---

[23] Doyle's decision to "[a]ctively communicating with the public about" the LUNAR data (*In re Carlotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *15 (S.D.N.Y. Mar. 29, 2024)), and to "h[o]ld himself out to investors as the person most knowledgeable about" the LUNAR results (*Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *5 (S.D.N.Y. June 21, 2021)) further support an inference of his scienter.

Class Period announcement of three additional trials in NSCLC, for which planning was necessarily underway during the Class Period, indicating Defendants recognized the implications of LUNAR's significant issues (¶134).[24]

### 2.    Motive Allegations Contribute to a Strong Inference of Scienter

The AC also alleges that Defendants "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08.[25] "'[I]nsider trading is considered a classic example of a "concrete and personal" benefit that suffices to plead motive to commit securities fraud.'" *Kusnier v. Virgin Galactic Holdings*, 2022 WL 16745512, at *19 (E.D.N.Y. Nov. 7, 2022). Stock sales by insiders raise a strong inference of scienter when those sales are "unusual"—because of "the amount of profit from the sales, the portion of the stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *Scholastic*, 252 F.3d at 74-75. Courts also consider the timing of the sales. *See Blanford*, 794 F.3d at 309. There is no level of sales at which insider trading becomes unusual per se; each case is independently decided. *See Scholastic*, 252 F.3d at 75.

Here, seven NovoCure insiders—including defendants Danziger and Cordova—collectively sold 346,520 shares of their stock, for gross proceeds of over $35 million, in sales that were highly

---

[24] Defendants' argument that "[m]ost of Plaintiff's scienter allegations are entirely conclusory" (MTD at 35) is based on a handful of paragraphs and overlooks the "whole factual picture painted by" the AC. *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 101-02 (S.D.N.Y. 2015). Further, *Abely*, is inapposite because there, the plaintiff's scienter allegations failed to connect the defendant company with the non-defendant company who was "responsible for all major aspects of the design and execution of the [clinical] trials." 2013 WL 2399869, at *19. In addition, Defendants' factual assertion that NovoCure had already planned additional trials in NSCLC while LUNAR was ongoing is unsupported by the exhibit they cite. *See* MTD at 42 (citing Def. Ex. 5 at 9). The only LUNAR pivotal study mentioned there is the KEYNOTE B36 pilot study—not the "3 *new* trials on lung cancer, aptly named LUNAR 2, LUNAR 3 and LUNAR 4," that defendant Cordova announced on June 6, 2023. ¶116 (emphasis added).

[25] Opportunity is presumed, where, as here, the defendants are high-level executives with "access to insider information[.]" *Scholastic*, 252 F.3d at 74.

unusual and suspicious—with approximately half of the sales being made without Rule 10b5-1 trading plans.  ¶¶15, 136.  Defendant Danziger sold 33.7% of his holdings for proceeds of $23,106,172, and defendant Cordova sold 4.78% of her holdings for proceeds of $666,520.  ¶136. Courts in this Circuit have found that similar insider sales have contributed to a strong inference of scienter.  *See Blanford*, 794 F.3d at 308 (finding "size and timing of [defendant] stock sales pursuant to [] 10b5-1 trading plans support an inference of scienter"); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 554 (S.D.N.Y. 2017) (finding "insider trading by [defendants] provides additional support for an inference of motive").

The insider sales were suspiciously-timed to take advantage of NovoCure's artificially inflated stock price because they were made during the five-month period between NovoCure's announcement of positive topline results for LUNAR, and the disclosure of the actual trial data, which revealed the significant shortcomings with the LUNAR results.  ¶137.  The fact that defendants Danziger and Cordova, along with multiple other company insiders, cashed out their shares during this time period indicates that these significant shortcomings were known within the Company.  If the LUNAR data was truly as "clinically meaningful," "groundbreaking," and "profound" as Defendants had led investors to believe, it would have been economically irrational for insiders to cash out before the data was disclosed—since under those circumstances, the presentation of the LUNAR data would have caused NovoCure's share price to rise.

The divergence from NovoCure insiders' trading patterns during the five months before and after the Class Period amplifies the suspicious timing of these sales.  During the five months before the Class Period, insiders sold only 66,252 shares for proceeds of approximately $5.35 million. ¶138.  And during the five months after the Class Period, insiders sold only 2,594 shares for proceeds of approximately $66,000.  *Id*.  These amounts stand in stark contrast to the insider sales of

260,537 shares for proceeds of more than $28.5 million that occurred on January 5, 2023 alone—the date that NovoCure announced LUNAR's topline results, causing its share price to soar.  ¶139.

