**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WILLIAM E. BAZZELLE, SR., individually
and on behalf of all others similarly situated,

                                Plaintiff,

    vs.

NOVOCURE LIMITED, WILLIAM DOYLE,
ASAF DANZIGER and ASHLEY CORDOVA,

                              Defendants.

No. 1:23-cv-05146-GHW

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.    PLAINTIFF CANNOT IDENTIFY A FALSE OR MISLEADING STATEMENT ........... 2

    A.    The Complaint Fails In Its Entirety Because It Depends on a Critique of Trial
        Design ..................................................................................................................... 2

    B.    Even if Plaintiff's Allegations About LUNAR's Purported "Flaws" Were Not
        Barred Under *Kleinman*, They Could Not Support a Fraud Claim......................... 6

        1.    The market was fully informed about the divergence between LUNAR's
            patient population and the current standard of care ....................................6

        2.    In alleging imbalance in PD-L1 scores—or NovoCure's purported
            inability to dispel uncertainty about imbalance—Plaintiff fundamentally
            misapprehends scientific experimentation....................................................8

    C.    Statements About LUNAR's Topline Results Cannot Support a Fraud Claim..... 10

        1.    The challenged statements did not create a duty to disclose, and are
            demonstrably accurate, non-actionable, or both ........................................10

        2.    Plaintiff has not satisfied *Omnicare*'s requirements .................................13

    D.    Responses to Questions About PD-L1 Status Cannot Support a Fraud Claim..... 15

        1.    Plaintiff engages in a non-justiciable dispute over oncology ....................15

        2.    Plaintiff distorts or deliberately misreads the remaining challenged
            statements about PD-L1 scores...................................................................16

        3.    Plaintiff has not satisfied *Omnicare*'s requirements .................................18

    E.    Statements About Additional Trials Cannot Support a Fraud Claim .................... 19

II.   PLAINTIFF FAILS TO ESTABLISH A STRONG INFERENCE OF SCIENTER......... 20

    A.    Plaintiff Cannot Avoid the Substantive Standard, Which Is Intentional Deceit ... 20

    B.    Plaintiff Cannot Redeem Threadbare Allegations of "Access" ............................ 21

    C.    Plaintiff's Stock Sale Allegations Do Not Create a Strong Inference of Deceit... 23

    D.    Plaintiff's Two Additional Allegations Do Not Move the Needle ........................ 24

CONCLUSION....................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Decisions**

*Abady v. Lipocine*,
2023 WL 2938210 (D. Utah Apr. 13, 2023)............................................................................21

*Abely v. Aeterna Zentaris Inc.*,
2013 WL 2399869 (S.D.N.Y. May 29, 2013) ........................................................................5, 6

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)...........................................................................................13, 14, 19

*In re Amarin Corp. PLC Sec. Litig.*,
2021 WL 1171669 (D.N.J. Mar. 29, 2021)..............................................................................11

*Biondolillo v. Roche Holding AG*,
2018 WL 4562464 (D.N.J. Sept. 24, 2018) .............................................................................11

*Cachia v. Bellus Health Inc.*,
2022 WL 4367444 (S.D.N.Y. Sept. 21, 2022)...........................................................................4

*Christiansen v. Spectrum Pharm., Inc.*,
2024 WL 246020 (S.D.N.Y. Jan. 23, 2024) ...............................................................18, 20, 22

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)......................................................................................23

*In re Delcath Sys., Inc. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014).....................................................................................6, 13

*Emps.' Ret. Sys. of the City of Baton Rouge v. Macrogenics, Inc.*,
2021 WL 4459218 (D. Md. Sept. 29, 2021) ............................................................................11

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................................23

*In re Keryx Biopharm., Inc. Sec. Litig.*,
2014 WL 585658 (S.D.N.Y. Feb. 14, 2014)..........................................................................3, 11

*Kleinman v. Elan Corp.*,
706 F.3d 145 (2d Cir. 2013)........................................................................................................7

*Lehman v. Ohr Pharm. Inc.*,
2019 WL 4572765 (S.D.N.Y. Sept. 20, 2019).........................................................................21

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)........................................................................................17

*Micholle v. Ophthotech*,
   2019 WL 4464802 (S.D.N.Y. Sept. 18, 2019)....................................................................12, 15

*New England Carpenters Guar. Annuity & Pension Funds v. DeCarlo*,
   80 F.4th 158 (2d Cir. 2023) ............................................................................................14

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)............................................................................................21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)....................................................................................................13, 14

*In re Philip Morris Int'l, Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) ........................................................................................16, 19

*Pitman v. Immunovant, Inc.*,
   2024 WL 964258 (E.D.N.Y. Feb. 25, 2024)................................................................5, 21, 22

*Pitman v. Immunovant, Inc.*,
   2024 WL 1342737 (E.D.N.Y. Mar. 29, 2024)..................................................................5, 16

*In re Plug Power, Inc. Sec. Litig.*,
   2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022)........................................................................24

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
   2023 WL 3569068 (S.D.N.Y. May 19, 2023) ........................................................................10

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015)......................................................................................6, 7

*Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*,
   – F. Supp. 3d –, 2024 WL 775195 (S.D.N.Y. Feb. 26, 2024) ....................................12, 14, 15

*Schueneman v. Arena Pharmaceuticals, Inc.*,
   840 F.3d 698 (9th Cir. 2016) ............................................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................................................20

**INTRODUCTION**

Plaintiff's opposition underscores the fatal defects in the Amended Complaint. Defendants established that Plaintiff's claims depend on a critique of clinical trial design, and that under *Kleinman* and its progeny, such claims are not justiciable. Plaintiff argues strenuously that his claims are not about trial design, but his brief confirms that they are. In his brief, as in his complaint, Plaintiff contends that LUNAR's "serious flaws" rendered the results NovoCure reported "unreliable." That is indistinguishable from the theories of fraud courts have rejected under *Kleinman*. This pleading deficiency infects the entire complaint.

Plaintiff's attacks on the two principal groups of statements at issue fail for additional reasons. In the first group, Plaintiff challenges use of the terms "clinically meaningful" and "profound" to describe LUNAR's topline results. But these characterizations did not create a duty to disclose complete trial data and do not otherwise support a fraud claim. "Clinically meaningful" is objectively accurate, while "profound" is not actionable under controlling law. Plaintiff does not dispute that these statements are also opinions governed by *Omnicare*. He now specifies that he is challenging them under *Omnicare*'s omission prong—a point not apparent in the complaint. But he does not acknowledge, let alone satisfy, the requirements of that prong: particularized factual allegations about the basis of a speaker's opinion, including the inquiry and knowledge underlying it. Plaintiff says nothing at all about Defendants' basis for their challenged opinions.

The second group of statements relates to PD-L1 scores. These too are opinions, and here again Plaintiff says nothing about Defendants' basis for them. In addition, as Defendants pointed out in their opening brief, Plaintiff's claim is premised on conclusory contentions about oncology: Plaintiff offers no support for his assertion that PD-L1 scores are relevant to the efficacy of ICIs beyond the first line of treatment for lung cancer patients. In response, Plaintiff now asks the Court to consider an article not cited in the complaint. That is improper as a procedural matter. As a

1

substantive matter, Plaintiff's maneuver confirms that he is improperly asking the Court to adjudicate medical issues. Plaintiff similarly asks the Court to wade into statistics when he argues that NovoCure could not have reliably concluded that PD-L1 scores were balanced unless it had obtained scores for *more than* 55% of patients. Plaintiff does not specify how much more would have sufficed, and cannot explain how any debate about the issue could support a fraud claim.