Most notably, defendant Danziger cashed out 212,500 shares, representing nearly 34% of his holdings, on January 5, 2023, the day that LUNAR's topline results were announced, for proceeds of over $23 million.  ¶140.  Prior to these sales, Danziger had not sold any stock since April 13, 2021.  *Id*.  Contrary to Defendants' assertion, Danziger's prior stock sale in April 2021 says nothing about the unusual or suspicious nature of his January 2023 sale.  MTD at 40.  The April 13, 2021 sale followed positive news that LUNAR's interim analysis had occurred sooner than anticipated (¶44), unconnected to any misstatements or omissions—unlike the January 2023 sale on the same day that Defendants described the LUNAR results as clinically meaningful and profound, while concealing the trial's significant issues.  ¶137.  *See Blanford*, 794 F.3d at 308 (motive adequately alleged where "sales occurred shortly after" alleged misstatements).[26]

Moreover, Danziger's motive is not undermined by his use of a 10b5-1 trading plan.  MTD at 39.  At this stage, "'the existence of a Rule 10b5-1 Trading Plan is an affirmative defense that must be pled and proved.'"  *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc*., 2019 WL 2360942, at *6 (S.D.N.Y. Mar. 4, 2019).  In *Tableau*, the court rejected defendants' argument that stock sales were not unusual because they were made pursuant 10b5-1 plans, reasoning that "there is nothing in the record to indicate when the plans were entered into" and "defendants sold more in stock value during the class period than they did during the previous year, but do not explain

---

[26] Defendants' misleadingly rely on *Magna* and *Vertex* to argue that Danziger's sales were not suspicious because they followed good news.  MTD at 40 (citing *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013); *Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*, 838 F.3d 76, 85 (1st Cir. 2016)).  In *Magna*, 967 F. Supp. 2d at 800, the insider sales were not suspicious because they were made throughout the class period at low prices, and the company's share price rose after the last insider sale.  In *Vertex*, 838 F.3d at 85, the sales occurred when the share price suddenly rose by a large amount following a long period of steadily falling share prices.

how their trading plans accomplished that goal." *Id*. at \*6. Likewise here, the Forms 4 for Danziger's sales do not disclose the terms of his trading plan. Therefore, they do not provide any information that would enable the Court to determine whether or not the plan was adopted or amended between the time that NovoCure received the LUNAR data and the release of the topline results in January 2023, or whether or not Defendants timed the release of LUNAR's topline results to coincide with a date when Danziger could sell stock under his Rule 10b5-1 plan. *See Blanford*, 794 F.3d at 309.

Defendant Cordova's Class Period sales were likewise suspiciously-timed because they were made during the five month period between the announcement of LUNAR's topline results and the disclosure of the LUNAR data. ¶¶136-137.[27] And *none* of Cordova's sales were made pursuant to a Rule 10b5-1 plan, further underscoring the suspicious nature of her sales. ¶142. Defendants argue that "[a]ll of Cordova's sales were made automatically to cover tax liability that arose when stock rights vested." MTD at 38. But "there is little principled reason to exclude" Cordova's sales even if they were made to pay taxes, and whether this is true raises a "disputed issue" of fact. *comScore*, 268 F. Supp. 3d at 555.[28] *See also City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent.*

---

[27] Defendants' argument that "Cordova did not make any challenged oral statements" (MTD at 38) is irrelevant. "As a signatory to [NovoCure's] public filings, [Cordova] constituted a 'maker' of statements contained therein[.]" *Dragon State Int'l Ltd. v. Keyuan Petrochemicals, Inc.*, 2016 WL 439022, at \*4 (S.D.N.Y. Feb. 3, 2016) (defendant acted with scienter regarding alleged misstatements in SEC filings). *See* ¶¶73, 76, 88, 92, 102, 104 (statements by Cordova). Defendants make the same argument with respect to Danziger (MTD at 40), which also fails. *See* ¶¶90, 92, 95 (statements by Danziger).

[28] The suspicious circumstances which are present here—*i.e.*, substantial sales following positive news, and before the imminent reveal of a negative disclosure just a few months later—are absent from the cases cited by Defendants. *See Keryx*, 2014 WL 585658, at \*13 (finding that small sales that were not unusual in timing or amount failed to show scienter); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) ("the Individual Defendants, in almost every instance, increased their BMS holdings during the Class Period—a fact wholly inconsistent with fraudulent intent"); *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 720 (S.D.N.Y. 2018) (finding that plaintiffs failed to allege any facts suggesting that defendants sold stock for reasons other than

*Inc.*, 477 F. Supp. 3d 123, 137 (S.D.N.Y. 2020) ("[an] alternative explanation merely raises a factual dispute that the Court must resolve in plaintiff's favor at this stage and is therefore not enough to defeat th[e] inference of scienter").[29]