Finally, Plaintiff's opposition cannot redeem the complaint's striking shortfall on scienter. Plaintiff does not dispute that many of his scienter allegations are boilerplate, but argues that they become meaningful when viewed in context with company-specific allegations. But those allegations too are most notable for what they lack—any reference to confidential witnesses, to internal documents, or to stock sales other than non-discretionary transactions consistent with prior trading patterns. Plaintiff points to no person, inside or outside of NovoCure, who even *disagreed* with the challenged statements, let alone to facts showing that Defendants did not believe in what they said about LUNAR's results, or sought to defraud investors. Plaintiff responds that he need not establish a strong inference of intentional deceit, but controlling law flatly contradicts him. Plaintiff's scienter allegations fail at every level.

## ARGUMENT

### I.    PLAINTIFF CANNOT IDENTIFY A FALSE OR MISLEADING STATEMENT

####     A.    The Complaint Fails In Its Entirety Because It Depends on a Critique of Trial Design

Under controlling law, Plaintiff cannot state a fraud claim based on purported flaws in the design of a clinical trial. Mot. 16–17, 22–23 (citing authorities). Plaintiff does not dispute this. He argues instead that his claim is not based on alleged design flaws. Opp. 29–32. But Plaintiff cannot save his allegations by arguing that they are something they clearly are not.

The complaint, amplified by Plaintiff's opposition brief, leaves no doubt that this case depends on the contention that LUNAR was a flawed trial. Plaintiff argues that Defendants "mischaracterize the AC as alleging that . . . the trial's *flawed* methodology '*undermined the reported topline results*.'" Opp. 29–30 (emphases added). But that is exactly what Plaintiff alleged. In the complaint, he states repeatedly that LUNAR was "marred by *serious flaws* and missing data that *rendered the purportedly favorable results unreliable*, uninterpretable, and clinically meaningless." ¶¶ 6, 58, 133, 137 (emphases added). There is no daylight between Plaintiff's allegations and Defendants' description of those allegations as attacks on trial design. And there is no doubt that such allegations cannot sustain a fraud claim. Courts following *Kleinman* have categorically rejected claims just like Plaintiff's. *In re Keryx Biopharm., Inc. Sec. Litig.*, 2014 WL 585658, at *9–11 (S.D.N.Y. Feb. 14, 2014) (dismissing case where "[t]he crux of plaintiffs' claim is that the design of the Phase 2 trial was *flawed*, and therefore the statistically significant *results it generated* were inherently *unreliable*") (emphases added); Mot. 16–17.

The matter is equally clear when Plaintiffs' two "serious flaws"—relating to changes in the standard of care and to the distribution of PD-L1 scores—are considered separately.

On the standard of care, Plaintiff accuses Defendants of "mischaracteriz[ing] the AC as alleging that LUNAR . . . 'did not match the evolving standard of care.'" Opp. 29. But that is again exactly what Plaintiff alleged—that LUNAR "did not incorporate the evolving standard of care for second-line treatment of NSCLC." ¶ 93(c) (cleaned up). Similarly, Plaintiff alleges that the change in the standard of care "meant that in order for the LUNAR trial to reflect current clinical practice—such that doctors were likely to consider TTFields as a second-line therapy if LUNAR was a success—the trial would need to enroll a patient population with a high rate of first-line ICI therapy." ¶ 51. An allegation about the population NovoCure "needed to enroll" is an

3

allegation about trial design.  And the law is clear that such allegations cannot support a fraud claim.  In a decision Defendants cited and Plaintiff ignores, a court in this District held that "second guessing a clinical trial's . . . enrollment criteria is not permitted under securities law."  *Cachia v. Bellus Health Inc.*, 2022 WL 4367444, at *5 (S.D.N.Y. Sept. 21, 2022); Mot. 19.

On PD-L1 scores, too, Plaintiff's claim is plainly premised on purported "flaws"— Plaintiff's term—in trial design.  Plaintiff alleges that "[b]ecause the effectiveness of ICIs is heavily impacted by PD-L1 scores, it was critical for the LUNAR trial's four subgroups to contain patient populations that were relatively balanced with respect to patients' PD-L1 scores."  ¶ 7.  Like the allegation about what was "needed," the allegation about what was "critical" relates to trial design—as does the contention that LUNAR did not satisfy these purported requirements.

Plaintiff responds that his "claim is not that the LUNAR results *were* skewed by patients responding differently to ICIs based on their PD-L1 scores," but instead that "NovoCure could not show that this had *not* occurred, absent a new trial."  Opp. 32 (emphases Plaintiff's).  Plaintiff is doubly wrong.  First, Plaintiff does in fact allege that distribution was skewed, or at least "likely" skewed:  He claims that the survival benefit "was likely due" to patients "receiving ICIs," as opposed to TTFields.  ¶ 10.  Less equivocally, he alleges that "the magnitude of the [survival] benefit reflect[ed] patients' PD-L1 scores, instead of being attributable to the addition of TTFields therapy."  ¶ 65.  Plaintiff's current disavowal does not change what he has pled.

As to the theory he now embraces, Plaintiff's claim that NovoCure cannot rule out the possibility of an imbalance driving results is just as plainly an attack on trial design.  ¶ 64.  It is a claim that NovoCure failed to screen for false positives.  Mot. 22.  Multiple courts have rejected such claims under *Kleinman*.  *Id.* (citing authorities).  Plaintiff offers no response to this point.

Plaintiff next contends that he is challenging not trial design but "statements."  Opp. 29–30.  That does not change the nature of his allegations either.  Two recent decisions in *Pitman v. Immunovant, Inc.* are instructive.  2024 WL 964258, at *4 (E.D.N.Y. Feb. 25, 2024) (report and recommendation); 2024 WL 1342737 (E.D.N.Y. Mar. 29, 2024) (adopting R&R).  The company in that case began monitoring patients' cholesterol in a Phase 2(b) study, and the results were sufficiently concerning that the trial was halted.  2024 WL 964258, at *4.  The plaintiff alleged trial flaws because the company did not monitor cholesterol in Phases 1 and 2(a).  *Id.*

The magistrate judge recommended dismissal and the plaintiff objected, arguing that she was challenging statements rather than trial design.  2024 WL 1342737, at *4.  The district judge overruled the objection and dismissed the case, finding the plaintiff's argument "difficult to reconcile" with her allegations.  *Id.*  Like Plaintiff here, the plaintiff there made pronouncements about what the trial "needed" to do.  *Id.* ("elevated cholesterol levels . . . needed to be monitored and assessed").  The court rejected the plaintiff's argument that she was challenging not trial design but the purported "failure to provide complete and accurate disclosures to investors" about alleged design flaws.  *Id.* at *5 (cleaned up).  The argument failed as a legal matter:  "Plaintiff's attempt to distinguish between [her] opposition to the design of the clinical trials, and [her] opposition to the statements Defendants made about the clinical trial . . . is not supported by the law."  *Id.* (citing *Keryx*, 2014 WL 585658, at *10).  That analysis applies equally to this case.  Plaintiff's insistence that he is not challenging trial design cannot be reconciled with his allegations, which are premised on LUNAR's purported "flaws."  The retreat to "statements" does not save the claim.