Defendants also argue that Plaintiff "cannot substantiate his allegation that Defendants had a motive to commit fraud when [Doyle] held a vast amount of NovoCure stock without a single alleged sale during the class period." MTD at 40-41. However, "the fact that multiple . . . executives sold stock" during the five-month Class Period for proceeds of $35 million, "outweighs the fact that one ([Doyle]) did not." *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 476 (S.D.N.Y. 2013). The absence of stock sales by Doyle says nothing about the motives of defendants Danziger and Cordova, who did sell stock. It also does not undermine the strong inference that Doyle knowingly or recklessly misled investors about the nature of the LUNAR results.

### 3. Defendants Have Not Presented a More Compelling Nonculpable Inference

Defendants' proffered benign inference—that they were excited about the LUNAR results and believed in good faith that they were profound and groundbreaking (MTD at 44-45) "misses the mark." *Ophthotech*, 2019 WL 4464802, at *17. Defendants may well have been enthusiastic that TTFields could help NSCLC patients—and had laudable intentions—but "the proper scienter inquiry is whether Defendants 'knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.'" *Id*. (quoting *Novak*, 216 F.3d at 308). *See, e.g.*, *Intercept Pharms.*, 2015 WL 915271, at *9 (rejecting argument that defendants did not act

---

tax purposes).

[29] Defendants make this argument based on their submission of Exhibits 20-22—Forms 4 that NovoCure filed with the SEC on Cordova's behalf. As discussed further in Plaintiff's Memorandum of Law in Support of Plaintiff's Motion to Strike Exhibits Submitted with Defendants' Motion to Dismiss, dated May 6, 2024, this argument should be rejected because a "Form 4 cannot be considered on a motion to dismiss to establish the truth of the matters asserted therein." *Pitman v. Immunovant, Inc.*, 2024 WL 964258, at *1 n.3 (E.D.N.Y. Feb. 25, 2024).

with scienter because they "reasonably believed the lipid finding would not have commercial significance"); *Delcath*, 36 F. Supp. 3d at 335-36 (rejecting argument that plaintiff did not plead scienter because "management honestly believe[d] its positive view of the data from its trials").

Defendants also assert that fraud was unlikely because its "exposure . . . was inevitable, and was only months away." MTD at 44. But a brief fraud is still a fraud. And this argument ignores that Defendants' misrepresentations and omissions prior to the disclosure of the LUNAR data allowed defendants Danziger and Cordova to sell their stock at artificially inflated prices.[30]

Taken collectively, the AC's allegations give rise to a strong inference that Defendants "were aware of information that contradicted [their] statements" (*Van Dongen*, 951 F. Supp. 2d at 473)— *i.e.*, that: (i) because PD-L1 scores were unavailable for 45% of patients, NovoCure could never show that the survival improvement was actually due to TTFields, rather than patients responding differently to ICIs because of differences in PD-L1 scores; and (ii) no subset of patients that had shown a statistically significant survival improvement met current standards of care. Defendants "'knew or, more importantly, should have known that they were misrepresenting material facts'" (*Novak*, 216 F.3d at 308) when they repeatedly described the LUNAR results as clinically meaningful and profound and issued assurances to analysts about the trial's balance and PD-L1 data. Defendants have not presented a more compelling nonculpable inference.[31]

### D. Plaintiff Has Pled a Control-Person Claim Under §20(a)

Because Plaintiff has adequately alleged a primary violation of §10(b), the Court should also

---

[30] In *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994), on which Defendants rely, there were no allegations of insider sales. MTD at 44.

[31] Since Doyle, Danziger, and Cordova had responsibility for NovoCure's activities during the Class Period, their scienter is imputed to NovoCure, and thus the AC also adequately pleads scienter for NovoCure. *See Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *Rex & Roberta Ling Living Tr. U/A Dec. 6, 1990 v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 409-10 (S.D.N.Y. 2018).

sustain the §20(a) control person claim.

## IV.    CONCLUSION

Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety.[32]

DATED:  May 6, 2024                          Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
ERIN W. BOARDMAN
MAGDALENE ECONOMOU


                                          */s/ Erin W. Boardman*
                                          ERIN W. BOARDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
eboardman@rgrdlaw.com
meconomou@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

---

[32]  If the Court grants Defendants' motion in whole or in part, Plaintiff respectfully requests leave to amend, which is typically freely given. *See Saskatchewan Healthcare Emp.'s Pension Plan*, 2024 WL 775195, at *33 ("district courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)"; granting leave to amend notwithstanding Individual Rule 3.D.).