Plaintiff's authorities do not change the analysis.  Plaintiff cites *Abely v. Aeterna Zentaris Inc.*, in which the court noted that its function in a Section 10(b) case is to evaluate challenged statements rather than trial methodology.  2013 WL 2399869, at *7 (S.D.N.Y. May 29, 2013)

(citing *Kleinman v. Elan Corp.*, 706 F.3d 145 (2d Cir. 2013)). But the courts in *Abely* and *Kleinman* both *rejected* the plaintiffs' claims because they depended on a critique of trial design. Mot. 16–17. Invoking "statements"—the subject of virtually all Section 10(b) claims—is not a way out when the alleged falsity of the statements is premised on purported flaws in trial design. *Compare Abely*, 2013 WL 2399869, at \*2 (dismissing claim where "Plaintiff maintains that the design of this first stage was inherently flawed"), *with* ¶ 6 (LUNAR was "marred by serious flaws").

Plaintiff also cites *Delcath*, in which the court concluded that *Kleinman* did not apply. *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014). But that was because the plaintiffs' claim did not concern trial design at all.[1] *Delcath* does not help Plaintiff.[2]

### B. Even if Plaintiff's Allegations About LUNAR's Purported "Flaws" Were Not Barred Under *Kleinman*, They Could Not Support a Fraud Claim

Plaintiff's contentions about LUNAR's two purported flaws also fail on their own terms. This provides an independent basis for dismissal.

### 1. The market was fully informed about the divergence between LUNAR's patient population and the current standard of care

Defendants have established that the market knew that LUNAR's population had diverged from the current second-line NSCLC population in the U.S. Mot. 20–21. Although Plaintiff objects, improperly, to the Court's consideration of analyst reports he cited in the complaint, he does not dispute market knowledge. Opp. 30–31. When the market is aware of purportedly concealed information, there is no fraud. *E.g., In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 539–

---

[1] In *Delcath*, the company reported safety data for the treatment arm of a clinical trial—a 7% mortality rate—and said that the safety profile of the device tested was similar to that of other therapies. *Id.* at 331–32. The company did not disclose safety data on the control arm, which was much more favorable: No patient had died. *Id.* at 332. The data led to a disastrous review by the advisory committee evaluating the device, with one member stating that "the option which we are offering to the patient is, we're going to make your quality of life much worse and your risk is increased by 35 percent of dying." *Id.* at 327 (cleaned up). That has nothing to do with flaws in trial design.

[2] Plaintiff further contends that *Kleinman* does not apply because "[n]o interpretation of data [is] required" here. Opp. 33. That is plainly wrong. Plaintiff's case depends in its entirety on the premise that the complete LUNAR data undermined reported results, making them "uninterpretable" and "unreliable." *E.g.*, ¶ 6.

6

40 (S.D.N.Y. 2015) (dismissing claim where "much of the information" purportedly concealed "was publicly available"), *aff'd*, 816 F.3d 199 (2d Cir. 2016).  Plaintiff responds that investors "*did not know* that the purportedly 'clinically meaningful,' 'profound' and 'groundbreaking' results actually showed that *no* subset of patients *both*: (i) met current standards of care; and (ii) showed a statistically significant benefit with the addition of TTFields."  Opp. 31 (citation omitted).  But the information Plaintiff says NovoCure should have reported is simply Plaintiff's litigation position—the terms Plaintiff asserts are misleading, paired with Plaintiff's view of what the data showed or failed to show.  NovoCure was not required to anticipate—much less disclose— Plaintiff's theory of liability.  *E.g.*, *Kleinman*, 706 F.3d at 154 (companies "not required to adopt" negative views of clinical trial data later developed by plaintiffs).

At the same time, Plaintiff misconstrues the information NovoCure did disclose.  Investors knew that (1) fewer than half the patients in the trial had received the current U.S. standard of care in the first line, Mot. 20, and (2) the trial had failed to demonstrate statistical significance in the docetaxel cohort, Mot. 6.  The market readily grasped these points and their implications.  The analyst reports Plaintiff himself cites show that long before the purported corrective disclosure, analysts drew from NovoCure's reports the very conclusion Plaintiff claims was hidden—that "the commercial opportunity for lung [cancer] will be limited due to trial design."  Defs.' Ex. 14 at 3.[3]

Plaintiff's standard of care theory additionally fails because it is based on speculation about commercial uptake.  As Defendants have explained, allowing investors to assert fraud claims based on the premise that a better trial design would persuade more providers to prescribe a company's product is entirely contrary to *Kleinman* and its progeny.  Mot. 18 (citing *Keryx*, 2014 WL 585658,

---

[3] Plaintiff seeks to downplay the market's understanding of these facts, pointing to J.P. Morgan's post-ASCO statement that "just 2%" of the patients in the ICI cohort had received the current United States standard of care in the first line. Opp. 31.  But Plaintiff leaves out the same analyst's statement that the results reported at ASCO were "expected." Mot. 20; Defs.' Ex. 11 at 1.

at *1).  Plaintiff has no response to this.  His claim suffers from the further defect that neither he nor anyone else knows today how widely TTFields will be prescribed for NSCLC after FDA approval, let alone whether a different trial design would produce different commercial uptake results.  Mot. 20, 34–35.  Plaintiff has no response to this either.

### 2.    In alleging imbalance in PD-L1 scores—or NovoCure's purported inability to dispel uncertainty about imbalance—Plaintiff fundamentally misapprehends scientific experimentation

As discussed, Plaintiff's PD-L1 theory consists of two components, the first of which he now seeks to disavow.  *Supra* at 4.  Neither part of Plaintiff's attack can support a fraud claim.

Plaintiff's first contention is that ICIs rather than TTFields were responsible for the "magnitude" of TTFields' overall survival benefit, and were also "likely" responsible for the benefit itself.  ¶ 10.  That contention is plainly refuted by the fact that LUNAR was a controlled trial.  The survival benefit it established was the *difference* between survival rates for patients treated with ICIs alone and patients treated with both ICIs and TTFields.  Mot. 23.  Plaintiff responds that the control was not reliable because of "the PD-L1 issue."  Opp. 32 n.17.  But Plaintiff has alleged no fact remotely suggesting that PD-L1 scores were not balanced between treatment and control arms.  Mot. 24.  The trial was randomized, meaning no reason exists to believe scores were not balanced.  And the data NovoCure presented at ASCO show that low, medium, and high expressers of PD-L1 *were* balanced across all four groups.  Mot. 8.

Plaintiff's second argument is that because investigators obtained PD-L1 scores for only 55% of the LUNAR patients (83% of U.S. patients), NovoCure could never dispel concerns that an imbalance might be lurking in the remaining 45% (17% of U.S. patients).  ¶ 9.  Plaintiff ignores baseline characteristics of scientific experimentation generally and LUNAR in particular.  Specifically, in claiming that NovoCure could never rule out the possibility that imbalance had crept in notwithstanding randomization, Plaintiff is both stating the obvious and missing the point.

No clinical trial or other scientific experiment can *entirely* eliminate the chance that the outcome was caused by some factor other than the phenomenon being investigated.  But control and randomization reduce that possibility.  Just as importantly, other tools allow investigators to quantify that risk (which here was low).  NovoCure discussed these tools in its opening brief.  Mot. 24 (discussing "alpha" and p-values, and citing authorities).[4]  Indeed, the very concept of statistical significance is a reflection that uncertainty exists in all scientific experimentation—but that it can be quantified.

Rather than addressing these matters—save by asserting that they have "no bearing" here, Opp. 32 n.17—Plaintiff cites analysts who voiced concerns about missing PD-L1 data.  That does not begin to show that the challenged statements were false or misleading.  If anything, the analysts' statements support Defendants' position.  Plaintiff points to an analyst's comment that it would be "impossible . . . to draw a conclusion on efficacy without knowledge of PD-[L]1 status."  Opp. 6; ¶ 60.  But the analyst made that statement in January 2023, showing that the market was aware of the issue from the beginning.  Plaintiff also cites an analyst who noted that the "potential for imbalance . . . could invite skepticism around the results."  Opp. 6; ¶ 61.  This analyst too made the comment long before the purported corrective disclosure at ASCO—on March 17, 2023.

Against this market background, Plaintiff points to forward-looking statements about a later presentation of full trial results—that "the full data, including PD-[L]1 status will be presented later," and that NovoCure "expect[ed] to address all the issues with respect to balance and PD-L1 status" at ASCO.  Opp. 28 (quoting ¶¶ 84 and 108; brackets Plaintiff's).  Plaintiff complains that these statements constituted "assurances" that "implied that NovoCure had enough data to address

---

[4] As NovoCure explained, LUNAR's "alpha" value of 0.05 means that the trial would not be considered a success unless the likelihood of a false positive was 5% or less.  The p-value on the ICI arm of 0.03 means that the likelihood of the 7.7 month overall survival benefit occurring by chance was 3%.  Mot. 24.

concerns about whether PD-L1 imbalances has [sic] impacted LUNAR's results." *Id.*

Plaintiff deliberately misreads the statements. NovoCure did not promise a complete slate of PD-L1 scores. It did not "assure" the market that LUNAR's investigators had collected any particular percentage of scores, let alone whatever the inherently unknowable quantity of scores was that would alleviate "concerns." Nor was the market falsely reassured on the point. Again, in the midst of the putative class period, analysts understood that the full trial data "could present downside risk given the potential for imbalance/incomplete data on patient baseline PD-L1 levels . . . which could invite skepticism around the results." Defs.' Ex. 14 at 3.[5] In LUNAR as in other clinical trials, issues of uncertainty were addressed through standard statistical tools. NovoCure never "assured" investors that it could resolve those issues in any different or superior way.

C. **Statements About LUNAR's Topline Results Cannot Support a Fraud Claim**

In his opposition, Plaintiff groups together a number of statements he calls "characterizations of LUNAR." Opp. 22–25. Plaintiff now clarifies that within these statements, he challenges the terms "clinically meaningful," "profound," and "groundbreaking," but does not dispute that LUNAR's results were "statistically significant" or that the trial "met its primary endpoint." *Id.*[6] Plaintiff's attack on the challenged "characterizations" fails on multiple grounds.

1. **The challenged statements did not create a duty to disclose, and are demonstrably accurate, non-actionable, or both**

Defendants have established that companies developing innovative medical treatments

[5] Plaintiff argues that the Court should "credit [his] interpretation" that NovoCure's statements in fact *did* "impl[y]" that NovoCure would later present PD-L1 scores "for all or most patients." Opp. 19 n.8. Both the words of the challenged statements and the analyst reports Plaintiff cites refute that self-serving "interpretation."

[6] Plaintiff bolded the language "statistically significant" and "met its primary endpoint" in the complaint, but accuses Defendants of "misapprehension" in defending that language; he now says the bolding was for "context." Opp. 15 n.7. In an exhibit to the opposition, Plaintiff explains that newly added highlighting (not in the complaint) signifies that a statement is challenged, but that bolding (in the complaint) does not. Declaration of Erin Boardman, Ex. 1. Courts disfavor pleading techniques that leave them "mired in having to ascertain exactly which statements [are] allege[d] to be false or misleading," as the complaint here does. *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *8 n.9 (S.D.N.Y. May 19, 2023).

10

commonly report trial results in stages.  Mot. 13–15.  Typically, several months elapse between a company's announcement of topline results to investors and its detailed discussion of trial data in a medical setting.  *Id.*  Plaintiff does not dispute that this is both commonplace and consistent with a public company's disclosure duties under the federal securities laws.

Plaintiff nevertheless argues that NovoCure assumed and breached a duty to disclose because it did more than simply report topline results—it also "editorializ[ed]" about them.  Opp. 15.  According to Plaintiff, NovoCure's characterizations—particularly "clinically meaningful" and "profound"—distinguish this case from the many in which courts have recognized that companies may report topline or preliminary results without assuming a burden of completeness.

The case law utterly refutes Plaintiff's argument.  In the decisions NovoCure cited, defendants also "editorialized" when they reported topline results—but this did not create a duty to disclose more detailed data immediately, nor in any other way support a fraud claim.  Mot. 15; *Biondolillo v. Roche Holding AG*, 2018 WL 4562464, at *2 (D.N.J. Sept. 24, 2018) (characterizing topline results as "terrific news for patients because we're really talking about a curative setting here with early breast cancer"); *In re Amarin Corp. PLC Sec. Litig.*, 2021 WL 1171669, at *1 (D.N.J. Mar. 29, 2021) (characterizing topline results as "the single most[] significant advance in preventive cardiovascular drug therapy since the advent of statin therapy"), *aff'd*, 2022 WL 2128560 (3d Cir. June 9, 2022); *Emps.' Ret. Sys. of the City of Baton Rouge v. Macrogenics, Inc.*, 2021 WL 4459218, at *5 (D. Md. Sept. 29, 2021) (stating that positive preliminary results "provide[] us with greater upside opportunity for a commercial market"), *aff'd*, 61 F.3d 369 (4th Cir. 2023); *see also Keryx*, 2014 WL 585658, at *3 ("we're excited about the dramatic advantages we saw across all key efficacy parameters") (cleaned up).  Defendants prevailed in each case.

Plaintiff further seeks to distinguish these authorities by observing that the companies did

11

not make "inaccurate or incomplete statements." Opp. 20–21. That begs the question. The plaintiffs in those cases, like Plaintiff here, claimed the opposite—that rosy characterizations of topline results were misleadingly incomplete in the absence of data purportedly undermining them. As to accuracy, Plaintiff now concedes it: He does not dispute that LUNAR's results were statistically significant, or that the trial met its primary endpoint. *Supra* at 10.

NovoCure's characterization of trial results did not trigger any disclosure duty, and cannot support a fraud claim in any other way either. The challenged statements were demonstrably accurate, not actionable, or both. According to Plaintiff's selected analyst reports, "clinically meaningful" is a defined term within the oncology and investment community. Mot. 27. It refers to an increase in overall survival of more than three months, which LUNAR demonstrated both on the ICI arm and overall. *Id.* Plaintiff offers no response to this point.[7]

The other terms Plaintiff attacks—"profound," "groundbreaking," "crucial finding," "key achievement"—cannot support a fraud claim either. Plaintiff repeatedly cites this Court's recent ruling in *Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*, but the Court held there that "descriptive terms . . . that are to a large extent neither quantifiable nor factual, but rather subject to interpretation" are not actionable. – F. Supp. 3d –, 2024 WL 775195, at *26 (S.D.N.Y. Feb. 26, 2024) (cleaned up).[8] That is exactly the case with terms like "profound."

---

[7] Defendants also showed that at least one other court in this District has rejected an attack on the term "clinically meaningful." Mot. 27 (citing *Lehman v. Ohr Pharm. Inc.*, 2019 WL 4572765, at *4 (S.D.N.Y. Sept. 20, 2019), *aff'd*, 2021 WL 5986761 (2d Cir. 2021)). In response, Plaintiff cites *Ophthotech*, which involved a similar treatment and in which parts of the complaint survived dismissal. Opp. 24 n.11 (citing *Micholle v. Ophthotech*, 2019 WL 4464802, at *2 (S.D.N.Y. Sept. 18, 2019)). But the challenged statement in *Ophthotech* was "meaningful," not "clinically meaningful." 2019 WL 4464802, at *12. And the *Ophthotech* court noted that even "meaningful" cannot support a fraud claim when "reasonable minds could differ" about the matter. *Id.* at *12 n.16 (citing *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557 (S.D.N.Y. 2016)). That is the case here. Plaintiff does not show that it was unreasonable for NovoCure to use the term "clinically meaningful" in the same way the cancer research community uses it.

[8] This Court held that the plaintiffs in *Saskatchewan* had plausibly alleged that certain other statements were false or misleading in connection with their Securities Act claim, which was not governed by heightened pleading standards. *Id.* at *32. The Court dismissed the plaintiffs' Section 10(b) claim in its entirety on scienter grounds. *Id.* at *30.

Second Circuit law is in accord.  In *Abramson v. Newlink Genetics Corp.*, on which Plaintiff also relies heavily, the Second Circuit affirmed dismissal as to the company's statement that trial results were "encouraging."  965 F.3d 165, 173–74 (2d Cir. 2020).  The plaintiffs' theory was that this statement was misleading because the company was studying a patient population that differed from that in other trials—the sickest patients had been excluded.  *Id.*  The Second Circuit concluded that the plaintiffs' quarrel with the representativeness of the patient population could not support a fraud claim, particularly as to "indefinite statements of corporate optimism."  *Id.* at 173.

Plaintiff's authorities are not contrary.  Plaintiff says that *Delcath* is "particularly instructive," Opp. 17, but the statements at issue there were altogether different (and as discussed above, had nothing to do with trial design).  The company reported some safety data but omitted other data showing that its device could have been responsible for patient deaths.  *Delcath*, 36 F. Supp. 3d at 327; *supra* at 6 & n.1.  Neither the facts of *Delcath* nor the court's ruling have any bearing on whether unquantifiable characterizations of trial results like "groundbreaking" and "profound" can support a fraud claim.  Under *Abramson* and *Saskatchewan*, they cannot.

### 2. Plaintiff has not satisfied *Omnicare*'s requirements

Plaintiff's attack on NovoCure's characterization of trial results fails for an additional reason.  The challenged statements are opinions governed by *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015); Mot. 25–26 (discussing *Omnicare*).  Plaintiff does not dispute this—and cannot meet *Omnicare*'s requirements.

*Omnicare* carves out three narrow channels through which securities plaintiffs may challenge opinions. Mot. 25–26.  Plaintiff now indicates that he is attempting only to come within the second channel, related to certain kinds of omissions.  He argues that NovoCure "omitted the contrary facts" that only 2% of the patients in the ICI cohort received ICIs in the first line, and that this was the only cohort that experienced a statistically significant survival benefit.  Opp. 25.

13

Plaintiff fundamentally misunderstands *Omnicare*. The Supreme Court did not hold that *any* omission of contrary and material information makes an opinion misleading, as might be the case with a factual statement. *Omnicare* recognizes that opinion statements are different from fact statements, that investors regard the two kinds of statements differently, and that opinions can give rise to liability under an omission theory only in limited circumstances. 575 U.S. at 187–88. In a key insight, the Court explained that opinion statements can be understood to "convey facts about how the speaker has formed the opinion." *Id.* at 188. An opinion statement is thus actionable under an omission theory if—but only if—the omitted information concerns *the basis for the opinion. Id.* at 194. Investors must plead particularized facts about the "inquiry" and "knowledge" underlying a challenged opinion, which is "no small task." *Id. Abramson*, on which Plaintiff relies heavily, did not (and could not) vary this formulation. 965 F.3d at 175 (discussing *Omnicare*); *see also, e.g.*, *New England Carpenters Guar. Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 171 (2d Cir. 2023) (defendants are liable under *Omnicare*'s omission prong if "the statement omits information whose omission conveys false facts *about the speaker's basis for holding that view*") (emphasis added); *Saskatchewan*, 2024 WL 775195, at *19 (under omission prong, opinion statements may be misleading "if they omit material facts *about the speaker's inquiry into or knowledge concerning a statement of opinion*") (emphasis added; cleaned up).

Although Plaintiff invokes the omission prong, he does not allege what *Omnicare* requires. Plaintiff says nothing about the basis of Defendants' opinions. Mot. 31. He alleges nothing at all about Defendants' "inquiry," and nothing about their "knowledge" save for conclusory assertions about access to data. ¶ 128. Plaintiff disagrees with Defendants' positive characterizations of LUNAR's results, but that is not close to sufficient under *Omnicare*. Indeed, Plaintiff has not pled facts showing even that Defendants' opinions were *wrong*, let alone that Defendants misleadingly

omitted material information about the basis of those opinions.

**D.      Responses to Questions About PD-L1 Status Cannot Support a Fraud Claim**

Plaintiff labels Doyle's responses to questions about PD-L1 scores "assurances." *E.g.*, Opp. 10, 19, 34, 44; *supra* at 9–10.  That is misleading.  Doyle made four distinct statements or groups of statements about PD-L1 scores.  None can fairly be characterized as an assurance, and Plaintiff's claim fails as to each.  It also fails under *Omnicare*.

**1.      Plaintiff engages in a non-justiciable dispute over oncology**

On January 10, 2023, Doyle responded to a question about PD-L1 scores with the statement that PD-L1 status "has not shown any relevance in [the] second line."  ¶ 84.  Plaintiff's attack on this statement is impermissibly conclusory.  Mot. 29.  Plaintiff does no more than state that PD-L1 status *is* relevant in the second line.  ¶ 87.  Plaintiff's disagreement with Doyle about matters of oncology is also non-justiciable under *Kleinman* and its progeny.  Mot. 28–29, 31–32.

Plaintiff responds that he is not "required to plead scientific evidence."  Opp. 29.  But nor is the Court required to accept Plaintiff's conclusory and unsupported assertions about oncology.  Plaintiff's authorities underscore the point.  In *Ophthotech*, as here, analysts questioned the company about a potential imbalance in the control and treatment groups.  2019 WL 4464802, at *2.  Specifically, they asked whether larger lesions in the control group could have contributed to the positive outcome.  The CEO responded that this concern had "no validity."  *Id.* at *10.  Plaintiffs challenged that statement, alleging that patients with larger lesions were less likely to respond to treatment.  The court rejected this as a "wholly unsupported, conclusory assertion," and dismissed the claim.  *Id.* at *10–11.  That is exactly the nature of Plaintiff's assertion here that PD-L1 status is relevant in the second line, which is purely a question of oncology.

Plaintiff now tries to backfill by submitting a scientific journal article not cited in the complaint. Opp. 29.  That is wholly improper.  *Saskatchewan*, 2024 WL 775195, at *18 (declining

15

to consider article submitted by the same attorney as Plaintiff's because it "was not referenced in the complaint"). Plaintiff offers no justification for submitting the article, and there is none.

Although the article is outside the record, Plaintiff's resort to it confirms that he is improperly pursuing a dispute about science. If he were not, he would not need to rely on a "meta-analysis" of oncology trials. And even if the article were properly before the Court, it would show at most that disagreement may exist, based on other trials, as to whether PD-L1 status is significant in the second line. That cannot support a fraud claim. *In re Philip Morris Int'l, Inc. Sec. Litig.*, 89 F.4th 408, 420 (2d Cir. 2023) ("We have rejected the proposition that a mere dispute about the proper interpretation of [clinical trial] data can form a basis for liability under section 10(b) and Rule 10b-5.") (cleaned up).[9] Plaintiff cannot state a claim based on Doyle's statement that PD-L1 scores are irrelevant in the second line, nor on the closely related statement that PD-L1 status is a "red herring" in the second line.

> 2.    **Plaintiff distorts or deliberately misreads the remaining challenged statements about PD-L1 scores**

*__"Nothing unusual about the control group"; "nothing funky."__* After Doyle told investors that PD-L1 status was not relevant in the second line, he addressed the issue of PD-L1 status by reference to the control group. Defs.' Ex. 3 at 9. As Defendants have shown, Doyle addressed a well-understood phenomenon in clinical trials—underperformance in the control group, which can present a false impression of success in the treatment group. Mot. 28. Specifically, Doyle told the market that "there was nothing unusual about the control group," that "the controls behaved as

---

[9] Plaintiff seeks to distinguish *Philip Morris* on the ground that the FDA in that case ultimately agreed with the company's interpretation of clinical trial data. Opp. 34 n.19. But the *Philip Morris* court stated that FDA disagreement would not support a fraud claim either: "Defendants' statements about the implications of their data cannot be misleading merely because a regulatory body disagreed with defendants' conclusion." 89 F.4th at 420–21 (cleaned up); *see also, e.g.*, *Immunovant*, 2024 WL 1342737, at *9 (rejecting attempt to distinguish *Philip Morris* on the same basis). Here, neither the FDA nor anyone else—except Plaintiff, for litigation purposes—has disagreed with NovoCure's interpretation of the LUNAR data.

16

expected," and that "there was nothing funky here."  ¶ 84.  Plaintiff has alleged nothing suggesting that the control group performed other than as expected.  Mot. 28.

In response, Plaintiff tries to strip away context.  He repeatedly quotes the term "nothing funky" in isolation, eliminating the reference to the control group.  *E.g.*, Opp. 2, 19, 20, 33, 38.  That is improper.  The challenged statement must be assessed in context.  *E.g.*, *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 578 (S.D.N.Y. 2014).  In context, it is neither false nor misleading.

***"Arms were well balanced."***  Defendants established that the only facts before the Court show that PD-L1 scores were balanced across LUNAR's arms.  Mot. 30.  Although Plaintiff now argues that he is *not* alleging imbalance, *supra* at 4, he continues to attack Doyle's statement that the treatment and control arms "were well balanced," ¶ 84, and that "all the indications, as we announced in the press release show balance," ¶ 99.  Plaintiff argues that in stating that "all the indications . . . show balance," Doyle "implied that he had enough information to conclude that significant imbalances did not exist, when in fact he could not reliably make that determination given the high percentage of missing PD-L1 data."  Opp. 27–28.

Plaintiff is once again improperly asking the Court to adjudicate a dispute about science.  Plaintiff's argument is that NovoCure could not permissibly draw conclusions about efficacy unless it had PD-L1 data from *more than* 55% of patients (83% of U.S. patients).  But it is not this Court's job to determine what percentage of data is sufficient to confirm that randomization worked, or that the survival benefit was attributable to TTFields.  The Second Circuit has unmistakably held that such disputes lie outside the bounds of the securities laws.  Mot. 31–32 (citing *Philip Morris*, *Sanofi*, and *Kleinman*).

***"Full data, including PD-[L]1 status, will be presented later."***  Plaintiff attacks Doyle's statements that "the full data, including PD-[L]1 status will be presented later," and that NovoCure

17

"expect[ed] to address all the issues with respect to balance and PD-L1 status" at ASCO.  ¶¶ 84, 108; *supra* at 9–10.  Nothing about these statements is false or misleading.  Doyle told investors only that NovoCure would present all the PD-L1 data it had.  Doyle neither said nor implied that NovoCure had obtained PD-L1 data from all LUNAR patients.  *Supra* at 10.

Plaintiff nevertheless argues the statements misleadingly "indicat[ed]" that NovoCure had "enough data to address concerns" about PD-L1 balance "when, in fact, it did not."  Opp. 18.  That argument fails for the same reason Plaintiff's attack on statements about PD-L1 scores fails.  Under *Kleinman* and its progeny, the task of determining what share of the patient population is "enough" to address questions about potential imbalance does not fall to this Court.[10]

### 3.      Plaintiff has not satisfied *Omnicare*'s requirements

*Omnicare* applies to Doyle's opinion statements—that PD-L1 status is a red herring in the second line, that LUNAR's arms were well balanced, and that the control group performed as expected.[11]  Plaintiff again fails to satisfy *Omnicare*.  He pleads no facts about Doyle's basis for the challenged statements—nothing at all about the inquiry he made and nothing but conclusory allegations about knowledge.  *Supra* at 15.

Because he has failed to allege the required facts about the basis of the challenged opinions, Plaintiff simply recites purportedly omitted facts he believes support his own opinion that NovoCure can never dispel the possibility that the survival benefit was driven by an imbalance. He argues that when Doyle addressed PD-L1 scores, he "omitted the competing fact that PD-L1

---

[10] Plaintiff's authorities are not contrary.  *Christiansen v. Spectrum Pharmaceuticals, Inc.* did not relate to clinical trial results at all.  2024 WL 246020 (S.D.N.Y. Jan. 23, 2024).  The company said that a Phase 3 trial was "in progress" and that it had "randomized" patients to treatment groups; in reality, the company had not yet enrolled any patients. *Id.* at *4.  In *Schueneman v. Arena Pharmaceuticals, Inc.*, the company made a blanket statement that "all" trials it had conducted favored its case for approval; the reality was that the FDA had raised concerns about certain unfavorable results.  840 F.3d 698, 708 (9th Cir. 2016).  In neither case was the court required to accept the contention that a challenged statement implied something different from—and well beyond—what the company actually said.

[11] Plaintiff disputes that any of the PD-L1-related statements are opinions, but makes that contention in a footnote unsupported by argument or authority.  Opp. 21–22 n.9.  Statements interpreting trial results are opinions.  Mot. 26.

data was missing for 45% of patients—and so NovoCure could not tell whether the trial arms were well-balanced with respect to PD-L1 scores, or whether there was anything unusual about the PD-L1 scores of patients in the control group or anything funky about the trial." Opp. 27 (cleaned up).

That is insufficient under controlling law. The Second Circuit recently emphasized that it has "never held that a statement of opinion can be rendered actionable by the speaker's failure to mention the possibility of contrary opinions," and that "such a holding would violate the fundamental principle that the securities laws do not require the people in charge of an enterprise to take a gloomy, fearful, or defeatist view of the future." *Philip Morris*, 89 F.4th at 420 (cleaned up). *Omnicare*'s omission prong does not permit Plaintiff to brand as fraud Doyle's failure to adopt Plaintiff's own self-serving opinions.

As noted, Plaintiff relies heavily on the Second Circuit's decision in *Abramson*. But the statements at issue there were very different. 965 F.3d at 176; Opp. 22. The Chief Medical Officer in *Abramson* cited a 20-month survival rate for patients who did not receive the experimental treatment, and said that the cited rate was supported by "all the major studies"—an "apparently factual representation," in the view of the Second Circuit. 965 F.3d at 176. The plaintiffs claimed that relevant studies placed the survival rate between 25 and 43 months. *Id.* at 177. The dispute in *Abramson* related to quantifiable, verifiable facts.

That is distinct from the issue in this case. Plaintiff does not dispute the veracity of the topline results NovoCure presented. Plaintiff claims that NovoCure wrongly omitted from those results more detailed information that would have increased market skepticism about future commercial uptake. But again, Plaintiff pleads nothing about the inquiry or knowledge underlying Doyle's opinions about oncology or trial results. Under *Omnicare*, that is fatal.

### E.    Statements About Additional Trials Cannot Support a Fraud Claim

The three remaining statements Plaintiff challenges situated LUNAR within the context of

other trials NovoCure was conducting:  Defendants referred to a "transformational" period and to the "threshold" on which the Company stood.  ¶¶ 78, 82, 90.  These statements are protected by the PSLRA's safe harbor, are non-actionable expressions of corporate optimism, and are opinions as to which Plaintiff once again fails to meet *Omnicare*'s requirements.  Mot. at 33–35.

Plaintiff responds that the statements are not forward looking because they employ present-tense formulations such as "now standing on the threshold."  Opp. 35.  That is easily disposed of.  "[T]he fact that [a] statement was in the present tense does not mean it loses protection of the Safe Harbor."  *Spectrum*, 2024 WL 246020, at *13 (dismissing challenge to statement that company stands "on the cusp of" FDA approval).  A statement is forward looking if it relates to a product's future, *id.*, and that is plainly the case here.  Plaintiff also ignores a key point:  His proffered reasons for falsity are themselves forward looking and depend on speculation.  Mot. 34–35.  He claims that TTFields will "not be widely adopted," Opp. 35, but that is simply not knowable today.

As to corporate optimism, Plaintiff argues that the statements "reassure[d]" the market, "which removes them from the realm of puffery."  *Id.* at 34–35.  But "assurance" is Plaintiff's label; it does not reflect the words of the challenged statements.  *Supra* at 10.  References to "transformation" are optimistic projections about the future—not "reassurances" about trial data.

## II.    PLAINTIFF FAILS TO ESTABLISH A STRONG INFERENCE OF SCIENTER

### A.    Plaintiff Cannot Avoid the Substantive Standard, Which Is Intentional Deceit

In defending his scienter allegations, Plaintiff seeks to dodge the controlling substantive standard.  He labels "bizarre" Defendants' contention that Section 10(b) plaintiffs must establish a strong inference of "intentional deceit."  Opp. 36.  But that is exactly what controlling law requires.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (plaintiff must allege "intention to deceive, manipulate or defraud" with particularity).  Purportedly unreasonable

conduct does not establish an "intention to deceive."[12]

Resort to recklessness does not save Plaintiff either. Section 10(b) plaintiffs alleging recklessness must identify "specific instances" in which defendants learned facts contradicting their challenged statements. *Immunovant*, 2024 WL 964258, at *20. Plaintiff does not even purport to have met that standard.

### B.    Plaintiff Cannot Redeem Threadbare Allegations of "Access"

Plaintiff next seeks to convert his boilerplate allegations about "access" into something more by arguing that because "there is no reasonable dispute that Defendants were in possession of the LUNAR data," the Court can infer scienter. Opp. 36. That elides a key distinction. Access alone does not establish scienter; every company has access to its internal data, as do its executives. Mot. 36. Access to trial data does not and cannot establish that *Defendants understood the data* in the way Plaintiff purports to understand them—as "render[ing] the [topline] results unreliable, uninterpretable, and clinically meaningless." *E.g.*, ¶ 6. Access to—even knowledge of—raw facts is critically distinct from a belief that those facts render challenged statements misleading. *E.g.*, *Ohr Pharm.*, 2019 WL 4572765, at *6 ("Plaintiffs allege that Defendants had access to omitted facts and information, namely other trial data, that would have put [the company's] positive claims in the proper context"; court "rejects knowledge of this information as establishing scienter."); *Abady v. Lipocine*, 2023 WL 2938210, at *23 (D. Utah Apr. 13, 2023) (in omission case, "the PSLRA requires more than an allegation that the defendant knew the facts that were allegedly omitted"; complaint must show that "the defendant knew that failure to reveal the potentially

---

[12] Plaintiff cites *Novak v. Kasaks*, in which the Second Circuit asked whether Section 10(b) defendants "should have known that they were misrepresenting material facts." 216 F.3d 300, 308 (2d Cir. 2000). *Novak* predated *Tellabs*, and in any event the *Novak* court recognized the same nearly 50-year-old scienter standard the *Tellabs* Court cited. *Id.* at 306 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976), for the proposition that "no 'private cause of action for damages will lie under § 10(b) and Rule 10b-5 in the absence of any allegation of scienter—intent to deceive, manipulate, or defraud'"). *Novak*'s reference to "should have known" does not establish an alternative scienter jurisprudence based on negligence.

21

material fact would likely mislead investors").

Plaintiff alleges at most that Defendants had access to data that Plaintiff—not NovoCure—believes contradicted their statements. But disputes over the meaning of trial data do not show scienter any more than they show falsity. "In general, disagreement as to the interpretation of scientific data is not a basis upon which scienter can be sufficient[ly] pled." *Immunovant*, 2024 WL 964258, at *19 (citing *Philip Morris*, 89 F.4th at 420). In this case, moreover, Plaintiff does not show that anyone other than he himself, for litigation purposes, disputed Defendants' interpretation. He cites no differing views from employees or regulators; meanwhile, analysts "expected" the results announced on June 6. *Supra* at 7 n.3. Plaintiff seeks to brush off this obvious shortfall, arguing "this is not a case where it is necessary to rely on witnesses or reports," because Defendants either reviewed trial data or were purportedly reckless in failing to do so. Opp. 37 n.22. Again, Plaintiff misses the point of the scienter analysis. Plaintiff *assumes* that review of trial data could lead to only one conclusion—that the topline results were "unreliable, uninterpretable, and clinically meaningless." *E.g.*, ¶ 6. But he has not pled facts that come close to establishing that, nor shown that Defendants reached the conclusion he advocates.

In addition to "access," Plaintiff relies on the Individual Defendants' "highest-level" positions and on the fact that they discussed LUNAR with investors. Opp. 38. These boilerplate allegations do not distinguish Defendants from any generic corporate executive. Mot. 36 (citing authorities). They do not support a strong inference of intentional deceit.[13]

---

[13] Even taken on their own defective terms, these latter allegations fail notably as to Cordova in particular. Cordova is NovoCure's CFO, a "high-level" position that conspicuously does *not* suggest knowledge of detailed clinical trial data. *See, e.g.*, *Spectrum*, 2024 WL 246020, at *16 (dismissing on scienter grounds claims against CFO of company conducting clinical trials). Plaintiff stresses that Cordova was a "maker" of challenged statements in SEC filings, Opp. 42 n.27, but making a statement is the threshold for even theoretical liability under Section 10(b). It does not give rise to a strong inference of scienter.

### C.      Plaintiff's Stock Sale Allegations Do Not Create a Strong Inference of Deceit

Defendants established that Cordova's and Danziger's stock sales were non-discretionary and cannot support an inference of scienter.  Mot. 38–39 (citing authorities).  Plaintiff seeks to obscure the matter with arguments about the timing and amount of five other NovoCure employees' stock sales.  Opp. 39–40.  None of the five is a defendant, and their sales are irrelevant as a matter of law.  Mot. 41 n.15.  Plaintiff ignores Defendants' point and supporting authorities.

All of Cordova's sales, as Defendants showed, were involuntary, made by NovoCure to pay tax withholding when stock rights vested.  Mot. 38.  Plaintiff argues that such sales may be probative of scienter, but his authorities in no way bear this out.[14]  Plaintiff also asks the Court to ignore the SEC forms recording Cordova's sales, but even if the Court were to do so (it should not), Plaintiff could not show that the sales were unusual in timing and amount.  Plaintiff himself says that Cordova's sales amounted to less than 5% of her holdings.  Opp. 40.

Plaintiff does not dispute that Danziger's sales were non-discretionary under a Rule 10b5-1 trading plan cited in the complaint, ¶ 141, but suggests that such sales may be probative of scienter if the plan was executed during the class period.  Opp. 41–42.  Critically, however, Plaintiff *does not allege* that Danziger executed his plan during the class period:  Danziger's only sale occurred on the first day of the period.  ¶ 136.  Plaintiff argues that a plan is suspicious even if executed *before* the class period, so long as it post-dates some other event he deems important—here, NovoCure's receipt of raw trial data.  Opp. 41–42.  Even if that argument had legal support, Plaintiff has alleged no supporting facts—nothing suggesting that Danziger executed his plan

---

[14] In *comScore*, where misconduct was undisputed, the individual defendants sold 92%, 83% and 68% of their holdings.  *Fresno Cnty. Emps.' Ret. Ass'n v. comScore*, 268 F. Supp. 3d 526, 554–55 (S.D.N.Y. 2017).  The defendants did not argue that these massive sales were wholly non-discretionary.  The sales at issue in *WWE* were not made to pay taxes at all and were entirely discretionary:  The defendants there sold stock to fund a new sports league.  *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 477 F. Supp. 3d 123, 137 (S.D.N.Y. 2020).

during the narrow window between NovoCure's receipt of data in late 2022 and the sale on January 5, 2023.  Plaintiff argues that *Defendants* fail to "provide any information" that would place the execution of the plan outside of that narrow window.  *Id.* 42.  But *Plaintiff* bears the burden of pleading particularized facts in this area, not Defendants.  Mot. 39–40.

Even without the trading plan, Danziger's single sale would not be suspicious.  It matches a sale he made under similar circumstances in 2021.  Mot. 40.  Plaintiff argues that the earlier sale is not comparable because it is "unconnected to any misstatements or omissions."  Opp. 41.  But that is the whole point of comparing class-period with pre-class-period sales.  *E.g.*, *In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *15 (S.D.N.Y. Sept. 29, 2022).

The third individual defendant, Doyle, sold no stock at all.  Mot. 40–41.  Plaintiff brushes this off, arguing that he is not required to allege stock sales across the board.  Opp. 43.  He declines to address Defendants' authorities showing that Doyle's holdings undermine Plaintiff's scienter allegations, Mot. 41; as significantly, he disregards the fact that the scienter analysis is holistic.  The statements attributed to Cordova and Danziger, who are the targets of Plaintiff's stock sale allegations, are highly generalized opinions and non-actionable expressions of corporate optimism.  *Supra* at 10–13, 19–20.  Meanwhile, Doyle, who made every challenged statement about PD-L1 scores, sold no stock at all.  And Doyle made those statements only *after* Danziger's single sale on January 5, 2023, making his statements irrelevant to that sale.

Setting out the links of Plaintiff's stock sale theory reveals how nonsensical it is.  Plaintiff proposes that Doyle fraudulently inflated NovoCure's stock price for Danziger's financial benefit, in connection with a non-discretionary stock sale that had already closed, and that Doyle continued to do so for months thereafter for no apparent reason.  The Court should reject that theory.

### D.       Plaintiff's Two Additional Allegations Do Not Move the Needle

Plaintiff presses two additional scienter points, neither of which has merit.  First, Plaintiff

cites the termination of NovoCure's Chief Medical Officer. Opp. 38. As Defendants have shown, Plaintiff has alleged nothing tying the CMO to any alleged fraud, which makes the reference to his termination meaningless. Mot. 41–42. Plaintiff ignores the point. Second, Plaintiff insists that NovoCure's plans for additional trials "indicat[e]" that Defendants "recognized the implications of LUNAR's significant issues," Opp. 39, failing to address the fact that undertaking additional trials is the normal course for drug and device developers seeking to expand indications. Mot. 42. Most obviously, the first additional trial Plaintiff cites was designed to establish TTFields' efficacy in the *first-line* treatment of NSCLC, which LUNAR was never supposed to do. ¶ 116. Planning for that trial does not establish an intent to deceive the market about LUNAR.

Plaintiff's allegations finally fail to create a strong inference of fraud when considered holistically. Plaintiff has not marshaled a single fact showing that anyone inside or outside of NovoCure believed that any challenged statement was false or misleading, let alone that Defendants believed this. No confidential witness or document suggests even room for disagreement about the accuracy of Defendants' statements. The stock sales, meanwhile, do not add up. Plaintiff's interpretation of the data, crafted for purposes of litigation, cannot establish scienter, nor dispel the far stronger inference that Defendants communicated about LUNAR in the same good faith they applied and continue to apply in developing treatments for cancer patients.

## CONCLUSION

The Court should dismiss the Amended Complaint with prejudice.

Dated: June 11, 2024

SIDLEY AUSTIN LLP

/s/ *Francesca E. Brody*
Francesca E. Brody
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
fbrody@sidley.com

25

Hille R. Sheppard (admitted *pro hac vice*)
One South Dearborn
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036
hsheppard@sidley.com

Robin Wechkin (admitted *pro hac vice*)
8426 316th Place Southeast
Issaquah, Washington
Telephone:  (415) 439-1799
Facsimile:  (415) 772-7400
rwechkin@sidley.com

*Attorneys for Defendants NovoCure Limited,
William Doyle, Asaf Danziger, and Ashley
Cordova*

26